# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JOSE MEDIAVILLA

*Plaintiff,*

v.                                                    Case No. 14 CV 8624 (VSB)

THE CITY OF NEW YORK, el al
        *Defendants.*

**PLAINTIFFS MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND IN SUPPORT OF
PLAINTIFF'S CROSS-MOTION**

**JOSE MEDIAVILLA**,
Plaintiff

By

STECKLOW & THOMPSON

BY:     DAVID A. THOMPSON
        WYLIE M. STECKLOW
217 CENTRE STREET – 6TH FLOOR
NEW YORK   NY   10013
Phone:        212 566 8000
Fax:          212 202 4952
E-mail:       ECF@WylieLAW.com

TABLE OF CONTENTS

Table of Authorities ……………………………………………………………iii

I.    Facts……………………………………………………………..…1

II.   The Present Motion ………………………………………………..5

III.  The Applicable Legal Standards………… ……………………………6

      A.    The Summary Judgment Standard …………………………….6

      B.    The Use of Video on a Rule 56 Motion ………………………8

      C.    The Legal Standard for Claims Under Section 1983 ……………8

            Personal Involvement and Failure to Intervene …………..……8

      D.    The Legal Standard for False Arrest …………….……………10

            The Elements of the Cause of Action ……………..……10

            Probable Cause is an Affirmative Defense ……………..……10

            Defendants Bear the Burden to Establish the Existence
            Of Probable Cause ……………… …….…………..……11

            Probable Cause is a Question for the Factfinder If Facts
            Are In Dispute ………………….…..….……………..……12

            Individualized Probable Cause is Required for All Arrests ….13

      E.    Excessive Force ……………….……….……….……..……14

IV.   The Legal Standards for the Relevant Penal Statutes …………………....14

      A.    Menacing in the Third Degree …….…………….…………...14

      B.    Disorderly Conduct …………………………………………16

            Penal Law 240.20 (Disorderly Conduct) ………………………16

            Penal Law 240.20 (5) – Blocking Traffic ..………………………17

            Penal Law 240.20 (6) – Refusal to Disperse ………………… 18

C.      Obstructing Governmental Administration …………………………20

V.      First Amendment Jurisprudence …………………..…………………...…22

        A.      The Plaintiff Was Entitled to The Highest Level of
                First Amendment Protection …….…………………………………22

                The Plaintiff Was Engaged in First Amendment
                Protected Activity …….…………………………………………23

                The Defendants Have Not Established Content-Neutrality…………24

        B.      Even if Their Actions Were Content-Neutral, The
                Plaintiff's Arrest Violated His First Amendment Rights  ………….24

                The Defendants Have not Demonstrated A
                "Significant Government Interest" or Narrow Tailoring …………..25

                The Defendants Have not Demonstrated The
                Existence of an Alternate Forum ………………..………..………..26

                Police Enforcement on November 5, 2011 Violated
                the First Amendment Rights of the Plaintiff  ………………………27

VI.     The Cause of Action of First Amendment Retaliation  ……………………28

VII.    The November 12, 2011 Arrest ……………………….……………………29

VIII.   Qualified Immunity ……………………….…….……………………31

IX.     Monell ……………………….…… ………………….……………………..32

X.      Leave to Amend the Complaint Should Be Granted ………………………36

XI.     The Court Should Grant the Plaintiff's Cross-Motion
        To Extend the Time for Service of the First Amended Complaint ………39

XII.    Conclusion ……………………….…… ………………….……………………42

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 9

*Blue v. Koren*, 72 F.3d 1075, 1082-1083 (2d Cir. 1995) ............................................................ 31

*Broughton v. State*, 37 N.Y.2d 451 (1975) ..................................................... 13, 14, 32, 33

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)......................................................................... 10

*Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) ................................................... 31

*Davis v. Rodriguez*, 364 F.3d 424 (2d Cir. 2004)....................................................................... 13

*Dickerson v. Napolitano*, 604 F.3d 732 (2d Cir. N.Y. 2010) ......................................... 14, 33

*Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) ............................................. 31

*Fabrikant v. French,* 691 F.3d 193 (2d Cir. 2012) ................................................................... 10

*Garnett v. City of New York*, 2014 U.S. Dist. LEXIS 112440 (S.D.N.Y. Aug. 13, 2014) . 12

*Gomez v. City of New York*, 2008 U.S. Dist. LEXIS 41455 (S.D.N.Y. May 28, 2008) ..... 14, 33, 34

*Gonzalez v. City of Schenectady*, 728 F.3d 149 (2d Cir. N.Y. 2013)...................................... 34

*Guilbert v. Gardner*, 480 F.3d 140 (2d Cir. 2007) ................................................................... 10

*Guntlow v. Barbera*, 907 N.Y.S.2d 86 (N.Y. App. Div. 3d Dep't 2010)...................... 13, 32

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)................................................................................ 34

*Jaegly v. Couch*, 439 F.3d 149 (2d Cir. N.Y. 2006)................................................................... 13

*Jenkins v. City of New York*, 478 F.3d 76 (2d Cir. 2007) ......................................................... 35

*Ky. v. Graham*, 473 U.S. 159 (1985) .......................................................................................... 11

*Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir. N.Y. 2012) .................................................... 11

*Lozada v. Weilminster,* 2015 U.S. Dist. LEXIS 35955, * 56 (E.D.N.Y. Mar. 23, 2015) .. 31

*McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92 (2d Cir. 2009) ............................ 10

*O'Neill v. Krzeminski*, 839 F.2d 9 (2d Cir. 1988)..................................................................... 12

*Ornelas v. United States*, 517 U.S. 690 (1996) .................................................................. 14, 15

*People v. Weaver*, 16 N.Y.3d 123, 127 (2011) .......................................................................... 19

*Provost v. City of Newburgh*, 262 F.3d 146 (2d Cir. N.Y. 2001)............................................ 11

*Rivera v. Rochester Genesee Reg. Transp. Auth.*, 702 F.3d 685, 693 (2d Cir. 2012).... 10, 14, 33

*Rowley v. City of New York*, 2005 U.S. Dist. LEXIS 22241 (S.D.N.Y. Sept. 29, 2005) .... 10

*Travis v. Village of Dobbs Ferry*, 355 F. Supp. 2d 740, (S.D.N.Y. 2005) ............................. 12

*Trueman v. New York State Canal Corp.*, 451 Fed. Appx. 27 (2d Cir. N.Y. 2011) ... 13, 32

*Vt. Teddy Bear Co. v. 1-800-Beargram Co.*, 373 F.3d 241 (2d Cir. 2004) ........................ 10

*Weather v. City of Mt. Vernon*, 474 Fed. Appx. 821 (2d Cir. N.Y. 2012) ........................... 17

*Weyant v. Okst*, 101 F.3d 845 (2d Cir. N.Y. 1996).......................................................... 13, 32

*Wu v. City of New York*, 934 F. Supp. 581 (S.D.N.Y. 1996)........................................... 14, 33

*Zellner v. Summerlin*, 494 F.3d 344 (2d Cir. N.Y. 2007) ................................................. 15, 35

**Statutes**

Fed. R. Civ. P. 56(c) ...................................................................................................................... 9

*People v. Jones*, 9 N.Y.3d 259, 263 (2007)......................................................................... 19, 20

## I.     Facts

JOSE MEDIAVILLA served this country for seven years as a member of the
United States Marine Corps.  (Plaintiff 56.1 ¶ 60). After being honorably discharged, and
obtaining a college education, he moved to New York City. (Plaintiff 56.1 ¶ 61). In
September 2011, he became involved in Occupy Wall Street.  (Plaintiff 56.1 ¶ 62). On
Saturday, November 5, 2011, he joined others to celebrate the success of Bank Transfer
Day (Plaintiff 56.1 ¶ 58) which was the culmination of a month-long effort to move funds
from large institutional banks to smaller, community-minded credit unions. (Plaintiff 56.1
¶ 34).  He joined a march from Zuccotti Park towards Foley Square (Plaintiff 56.1 ¶ 59),
intending to climb the steps of the New York State Supreme Courthouse at 60 Centre
Street to celebrate the bank transfer day's success, and to talk more about the changes to
the world and to society that he believed peaceful protest could help achieve.  (Plaintiff
56.1 ¶ 35-36).

The NYPD would not let him, or the other protesters, onto the steps (Plaintiff 56.1
¶ 37), and eventually sought to push the protesters away from the Courthouse steps, the
Courthouse and the sidewalk in front of the courthouse. (Plaintiff 56.1 ¶ 44).  Jose
Mediavilla believed that the symbolism of ascending the courthouse steps to discuss
institutional inequality and changing the system, was specific and important to the
message the marchers were seeking to express that day. (Plaintiff 56.1 ¶ 36).  Jose
Mediavilla believed that the NYPD officers present were violating their oath of office,
which bound them to uphold the tenets of the United States Constitution, by breaking up
this peaceful assembly.  (Plaintiff 56.1 ¶ 63-64).

JOSE MEDIAVILLA had also taken an oath of office to uphold the rights guaranteed by the United States Constitution (Plaintiff 56.1 ¶ 60), and he believed that the NYPD, by violating their oath of office and the rights of the Occupiers, were violating the Constitution, (Plaintiff 56.1 ¶¶ 64, 66-67). To him, in simple military parlance, this was treason. (Plaintiff 56.1 ¶ 73).  JOSE MEDIAVILLA expressed that this was treason to the NYPD (Plaintiff 56.1 ¶¶ 73, 77, 79), and for this expressive speech, he was arrested, detained against his will, held for 24 hours, and forced to return to court a number of times over approximately fourteen months, before the case was adjourned in contemplation of dismissal, and then dismissed. (Plaintiff 56.1 ¶¶ 81, 90-95).

On Saturday November 12, 2011, JOSE MEDIAVILLA participated in a silent night march from Zuccotti Park, heading towards the Federal Reserve Bank (Plaintiff 56.1 ¶ 96).  Before reaching the bank, Jose Mediavilla was grabbed by an unknown officer wearing a blue community affairs shirt, taken into custody by PO Michael HO, and charged with a violation of a loitering statute (that he did **not** violate). (Plaintiff 56.1 ¶¶ 105, 112).  After ten hours of confinement, he was released. (Plaintiff 56.1 ¶¶ 114). He was forced to return to court twice before this case was dismissed. (Plaintiff 56.1 ¶¶ 117-118).

Since at least 2004, when the Republican National Convention ("RNC") was held, the City of New York was on notice that members of its police force would encounter protest on the sidewalks and streets of this great city on a regular basis. (Plaintiff 56.1 ¶¶ 119-120).  Due to the failure of proper policing in 2004 -- before, during, and after the RNC -- the City of New York and its taxpayers faced claims of unlawful arrest by hundreds of individuals. (Plaintiff 56.1 ¶ 120).  In the summer of 2011, the City of New

York learned that a large protest movement called Occupy Wall Street ("OWS") intended to occupy Wall Street and the financial center in downtown New York City, starting on September 17, 2011. (Plaintiff 56.1 ¶ 119). This knowledge gave the City of New York immediate awareness and actual notice that further protest would soon occur.

The City of New York failed to train its officers in First Amendment rights, and how to properly police such expressive speech activity. (Plaintiff 56.1 ¶ 137-146).  In recent OWS cases handled by this office, many police officers testified about the training received in policing First Amendment activity, and none were able to identify specific and proper training in policing First Amendment activity. (Plaintiff 56.1 ¶ 137-146). Most recalled some general training about state penal law and police practices in the six-month police academy, but nobody could specify any further training received thereafter. (Plaintiff 56.1 ¶ 137-146).  The NYPD officers deposed could not recall any specific First Amendment training they received, and at best, could only identify that the First Amendment relates to speech, without any understanding of how the amendment affects the policing of protests and other expressive speech activities. (Plaintiff 56.1 ¶¶ 137-146). Nor did they express any understanding of the proper and lawful enforcement of the disorderly conduct statute, especially as it relates to individuals engaged in First Amendment activity (as opposed to individuals not engaged in constitutionally protected activity). (Plaintiff 56.1 ¶¶ 131-146).

However, two high-ranking officers of the NYPD did have a good understanding of how to properly police First Amendment activity. (Plaintiff 56.1 ¶ 124-127). One of these two officers that understood the proper policing of First Amendment activity was the commanding officer of the NYPD training unit (called the Disorder Control Unit),

Deputy Inspector Anthony Raganella. (Plaintiff 56.1 ¶ 125).  Although the commanding officer of the unit responsible for police training understands the proper policing of First Amendment activity, he was never asked to use this understanding to train others.

Having notice of the constant need to police expressive speech activity, and the intent of Occupy Wall Street to engage in regular Fist Amendment activity in downtown Manhattan, the City of New York should have reviewed the proper policing of First Amendment activity with its highest ranking officers, and ensured proper training for the officers most likely to encounter such activity, as well as for those that would be tasked with making the difficult decisions of distinguishing arrestable disorderly conduct from non-arrestable Constitutionally, protected conduct.  The City of New York, instead, arranged for training in formations to break mass protest, baton training and pepper spray training. (Plaintiff 56.1 ¶ 121).  Instead of assigning officers who had a proper understanding of how to police First Amendment activity, such as Deputy Inspector Brandon Del Pozo, the then Commanding Officer of the 6th Precinct, with supervising the policing of Occupy Wall Street, the City of New York tasked Deputy Inspector Edward Winski to supervise and train the vast majority of officers responsible for policing Occupy Wall Street. (Plaintiff 56.1 ¶¶ 131-136).   As set out herein, and in the proposed second amended complaint, Deputy Inspector Edward Winski has virtually no understanding of the First Amendment rights and expressive speech activity, nor the need to observe more than mere inconvenience of pedestrians or vehicles in order to lawfully arrest an individual engaged in Fist Amendment activity for the offense of disorderly conduct.  (Plaintiff 56.1 ¶ 131-135).  Deputy Inspector Edward Winski regularly failed to read NYPD Legal Bulletins provided to him (Plaintiff 56.1 ¶ 136), and set in place a

standing policy for all of the officers policing Occupy Wall Street, that they should not engage in any conversation with members of Occupy Wall Street (Plaintiff 56.1 ¶ 70).  In so doing, he deprived his officers of their primary tool to handle non-violent situations, leaving them to resort to their remaining tools, such as violence and arrest, when dealing with protesters.

Due to the failure to properly train and supervise the officers who policed this expressive speech activity, members of Occupy Wall Street, including JOSE MEDIAVILLA suffered multiple violations of their constitutional rights to freedom of speech, freedom of assembly and freedom from unlawful arrest and confinement.  The City of New York knew or should have known that this would be the result of their failure to train and supervise their police force.  This deliberate indifference could have been avoided, and the rights guaranteed by the U.S. Constitution could have been honored.  Instead, more than eighty (80) separate litigations (for hundreds if not thousands of claims) have already been filed against the City of New York, in the Southern District of New York, arising out of actionable police conduct that resulted in constitutional violations at Occupy Wall Street activities (Plaintiff 56.1 ¶ 177).

## II.   The Present Motion

On May 28, 2015, the defendants' present motion was filed on behalf of Defendants City of New York, Michael Zielinksi, Steven Anger, Anthony Ciaramitaro, and Elissa Cokkinos.  No attorney has yet appeared on behalf of the other defendants, Daniel Albano, Frank Tloczkowski, and Bill Cook.  This motion does not seek relief on their behalf.

The defendants' motion was filed as a motion to dismiss under Rule 12(b)(6), but was largely based on material outside the pleadings.  Specifically, the defendants argued that video of the incident in which Mr. Mediavilla was arrested conclusively negated a cause of action.  The defendants also asked that the Court consider the motion as a motion for summary judgment

under Rule 12(d), if necessary to allow consideration of the submitted evidence.  (Def. Memo. P.4).

By letter dated June 9, 2015, the plaintiff notified the Court that the plaintiff consented, and the parties agreed, to conversion of the present motion to a motion to be decided pursuant to Rule 56.  The plaintiff sought leave to file a Rule 56.1 statement as part of its opposition to the motion, informing the Court that the defendants' position was the a Rule 56.1 statement was not necessary to be filed by either party.

By order dated June 12, 2015, the Court converted the present motion to one for summary judgment, and directed both parties to submit Rule 56.1 statements.

On July 7, 2015, the defendants filed their Rule 56.1 statement.  The defendants did not submit any additional evidentiary material.

The plaintiff now submits his opposition to the present Rule 56 motion, including this memorandum of law, the plaintiff's 56.1 statement, the annexed affirmation of Wylie M. Stecklow, and the exhibits annexed thereto.

## III.   The Applicable Legal Standards

### A.   The Summary Judgment Standard

Summary judgment is appropriate only when there is no genuine dispute as to material facts and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). Material facts are those that may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*  The court may not weigh the evidence, and must view the evidence in the light most favorable to the nonmoving party.  *Id.* at 255.

"The judge must ask not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (internal quotation marks and alterations omitted).

"It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief*." Johnson v. City of NY,* 2008 U.S. Dist. LEXIS 78984 (S.D.N.Y. 2008), *citing*, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law."

The defendants, as the party seeking summary judgment, bear the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"'A genuine issue exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'"  *Rivera v. Rochester Genesee Reg. Transp. Auth*., 702 F.3d 685, 693 (2d Cir. 2012) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)).  In determining whether a genuine dispute exists, the Court must "'constru[e] all the evidence in the light most favorable to the non-movant and draw[] all reasonable inferences in [her] favor.'" *Id.* (quoting *McBride v. BIC Consumer Prods. Mfg. Co*., 583 F.3d 92, 96 (2d Cir. 2009)).

A defendant who moves for summary judgment is on notice of all of the issues raised in the complaint, and must address these in its primary motion papers, or waive the right to seek summary judgment thereon.  *Rowley v. City of New York*, 2005 U.S. Dist. LEXIS 22241 (S.D.N.Y. Sept. 29, 2005).  Put another way, where a movant does not raise an issue in their primary moving papers, this means that the movant is not asking the court to render summary judgment on that issue.  *See Am. Home Assur. Co. v. Panalpina, Inc.*, 2011 U.S. Dist. LEXIS 16677 (S.D.N.Y. 2011).

If the moving party meets its initial burden, the opposing party must then "set forth specific facts showing that there is a genuine issue for trial" in order to defeat the motion.  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250.  However, if the moving party fails to meet its burden of production, them summary judgment must be denied even in the absence of opposition.  *See Fabrikant v. French,* 691 F.3d 193, 215 fn. 18 (2d Cir. 2012) (quoting *Vt. Teddy Bear Co. v. 1-*

*800-Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004)).  "The  nonmoving party does **not** need to

provide 'evidence in a form that would be admissible at trial in order to avoid summary

judgment.'" *Nofal v. Jumeirah Essex House*, 2010 U.S. Dist. LEXIS 128814, 11-12 (S.D.N.Y.

Dec. 3, 2010) (emphasis added) *(*quoting *Celotex*, 477 U.S. at 324).

      In the present case, the plaintiff bears the burden simply to show that he was arrested

without a warrant, and that he suffered harm as a result.  The defendants bear the burden on all

other factual and legal issues.

### B.      The Use of Video on a Rule 56 Motion

      "[E]ven when there is a video, courts must still draw reasonable inferences in the non-

moving party's favor." *Mack v. Howard*, No. 11-CV-00303-A F, 2014 U.S. Dist. LEXIS 82440,

2014 WL 2708468, at *1 (W.D.N.Y. June 16, 2014) (citing *Tolan v. Cotton*, 134 S.Ct. 1861, 188

L. Ed. 2d 895 (2014)).  *Accord Sanders v. City of New York*, 2015 U.S. Dist. LEXIS 42698

(E.D.N.Y. Jan. 7, 2015), adopted by 2015 U.S. Dist. LEXIS 40972 (S.D.N.Y. March 30, 2015).

      Where "conflicting interpretations" may be drawn from the same video, summary

judgment is not warranted.  *Mack*, 2014 U.S. Dist. LEXIS 82440 at *10-11 (citing *Holdeen v.*

*United States*, 186 F. Supp. 76, 78 (S.D.N.Y. 1960)).

      Relevant videotape "whose accuracy is unchallenged," may overcome the non-movant's

evidence only if "it so utterly discredits the opposing party's version that no reasonable juror

could fail to believe the version advanced by the moving party." *Zellner v. Summerlin*, 494 F.3d

344 (2d Cir. N.Y. 2007) (citing *Scott v. Harris*, 127 S. Ct. 1769, 1775-76, 167 L. Ed. 2d 686

(2007)).

### C.      The Legal Standard for Claims Under Section 1983

      "[T]o establish personal liability in a § 1983 action, it is enough to show that the official,

acting under color of state law, caused the deprivation of a federal right." *Lore v. City of*

*Syracuse,* 670 F.3d 127, 168 (2d Cir. N.Y. 2012) (quoting *Ky. v. Graham*, 473 U.S. 159, 166

(1985)).

### PERSONAL INVOLVEMENT AND FAILURE TO INTERVENE

Generally, a defendant is liable for a Constitutional wrong if they were personally involved in the wrong.  Personal involvement and liability can be established by showing that the defendant: "(i) personally participated in the alleged constitutional violation, (ii) was grossly negligent in supervising subordinates who committed the wrongful acts, or (iii) exhibited deliberate indifference to the rights of the plaintiff by failing to act on information indicating that unconstitutional acts were occurring."  *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. N.Y. 2001).

Multiple officers can be held liable for a single arrest. *See, e.g., Jackson v. City of New York*, 939 F. Supp. 2d 219 (E.D.N.Y. 2013).  A particular officer who was not the "arresting" officer still faces liability if he assisted in the arrest in some fashion.  *See Mack v. Town of Wallkill*, 253 F. Supp. 2d 552, 558 (S.D.N.Y. 2003) ("[A] non arresting officer directly involved in the arrest of plaintiff could be liable for false arrest.").

However, personal involvement is neither an element of, nor a requirement for, a claim for failure to intervene.  An officer may be held liable for preventable harm caused by the actions of other officers, if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and 93) the officer does not take reasonable steps to intervene."  Jackson, 939 F. Supp. 2d at 231.

 "A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers."  *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988).  "The requirement that an officer be personally involved in the arrest distinguishes a false arrest claim from a failure-to-intervene claim relating to an arrest, which imposes liability on an officer who is not personally involved in an arrest but nevertheless knew that an arrest lacked probable cause and did nothing to prevent it."  *Garnett v. City of New York*, 2014 U.S. Dist. LEXIS 112440 (S.D.N.Y. Aug. 13, 2014) (citing *Wong v. Yoo*, 649 F. Supp. 2d 34, 61 (E.D.N.Y. 2009), *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) and *Travis v. Village of Dobbs Ferry*, 355 F. Supp. 2d 740, 752-53 (S.D.N.Y. 2005)).

9

In this case, the defendants' personal involvement has been established.  Lieutenant Zielinski issued the orders and instructions that were the predicate to the plaintiff's arrest. (Def. 56.1 *passim*).  Lt. Cook shared this function with Lt. Zielinksi at the same time and location, and was physically involved in the plaintiff's arrest.  (Pl. 56.1 ¶¶ 45, 81-21).  Lieutenant Zielinski did so under the supervision of D.I. Cokkinos.  (Pl. 56.1 ¶ 76; Def. Video Ex C ) 7:57 – 07:58).  Lt. Albano was personally involved in placing the plaintiff in physical custody.  (Pl. 56.1 ¶¶22, 81-82).  Deputy Chief Anger was the Incident Commander at 60 Centre Street, and directed police activities there.  (Def. Exhibit D, 04:00 – 04:05).

### D.      The Legal Standard for False Arrest

#### THE ELEMENTS OF THE CAUSE OF ACTION

The elements of a claim of false arrest under § 1983 are substantially the same as the elements of a false arrest claim under New York law, and they are as follows: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged."  *Weyant v. Okst*, 101 F.3d 845, 853 (2d Cir. N.Y. 1996).  *See also Broughton v. State*, 37 N.Y.2d 451, 456 (1975).

#### PROBABLE CAUSE IS AN AFFIRMATIVE DEFENSE

A § 1983 claim for false arrest "derives from his Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." *Jaegly v. Couch*, 439 F.3d 149, 151-152 (2d Cir. N.Y. 2006) (citing *Weyant*, 101 F.3d at 852).  A warrantless arrest is "presumptively unlawful."  *Trueman v. New York State Canal Corp.*, 451 Fed. Appx. 27, 29 (2d Cir. N.Y. 2011) (citing *Guntlow v. Barbera*, 907 N.Y.S.2d 86, 90 (N.Y. App. Div. 3d Dep't 2010)).  The existence of probable cause constitutes an affirmative defense to a false arrest claim.  *See id*.

"[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a

crime." *Weyant*, 101 F.3d at 852 (citations omitted).  The court looks to the law of the state in which the arrest occurred in order to determine the existence or non-existence of probable cause. *See Jaegly*, 439 F.3d at 151-152.  *Accord Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004) ("In analyzing § 1983 claims for unconstitutional false arrest, we have generally looked to the law of the state in which the arrest occurred.")

### DEFENDANTS BEAR THE BURDEN TO ESTABLISH THE EXISTENCE OF PROBABLE CAUSE

"When an arrest is not made pursuant to a judicial warrant, the **defendant** in a false arrest case bears the burden of proving probable cause as an affirmative defense." *Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. N.Y. 2010) (emphasis added) (citing *Broughton*, 37 N.Y.2d at 458).  *See also Ackerson*, 702 F.3d at 19 (stating that probable cause is an "affirmative defense"); *Trueman.*, 451 Fed. Appx. at 29 (same).  *See also Gomez v. City of New York*, 2008 U.S. Dist. LEXIS 41455, 12-14 (S.D.N.Y. May 28, 2008)(Daniels, J.) ("where the arrest is made without a warrant, the government bears the burden of establishing probable cause")( citing *Wu v. City of New York*, 934 F. Supp. 581, 586 (S.D.N.Y. 1996)).

As explained in Broughton:

> Whenever there has been an arrest and imprisonment without a warrant, the officer has acted extra judicially and the presumption arises that such an arrest and imprisonment are unlawful.  The cases uniformly hold that where the arrest or imprisonment is extrajudicial, that is, without legal process or color of legal authority, it is not necessary to allege want of probable cause in a false imprisonment action. Indeed, the burden is on the defendant to prove the opposite. … As a matter of pleading the defendant has the burden of proving legal justification as an affirmative defense and the defendant will be precluded from introducing such evidence under a general denial. *Broughton*, 37 N.Y.2d at 458.

Here, the defendants have simply presented video showing the defendant police officers sweeping non-violent protestors into orange plastic netting, during which process the plaintiff was arrested.  Neither the video nor the defendants' 56.1 statement (which is solely based on the same video) demonstrate that the plaintiff actually did anything wrong.  As is explained below, if the plaintiff was not creating a "clear and present danger" to the community through his involvement in the protest, then he was not lawfully subject to arrest.  The defendants' 56.1

11

statement and video evidence do not even begin to reach this threshold of proof. Bearing the movants' burden, as well as the burden to establish probable cause as an affirmative defense, the defendants' motion should be denied.

### PROBABLE CAUSE IS A QUESTION FOR THE FACTFINDER IF FACTS ARE IN DISPUTE

Probable cause is a "mixed question of law and fact." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). As the Supreme Court explained in <u>Ornelas</u>:

> The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause. The first part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact.
> *Ornelas*, 517 U.S. at 696.

Where the factual portion of such a mixed law-fact question is disputed, the fact finder must determine these factual issues. *See Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. N.Y. 2007). As the Second Circuit explained: "If there is no dispute as to the material historical facts, the matter of whether the officer's conduct was objectively reasonable is an issue of law to be determined by the court. If there is such a dispute, however, the factual questions must be resolved by the fact finder." *Id.* at 368 (citations and quotations omitted).

In the present case, the defendants' meager factual showing fails to meet their burden of production on probable cause, let alone their burden to demonstrate that the case can be decided in their favor on this issue as a matter of law. To a large extent, the defendants have simply presented the Court with video, which is not continuous or comprehensive, and invited the Court to extrapolate from this video facts that the defendants themselves are unable to. For instance, although in order to show probable cause for the plaintiff's arrest on the charge of disorderly conduct, the defendant must establish a public harm in the nature of a breach of the peace, affecting a significant segment of the community (see authority cited below including *People v. Jones*, 9 N.Y.3d 259, 263 (2007)), the sole statement of fact concerning the community apart from the police and protestors is: "Pedestrians can be seen in the area walking in Foley Square, on

12

Worth Street, and on Lafayette Street." (Def. 56.1 ¶ 15). Based on the defendants' utter failure to address the legal standards with evidence and facts, the Court should grant summary judgment to the plaintiff. However, to the extent that the plaintiff's mere presentment of video can be said to raise factual issues at all, any dispute concerning the interpretation of the video is a matter for the jury.

## INDIVIDUALIZED PROBABLE CAUSE IS REQUIRED FOR ALL ARRESTS

The Constitution does not admit of the concept of collective guilt. "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt, [and] the belief of guilt must be particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citing *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)).

The requirement that probable cause be "particularized" to the individual to be seized has been called "individualized probable cause." *See Dinler v. City of New York*, 2012 U.S. Dist. LEXIS 141851 (S.D.N.Y. Sept. 30, 2012).

It is well-settled that probable cause to arrest an individual cannot arise solely due to that individual's mere presence within a group of people, some of whom may have committed an offense, or proximity to another individual for whom probable cause has been independently established. *See Dinler*, 2012 U.S. Dist. LEXIS 141851 at *49. The contrary idea, sometimes called "group probable cause," has been firmly rejected by the Supreme Court and the Second Circuit. *See Pringle*, 540 U.S. at 371; *Papineau*, 465 F.3d at 59; *Dinler*, 2012 U.S. Dist. LEXIS 141851 at *15-16. The police may not arrest someone if they do not have probable cause personally committed an offense and did not merely pertain to a group in which lawbreakers may have been included. *See id.* This requirement was clearly established well before the plaintiff's arrest. *Dinler*, 2012 U.S. Dist. LEXIS 141851 at *38 ("the law of individualized probable cause was clearly established well before August 31, 2004").

To a large extent, the defendants' motion depends on imposing on the plaintiff responsibility for the acts of an entire group. The defendants argue that if anyone among the protestors committed a wrong, that wrong justifies the arrest of the plaintiff. In fact, the

defendants have not shown that anyone committed a wrong, other than the police, but even if it were so, the defendants' allegations that the "crowd" or "the protestors" did this or that, do not establish probable cause for the arrest of the plaintiff individually.  For instance, the defendants' allegation that "Protestors pushed against the line of police to get through," while false (see plaintiff's responsive 56.1 ¶ 17-1 – 17-13), would not provide probable cause for the arrest of the plaintiff even if true, because the defendants provide no evidence that the plaintiff was involved in this conduct.

### E.   Excessive Force

The Second Circuit has held that the threshold for excessive force as a constitutional tort is low, where the plaintiff was falsely arrested.  *See Weather v. City of Mt. Vernon*, 474 Fed. Appx. 821, 824 (2d Cir. N.Y. 2012).   In Weather, the police officers twisted the plaintiff's arm and shoved him into a wall, apparently causing no injury.  The Second Circuit took into consideration the facts that the plaintiff was being arrested for a low-level, non-violent offense, and the plaintiff was in fact innocent, and affirmed defendants' liability for the Constitutional tort of excessive force.  The Second Circuit explained:  "The law protecting a person against excessive force in this situation is clearly established. Weather was breaking no law, was not resisting arrest, and was not placing himself or others in danger."

In this particular case, the plaintiff was pulled from behind and knocked to the ground, and, once he was on the ground, four to five police officers sat or kneeled on him while effecting his arrest.  (Pl. 56.1 ¶¶ 81-82; Def. Video Ex. D 14:45 – 14:55; Def. Video Ex. C 0*:50 – 09:10).  Where an arrest is allegedly unlawful – and presumptively so, given the lack of warrant – it is unreasonable to contend that violence which would be a felony if committed by a civilian is "*de minimus*" if committed by police during an unlawful arrest.

## IV.   The Legal Standards for the Relevant Penal Statutes

### A.   Menacing in the Third Degree

The defendants contend that the plaintiff committed the misdemeanor of menacing in the third degree (Penal Law § 120.15).  Penal Law 120.15 states:

> A person is guilty of menacing in the third degree when, by physical menace, he or she intentionally places or attempts to place another person in fear of death, imminent serious physical injury or physical injury.

The Second Circuit explained the statute as follows:

> The defendant must take a physical action with the intent to make another reasonably afraid of an imminent danger; that is, the perceived danger must be immediate.  **Oral statements alone do not constitute a physical menace and must be accompanied by a physical action beyond approaching someone to talk with them**. ..  Moreover, third-degree menacing requires a well-founded fear of imminent physical injury. When a complainant fails to testify to **actually being in fear of injury**, the evidence is insufficient to sustain a menacing conviction.  *Ackerson v. City of White Plains*, 702 F.3d 15, 20 (2d Cir. N.Y. 2012) (citations omitted, emphasis added).

In the defendants' memorandum of law (which of course is not evidentiary), the defendants argue the plaintiff committed the "action of lunging at" Lt. Zielinski, or "charging at Lt. Zielinski as he issued orders" amounted to the crime of menacing.  (Def. Memo, p. 13).

The defendants' representation as to what happened, however, is negated by the video. And, in their 56.1 statement, the defendants walk back the "lunging/charging" allegation, and simply say: "Lieutenant Zielinski turned away from plaintiff and took a step towards the building line.  Plaintiff followed closely behind the Lieutenant, shouting 'treason.'"  (Def. 56.1 ¶¶ 79-80).

Indeed, the video shows that the plaintiff did not 'lunge' at Lt. Zielinski, or do anything else that could cause a reasonable officer to believe that the plaintiff committed the crime of menacing.  Video shows the plaintiff's arrest, as well as approximately 15 seconds of police interaction with the plaintiff leading up to his arrest.  (Def. Video Ex. D 14:32 – 14:47).

The video shows Lt. Zielinski standing in front of a line of officers, facing a group of approximately 15 protestors, one of which was the plaintiff, Mr. Mediavilla.  Most of the protestors are standing still, apparently observing the activity of the police.  About half of them appear to be using a device to film or photograph what is happening.  None are acting in a violent or tumultuous manner.

"What you're doing is unlawful.  You are preventing a peaceful assembly.  This is breaking the law."  (Def. Video Ex. D 14:33 – 14:39).  At the same time, another protestor nearby

15

says the word "treason" several times.  The other protestors do not appear to be disturbed or alarmed by what Mr. Mediavilla is doing or saying.  Nor, for that matter, do any of the police appear to be in any way disturbed or alarmed.

Lt. Zielinski does not acknowledge Mr. Mediavilla. Instead, he says through the megaphone: "The sidewalk [is closed]. You need to move."  (Def. Video Ex. D 14:40 – 14:41).  Mr. Mediavilla (an honorably discharged marine) takes up the call of "treason" as Lt. Zielinski finishes his announcement.  (Def. Video Ex. D 14:41 – 14:42).

In the next three to four seconds, from Def. Video Ex. D 14:42 – 14:46 in, Lt. Zielinski turns to walk away from Mr. Mediavilla, taking approximately three steps away from him.  At this point, Lt. Zielinski's back is turned to the plaintiff.  The plaintiff takes a single step forward to follow.  The plaintiff's hands remain at his sides.  Lt. Zielinski unexpectedly stops and turns around.

In the next one to two seconds, Mr. Mediavilla, while moving no closer to Lt. Zielinski (in fact, while moving slightly away from him), says the word "treason" twice more.  (Def. Video Ex. D 14:46 – 14:47).  Lt. Zielinski displays no sign of fear.  However, Mr. Mediavilla is already being grabbed by other officers to be placed under arrest.  (Def. Video Ex. D 14:47).   In another six seconds, Mr. Mediavilla in on the ground with police all over him.

What the plaintiff did in "Plaintiff followed closely behind the Lieutenant, shouting 'treason,'" to use the defendants' words, simply approaching someone to speak with them is not "menacing."  *See Ackerson*, 702 F.3d at 21 ("Being tall, approaching someone, and asking them questions (even in an accusatory tone) does not arguably satisfy the elements of any crime.") (denying qualified immunity).  This is why, in arguing this point in their brief, the defendants felt compelled to spice up the facts by characterizing what the plaintiff did as "lunging" and "charging" at Lt. Zielinski, in defiance of the clear video record of the event.

### B.   Disorderly Conduct

### PENAL LAW 240.20 (DISORDERLY CONDUCT)

Section 240.20 New York Penal Law ("PL 240.20") defines the offense of disorderly conduct.  Disorderly conduct is a violation, not a misdemeanor, and is therefore not a crime.  In order to avoid Constitutional infirmity, each section of the disorderly conduct statutes incorporates the requirement of a manifest "intent to provoke a breach of the peace, or [intentional conduct] whereby a breach of the peace may be occasioned."  *People v. Jones*, 9 N.Y.3d 259, 263 (2007), and the statute is limited to conduct that creates or recklessly threatens a "breach of the peace."  *People v. Weaver*, 16 N.Y.3d 123, 127 (2011).  Breach of the peace, in turn, means a disturbance of real consequence to the community, a "disturbance … of the whole community, or of any sizeable segment thereof."  *People v. Chesnick*, 302 N.Y. 58, 61 (1950).  "In virtually all of our prior decisions, the validity of disorderly conduct charges has turned on the presence or absence of adequate proof of public harm."  *People v. Baker*, 20 N.Y.3d 354, 359 (2013).

### PENAL LAW 240.20(5) – BLOCKING TRAFFIC

Section 240.20(5) of the Penal Law states that "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, [h]e [or she] obstructs vehicular or pedestrian traffic." N.Y. Penal Law § 240.20(5).

"New York courts have interpreted this statute to permit punishment only where the conduct at issue does **more** than **merely inconvenience** pedestrian or vehicular traffic." *Papineau*, 465 F.3d at 59 (citing *People v. Pearl*, 66 Misc. 2d 502, 321 N.Y.S.2d 986, 987 (1st Dep't 1971)) (emphasis added).  Thus, the elements of 240.20(5) **have not been met** even where demonstrators block a sidewalk, "requiring [pedestrians] to enter the roadway to get to the other side," or "forc[ing] pedestrians out into the street." *Papineau*, 465 F.3d at 59 (quoting *Pearl*, 66 Misc. 2d 502 and *People v. Nixon*, 248 N.Y. 182, 185, 187 (1928)).

After Papineau was decided, the New York Court of Appeals reaffirmed the principle once again: "Something more than a mere inconvenience of pedestrians is required to support the charge" of disorderly conduct.  *People v. Jones*, 9 N.Y.3d 259, 262 (2007) (dismissing charge).  In Jones, the New York Court of Appeals found a 240.20(5) charge to be facially defective where

the arresting officer alleged that the defendants occupied the sidewalk so that "numerous pedestrians in the area had to walk around defendants." *Jones*, 9 N.Y.3d at 261.

The defendants do not come close to meeting this standard. The sole allegation relating to any effect that the protestors had on other pedestrians (if any) is: "'Pedestrians can be seen in the area walking in Foley Square, on Worth Street, and on Lafayette Street." (Def. 56.1 ¶ 15). All case law relating to protests presumes that non-protestor civilians will be somewhere to "be seen" in the vicinity of the protestors, because one of the principal goals of any protest is to "be seen" (and heard) by other citizens. Protestors do not violate the law simply by protesting in the general vicinity of other people. The defendants have not even alleged, much less shown, that any pedestrian was affected in any way, much less subjected to the "more than mere inconvenience" required by clearly established law. As a matter of law, the defendants have failed to establish this clearly-established and necessary element of this offense.

### PENAL LAW 240.20(6) - REFUSAL TO DISPERSE

Penal Law 240.20(6) provides: "A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof: He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse." Penal Law § 240.20(6).

The defendants cite two district or county court cases to argue that the requirement of a "lawful" order to disperse is satisfied by an order that is not "purely arbitrary." (Def. Memo. P. 11). There is a Court of Appeals case from 1932, People v. Galpern, 259 N.Y. 279 (1932), which originated this language (interpreting predecessor statute Penal Law § 722). However, well before the events at issue in this case, Galpern ceased to be good law. It was overruled by a string of subsequent Court of Appeals authority, in particular People v. Munafo, 50 N.Y.2d 326, 331 (N.Y. 1980), People v. Tichenor, 89 N.Y.2d 769, 777 (1997), People v. Jones, 9 N.Y.3d 259 (2007), and People v. Johnson, 22 N.Y.3d 1162, 1164 (2014).

The facts of Jones and Galpern are essentially identical. In Galpern, the court summarized the facts as follows: "the defendant did 'congregate' with five or six friends on a public street, even if he did so in an orderly and inoffensive way." *Galpern*, 259 N.Y. at 284. In

18

Jones, a police officer observed "defendant along with a number of other individuals standing around at the above location, to wit a public sidewalk, not moving." *Jones*, 9 N.Y.3d at 261.  In Jones, there was an added allegation – absent in Galpern -- that "numerous pedestrians in the area had to walk around defendants." *Id.*   In both cases, the police ordered the defendant to move on, and the defendant refused.  In 1932, in Galpern, the Court of Appeals held that the defendant was guilty of disorderly conduct because the order he disobeyed was not "purely arbitrary."  In 2007 in Jones, the Court of Appeals held that the complaint had to be dismissed for lack of facial sufficiency.

The Court of Appeals reaffirmed that same conclusion in a later case, in which "defendant stood with three other young men, reputed to be gang members, on a street corner, and the four refused to move when asked to do so by the police."  *People v. Johnson*, 22 N.Y.3d 1162, 1164 (2014).  The Court found that the defendant's arrest lacked probable cause, because the allegations were "not sufficient to satisfy the public harm element of the statute."  *Id.*  The Court of Appeals remarked that it had "made clear that evidence of actual or threatened public harm ('inconvenience, annoyance or alarm') is a necessary element of a valid disorderly conduct charge."  *Id.* (citing *People v Baker*, 20 NY3d 354 (2013); *People v Weaver*, 16 NY3d 123 (2011)).

These cases demonstrate that, where individuals are congregating, but are not causing public harm, any police order to disperse is not lawful, and the individual is free to disobey it.  If the law was otherwise, police could convert lawful protests in which individuals gathered without creating public harm, and convert them into 'unlawful' ones by the simple expedient of issuing an order to disperse, however baseless such an order might be.  The protection offered to demonstrators by the First Amendment in the context of Penal Law 240.20(5) would be rendered totally illusory by the unfettered use of 240.20(6).

As explained above, the defendants have presented no evidence whatsoever that the protest in general, and the plaintiff in particular, had any effect on the community at large, let alone an effect amounting to a "clear and present danger" of a "breach of the peace."  As People v. Jones and People v. Johnson show, it is not a crime to refuse to obey an order to leave, in the

19

absence of this necessary element of public harm.  The police orders to move on or disperse were

unlawful orders, because the plaintiff was engaged in First Amendment protested speech in a

traditional public forum, and was not committing any other offense when the orders were given.

The plaintiff had the right to remain exactly where he was, and the defendants had no right to

silence and arrest him.

### C.    Obstructing Governmental Administration

The defendants take the position that because the police department is – in general –

authorized to regulate traffic, that anything any individual police officer does which is in any way

related to that goal is an "authorized" function.  According to the defendants, it doesn't matter

whether the police officer is doing something lawful, unlawful, or even criminal: if it relates to

the activities set forth in the Charter, it is "authorized."  Similarly, it matters not whether the

police action is constitutional or unconstitutional, it is "authorized."  By this reading, the Charter

"authorizes" the police to violate other state laws, to violate federal laws, and to violate the

Constitution.[1]  In their view, anyone who "obstructs" such an "authorized" police activity is

guilty of obstructing governmental administration, notwithstanding that the police action was

unlawful, unconstitutional, or criminal.

On its face, this does not make much logical sense.   This, however, is the heart of the

defendants' argument: if the police officers' orders to disperse were unlawful, the plaintiff was

still guilty of obstructing governmental administration for failing to obey those unlawful orders.

If Penal Law § 195.05 actually purported to allow the police to violate a citizen's

constitutional rights, and then arrest that citizen if he "obstructed" the constitutional violation,

then the statute itself would be unconstitutional.  Similarly, if section 435 of the City Charter

purported to authorize unlawful, unconstitutional, or criminal activity by the police, it too would

---

[1]      Among other activities expressly "authorized" by section 435, the police are given the "power and duty" to "arrest all street mendicants and beggars," an activity which the Second Circuit declared unconstitutional in 1993.  *See Loper v. New York City Police Dep't*, 999 F.2d 699, 706 (2d Cir. N.Y. 1993). The City was later held in contempt of court for failure to obey this ruling.  *See Brown v. Kelly*, 609 F.3d 467, 472 (2d Cir. N.Y. 2010).

be unconstitutional.  The Court can avoid ruling on these constitutional questions, however, because the defendants' interpretation of the Charter and Penal Law § 195.05 is simply incorrect.

The police are empowered to exercise general police powers, such as controlling traffic, pursuant to section 435 of the Charter.  However, under well-established interpretation of Penal Law 195.05, it is not obstructing governmental administration to obstruct **unlawful** police conduct.  *See Cameron v. City of New York*, 598 F.3d 50, 68 (2d Cir. N.Y. 2010).  For example, it is not OGA to interfere in an arrest, if the arrest is without probable cause.  *See id*. ("In New York, however, for an arrest to be 'an official function,' it must be lawful."); *People v. Vogel*, 116 Misc. 2d 332, 333 (N.Y. App. Term 1982).  *Accord People v. Perez*, 47 A.D.3d 1192, 1193-1194 (N.Y. App. Div. 4th Dep't 2008), *app. den.*, 10 N.Y.3d 814.  *People v. Lupinacci*, 191 A.D.2d 589 (N.Y. App. Div. 2d Dep't 1993); *In re Jeremy B.,* 151 A.D.2d 314, 316 (N.Y. App. Div. 1st Dep't 1989) (restoring OGA charge for interference with an arrest upon finding of probable cause for the underlying arrest); *In re Verna C.*, 531 N.Y.S.2d 344, 345 (N.Y. App. Div. 2d Dep't 1988) ("the petition herein failed to allege facts which, if true, would establish that the underlying arrest, which was the official function performed by the police officer, was authorized by law. The petition therefore failed to allege facts sufficient to establish all the essential elements of the crimes of resisting arrest and of obstructing governmental administration.").[2]

For these reasons, police cannot issue an unlawful order to disperse – which would not satisfy the elements of 240.20(6) -- and then make an arrest for "obstructing" the officer's effort to enforce the unlawful order. "Obviously … one cannot be punished for failing to obey the command of an officer if that command is itself violative of the Constitution." *Wright v. Georgia*, 373 U.S. 284, 291-292 (1963).  *See also Dowling v. City of New York*, 2013 US Dist. LEXIS 142108. *10 (E.D.N.Y. 2013) (Failing to obey a police order, in and of itself, does not constitute a circumstance that gives rise to probable cause for an arrest for obstructing

---

[2]      New York Courts have similarly interpreted the Penal Law § 205.30 (resisting arrest), and Penal Law § 120.05(3) (assault on a police officer).  Neither offense will lie if the officer involved was acting unlawfully, such as by making an arrest without probable cause.  *See, e.g., Murphy v. Lynn*, 118 F.3d 938, 948 (2d Cir. N.Y. 1997) ("an arrest for resisting arrest is not lawful unless the arrest that was supposedly resisted was itself authorized, either by way of an arrest warrant or by the existence of probable cause"); *People v. Rivera*, 46 A.D.3d 349, 350 (N.Y. App. Div. 1st Dep't 2007), *app. den.,* 10 N.Y.3d 815 (no violation of Penal Law § 120.05(3) where officer was engaged in unlawful arrest).

government administration); *Jackson v. City of New York*, 939 F. Supp. 2d 219, 229-230 (E.D.N.Y. 2013).

## V.      First Amendment Jurisprudence

The police arrested the plaintiff without probable cause, because one or more of the elements of each of the offenses above was lacking.  This was a violation of the plaintiff's Fourth Amendment right to freedom from unreasonable seizure.  The plaintiff's arrest would have been a constitutional violation even if he had not been engaged in First Amendment protected speech when he was arrested.

However, because the plaintiff was engaged in core protected speech, the legal authority of the police to arrest the plaintiff was even more narrowly circumscribed than it would have been if the plaintiff had simply been hanging out with friends at the same time and location.

Activities that fall within the protection of the First Amendment must be treated differently by government actors such as police, than unprotected activities.  The First Amendment provides, in relevant part, that "Congress shall make no law … abridging the freedom of speech … or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." First Amendment freedoms "are delicate and vulnerable, as well as supremely precious in our society." NAACP v. Button, 371 U.S. 415, 433 (1963).

### A.      The Plaintiff Was Entitled to The Highest Level of First Amendment Protection

As the Second Circuit explained, in beginning the analysis of the manner in which the Court must apply the protections of the First Amendment to the circumstances at issue, the Court should "consider [1] whether Plaintiff[] [was] engaged in First Amendment protected activity [2] in a traditional public forum, and [3] if the restriction on speech was unrelated to content." *Marcavage v. City of New York*, 689 F.3d 98, 103 (2nd Cir. 2012) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 790-91 (1989)).

### THE PLAINTIFF WAS ENGAGED IN FIRST AMENDMENT PROTECTED ACTIVITY

22

The defendants concede that the plaintiff was participating in a political demonstration at the time of his arrest.  Political speech "is entitled to the fullest possible measure of constitutional protection."  *Marcavage*, 689 F.3d at 104 (quoting *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 816 (1984)).

## THE PLAINTIFF WAS SPEAKING IN A TRADITIONAL PUBLIC FORUM

"Sidewalks, of course, are among those areas of public property that traditionally have been held open to the public for expressive activities and are clearly within those areas of public property that may be considered, generally without further inquiry, to be public forum property."  *United States v. Grace*, 461 U.S. 171, 179 (1983).  Indeed, "public streets [are] the archetype of a traditional public forum,' and 'time out of mind public streets and sidewalks have been used for public assembly and debate.'"  *Snyder v. Phelps*, 562 U.S. 443, 456 (2011) (quoting *Frisby v. Schultz*, 487 U.S. 474, 480 (1988)).  In Grace, moreover, the Supreme Court recognized that a sidewalk in front of a courthouse (in that case, the sidewalks in front of the Supreme Court) is a traditional public forum.  Accord, *Grayned v. City of Rockford*, 408 U.S. 104, 117,  92 S. Ct. 2294, 2304 (1972) (Marshall, J) ("[W]e think it clear that the public sidewalk adjacent to school grounds may not be declared off limits for expressive speech activity by members of the public… Expressive action could certainly be restricted, but only if the forbidden conduct 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others.'" (citation omitted)).

The steps of 60 Centre Street, which the police closed off to protestors, were also a traditional public forum that the plaintiff and the others participating in the demonstration should have been given allowed to use.  *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992).  In Forsythe, the Supreme Court treated the courthouse steps as a public forum, when holding a licensing scheme for the use of the steps unconstitutional.  *See also United States v. Nicholson*, 263 A.2d 56, 57 (D.C. 1970) (A statute barring the use of the steps of Congress for protests was found constitutional **only** when judicially narrowed to apply only to speech activities that actually interfered with the functioning of Congress).

23

## THE DEFENDANTS HAVE NOT ESTABLISHED CONTENT-NEUTRALITY

There is no question that the Penal Law statutes at issue in this case are content neutral. However, that does not end the inquiry.  In <u>Marcavage</u>, the Second Circuit looked not to the neutrality of the statute pursuant to which the plaintiff was arrested, but to the neutrality of the policies put in place by the police to regulate protest activity at the particular time and place where the plaintiff was arrested.  The City, in that case, provided evidence demonstrating in detail what the nature of the policies were, so that the content-neutrality of the policies was clearly established.  The Second Circuit was able to explain the NYPD's policies in some detail.  The opinion explains: "The NYPD implemented a three-zone system outside the Garden: a demonstration area, a frozen area (with no pedestrian traffic), and a no-demonstration area," and goes on to describe the precise nature of the speech regulation in each of those zones. *Marcavage*, 689 F.3d at 101-102.  On this basis, concerning the location where the plaintiff was arrested, the Second Circuit was able to conclude: "The restriction on expressive activity was not aimed at the content of the message; no demonstrating of any kind was allowed in that zone." *Marcavage*, 689 F.3d at 104.

Here, the defendants have not stated what policy the police officers at the scene were applying to the protest, and so it is impossible for the Court to determine whether that policy was content-neutral, or not.  Moreover, the video and testimonial evidence shows that Lt. Zielinski announced to the protestors that there was "a hazard," when there was no hazard, and that the protestors were committing disorderly conduct when he knew they were not committing disorderly conduct, raises an inference that the policy the police were implementing was simply pretextual, and its purpose was to silence these speakers and their message.

### B.    Even If Their Actions Were Content-Neutral, The Plaintiff's Arrest Violated His First Amendment Rights

In <u>Marcavage</u>, the Second Circuit explained that a content-neutral restriction on speech "is properly characterized as a time, place, and manner restriction," and that "[s]uch restrictions are permissible if they: [1] are justified without reference to the content of the regulated speech, [2]  are narrowly tailored to serve a significant governmental interest, and [3] leave open ample

24

alternative channels for communication of the information." *Marcavage*, 689 F.3d at 104 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

"Defendants bear the burden of demonstrating that the regulation was constitutional." *Id.* (citing *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816-17 (2000)).

As discussed above, the defendants have not established content-neutrality, and so they are not entitled to the presumption, which the Second Circuit accorded to the City in Marcavage, that the first element of this three-part test is satisfied. However, as in Marcavage, the plaintiff will focus on the second and third elements of this test.

### THE DEFENDANTS HAVE NOT DEMONSTRATED A "SIGNIFICANT GOVERNMENT INTEREST" OR NARROW TAILORING

The defendants have not identified a particular governmental interest that the police were attempting to promote, except, in conclusory terms, that they were attempting to maintain "congestion-free sidewalks" and "order." (Def. Memo p. 10). This is insufficient. "The state may not infringe First Amendment rights on generalized and unsupported assertions that speech would clash with other governmental interests; real and substantial conflict must be demonstrated before constitutional rights may be abridged." *Eastern Connecticut Citizens Action Group v. Powers*, 723 F.2d 1050, 1055 (2d Cir. Conn. 1983).

Marcavage is once again instructive. There, a national political convention was being held in a facility, Madison Square Garden, that sits above a train station in which six major subway lines, the Path train, the Long Island Rail Road, and Amtrak all converged with their passengers. The neighborhood was already one of the busiest in Manhattan. The convention, of course, brought with it not merely thousands of participants, but special security concerns. As the Second Circuit explained:

> The stretch of Seventh Avenue in front of the Garden is a crowded
> thoroughfare even without major sports or political events at the Garden,
> with commuters, shoppers, tourists, residents, and other people passing
> through. … The police had to design measures to cope with a security
> challenge that was altogether extraordinary. The Convention was in the
> middle of New York City, adjacent to Penn Station. Fifty thousand
> attendees were expected for the Convention itself. Protesters of different
> persuasions would descend. Vehicle and pedestrian traffic would be re-

routed along two main arteries. The national conventions that year were the first following the 2001 terror attacks. The President was coming, as well as the Vice President and a host of other government officials. These facts, taken together, bespeak a significant--indeed, compelling-- government interest in security. *Id.* at 105.

None of these factors are present in this case.  Where Seventh Avenue is one of the busiest streets in Manhattan, on a Saturday (the day of the week of this incident) Foley Square is one of the least busy.  All sides of the plaza are zoned commercial, not residential.  Most of these buildings are government buildings, such as 60 Centre Street, which are either closed on Saturdays, or which perform only minimal functions.  There is a subway station entrance at Duane Street, although the principle entrances to those lines are at the Municipal Building and City Hall Park.  There is no other mass transit.  There is no shopping, and little tourism.  From building line to building line, Foley Square is approximately three times the width of Seventh Avenue.  Certainly, there was no location near 60 Centre Street that on November 5, 2011 was expecting "fifty thousand attendees," as well as the President, the Vice President and "a host" of other government officials.

In making their motion, the defendants have presented zero evidence of any governmental function, business, traffic, pedestrian, or residential interest that was, or was likely to be, affected in any way by the protest.  The sole allegation in any way relevant to these issues is the defendants statement that "[p]edestrians can be seen in the area walking in Foley Square, on Worth Street, and on Lafayette Street."  (Def. 56.1 ¶ 15).  This is not enough to demonstrate that there was a "significant governmental interest" in entirely removing the protestors from the sidewalk in front of 60 Centre Street.

The defendants' utter lack of evidence concerning the nature of the interests implicated also renders it impossible for the Court to determine whether the defendants' actions were "narrowly tailored" to such interests.  "In a First Amendment challenge, the government bears the burden of showing that its restriction of speech is justified under the traditional 'narrowly tailored' test." *Deegan v. City of Ithaca*, 444 F.3d 135, 142 (2d Cir. N.Y. 2006).  The defendants have failed to meet this burden.

26

## THE DEFENDANTS HAVE NOT DEMONSTRATED
## THE EXISTENCE OF AN ALTERNATE FORUM

The defendants' 56.1 does not assert that – at least prior to the arrest of the plaintiff – the police offered any alternate forum for the protest.  The defendants allege that the police began directing protestors across the street to "Foley Square," apparently meaning Thomas Paine Park, approximately a minute after the plaintiff had been arrested.  (Def. 56.1 ¶¶ 86-87 (citing Def. Ex. C 09:22-09:36; compare, plaintiff's arrest at Def. Ex. C 08:27).   Although the defendants have transcribed announcements made by Lt. Zielinski and other officers prior to the plaintiff's arrest (see Def. 56.1 ¶¶ 20, 24, 28, 33, 38, 41, 43-49, 52-54, 57-63, 77), none of these announcements informed the protestors that there was an alternative forum available to them across the street.

And, although the defendants have presented evidence that officers instructed people, **after** the plaintiff's arrest, to cross the street to Foley Square, the defendants have neither alleged nor presented evidence to show that further protest was in fact allowed across the street.  The defendants merely state: "There is no indication that officers issued any orders [sic], or attempted to disperse the group at Foley Square."  (Def. 56.1 ¶ 56).  Here, it is worth remembering that both as movants and under First Amendment jurisprudence, the defendants bear the burden to show the existence of an adequate alternative.  *See Marcavage*, 689 F.3d at 104.  The defendants have made no serious effort to meet that burden.

## POLICE ENFORCEMENT ON NOV. 5, 2011
## VIOLATED THE FIRST AMENDMENT RIGHTS OF THE PLAINTIFF

Where the police apply a facially valid law (such as Penal Law 240.20) in a manner that violates the First Amendment, the actions of the police are unlawful.  *See Deegan v. City of Ithaca*, 444 F.3d 135, 140 (2d Cir. N.Y. 2006).  In the First Amendment context, absent "clear and present danger," which has not been demonstrated by the defendants, "no objectively reasonable officer would have believed that he or she could have as a matter of law dispersed the demonstration."  *Papineau v. Parmley*, 465 F.3d 46, 60 (2d Cir. 2006) (section headline).

As the Second Circuit explained in Papineau:

> In the protest context, the Supreme Court has already well articulated the contours of the right and made clear that the police may not interfere with

27

demonstrations unless there is a "clear and present danger" of riot, imminent violence, interference with traffic or other immediate threat to public safety.  Neither energetic, even raucous, protesters who annoy or anger audiences, nor demonstrations that slow traffic or inconvenience pedestrians, justify police stopping or interrupting a public protest.  *Id.* at

The Second Circuit's opinion in <u>Marcavage</u> shows the depth of analysis required to justify the arrest of a person engaging in protest in a traditional public forum.  <u>Papineau</u> shows that where, as here, protest was not in contravention of a valid time place and manner restriction, the police may not invoke the Penal Law to disperse a protest or arrest its participants unless the protest presented a "clear and present danger" to the public.

## VI.     The Cause of Action of First Amendment Retaliation

To prevail on a First Amendment retaliation claim a plaintiff must show: "(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury."  *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) (citing *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)).

A plaintiff may show "improper motive [through]…'expressions by the officials regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken.'" *Anderson*, 817 F. Supp. 2d at 96 (quoting *Blue v. Koren*, 72 F.3d 1075, 1082-1083 (2d Cir. 1995)).

It has long been recognized that there a First Amendment retaliation claim lies whenever the defendants' improper actions "effectively chilled" the exercise of the plaintiff's First Amendment right." *Anderson v. City of N.Y.*, 817 F. Supp. 2d 77, 96 (E.D.N.Y. 2011) (citing *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)).  However, "[c]hilled speech is not the sine qua non of a First Amendment claim. A plaintiff has standing if he can show either that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm. Various non-speech related harms are sufficient to give a plaintiff standing." *Dorsett*, 732 F.3d 157.  Being arrested and charged with disorderly conduct is, by itself, sufficient harm.  *See Lozada v. Weilminster,* 2015 U.S. Dist. LEXIS 35955, * 56 (E.D.N.Y. Mar. 23, 2015).

28

Official reprisal for protected speech offends the Constitution because it threatens to inhibit exercise of the protected right, and the law is settled that as a general matter the Firs Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256, (2006).  Even when an action would be legal if undertaken for legitimate reasons, where the motivation to prevent a person from exercising her First Amendment rights is a but-for cause of the response, the individual's rights have been violated.  *See Crawford-El v. Britton*, 523 U.S. 574, 593 (U.S. 1998)To prevail on this claim, plaintiff must demonstrate that (1) she has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of her first Amendment right.  Curley v. Village of Suffern, 268 F.3d 65, 73 (2d Cir. 2001).  There is no need, in a retaliatory prosecution action, to meet the chilling prong of his analysis if the plaintiff can establish that the police lacked probable cause to arrest her." Holley v. County of Orange, et al, 625 F.Supp.2d 131 (20089 SDNY).

## VII.   The November 12, 2011 Arrest

The defendants sought to convert this motion to one for summary judgment, and, in concordance with the defendants' desire, this motion is now one that must be decided on the facts, not the pleadings.  As the movant, the defendants bore the burden to show that the undisputed facts require dismissal of this claim.  They have not done so.  Indeed, the have limited the "factual" presentation in their 56.1 concerning this claim to argumentative and immaterial statements calculated to support their (mistaken) contention that this claim was inadequately pled. In so doing, they have utterly failed to carry their burden as movants.

The elements of a claim of false arrest under § 1983 are substantially the same as the elements of a false arrest claim under New York law, and they are as follows: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise

privileged." *Weyant v. Okst*, 101 F.3d 845, 853 (2d Cir. N.Y. 1996). *See also Broughton v. State*, 37 N.Y.2d 451, 456 (1975).

A warrantless arrest is "presumptively unlawful." *Trueman v. New York State Canal Corp.*, 451 Fed. Appx. 27, 29 (2d Cir. N.Y. 2011) (citing *Guntlow v. Barbera*, 907 N.Y.S.2d 86, 90 (N.Y. App. Div. 3d Dep't 2010)). The existence of probable cause constitutes an affirmative defense to a false arrest claim. *See id*.

As the Second Circuit has held: "When an arrest is not made pursuant to a judicial warrant, the **defendant** in a false arrest case bears the burden of proving probable cause as an affirmative defense." *Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. N.Y. 2010) (emphasis added) (citing *Broughton*, 37 N.Y.2d at 458). *See also Ackerson*, 702 F.3d at 19 (stating that probable cause is an "affirmative defense"); *Trueman.*, 451 Fed. Appx. at 29 (same). *See also Gomez v. City of New York*, 2008 U.S. Dist. LEXIS 41455, 12-14 (S.D.N.Y. May 28, 2008)(Daniels, J.) ("where the arrest is made without a warrant, the government bears the burden of establishing probable cause")( citing *Wu v. City of New York*, 934 F. Supp. 581, 586 (S.D.N.Y. 1996)).

As explained in <u>Broughton</u>:

> Whenever there has been an arrest and imprisonment without a warrant, the officer has acted extra judicially and the presumption arises that such an arrest and imprisonment are unlawful. The cases uniformly hold that where the arrest or imprisonment is extrajudicial, that is, without legal process or color of legal authority, it is not necessary to allege want of probable cause in a false imprisonment action. Indeed, the burden is on the defendant to prove the opposite. ... As a matter of pleading the defendant has the burden of proving legal justification as an affirmative defense and the defendant will be precluded from introducing such evidence under a general denial. *Broughton*, 37 N.Y.2d at 458.

In relation to the plaintiff's November 12, 2011 arrest, the plaintiff alleged that he was engaged in a lawful activity (protesting), when he was subjected to a warrantless arrest. That is all that the plaintiff needs to allege to state a claim. The plaintiff not only stated a claim, but the elements of this claim are now undisputed facts. (Def. 56.1 ¶¶ 89-91). The defendants' gripes concerning the (admittedly laconic) pleading of this claim all relate to the plaintiff's failure to

plead facts which are not necessary to the plaintiff's claim, but which might help the defendants establish their affirmative defense of probable cause (assuming the defendants have any such defense – they have provided zero facts and evidence on this summary judgment motion indicating that they do).

But it must be emphasized: "The cases uniformly hold that … it is not necessary to allege want of probable cause in a false imprisonment action." *Broughton*, 37 N.Y.2d at 458. To the contrary, "the defendant has the burden of proving legal justification as an affirmative defense." *Id.*

The defendants complain that "[t]here is no mention within the amended complaint as to the location of plaintiff's arrest, the time of day in which the arrest/events occurred, the charges levied against plaintiff, or his own conduct." (Def. Memo p. 4). There doesn't have to be. Certainly, "the charges levied against the plaintiff" are not an element of a false arrest claim. It is quite possible to state a claim for false arrest even if no charges are filed. Neither is the plaintiff's "own conduct" an element of the claim, although it would be necessary for the defendants to allege and prove conduct by the plaintiff giving rise to probable cause (which they have not done). Especially where, as here, the defendants have admitted to the truth of the elements of the plaintiff's claim (Def. 56.1 ¶¶ 89-91), it cannot seriously be argued that failure to plead the exact location of the arrest, or the "time of day," renders the claim subject to dismissal.

## VIII.  Qualified Immunity

The doctrine of qualified immunity provides that "government officials are protected from liability only 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Gomez*, 2008 U.S. Dist. LEXIS 41455 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

It is clearly established that "the Fourth Amendment right to be free from unreasonable seizure includes the right to be free from arrest without probable cause." *Gomez*, 2008 U.S. Dist. LEXIS 41455 at *27 (citing *Jaegly*, 439 F.3d at 151 and *Weyant*, 101 F.3d at 852). "It is undisputed that freedom from false arrest, false imprisonment and malicious prosecution are

clearly established rights."   *Decker v. Campus*, 981 F. Supp. 851, 855 (S.D.N.Y. 1997) (*Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996)).

The right to be free from arrest without probable cause was clearly established well before the plaintiff's arrest on November 5, 2011.  *See Gonzalez v. City of Schenectady*, 728 F.3d 149, 157 (2d Cir. N.Y. 2013) (holding that the right was clearly established on or before May 16, 2006).

Thus, in a false arrest case, "[t]he essential inquiry in determining whether qualified immunity is available to an officer accused of false arrest is whether it was objectively reasonable for the officer to conclude that probable cause existed."  *Zellner*, 494 F.3d at 369-370 (citing *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007)).

As is the case for probable cause, qualified immunity is a mixed question of law and fact, and if there are disputed factual questions, the issue of qualified immunity must be decided by the fact finder.  *See Zellner*, 494 F.3d at 368.

In this case, the plaintiff was engaging in a peaceful protest in a traditional public forum. The defendants have offered no evidence that the plaintiff, or the protest generally, created any set of circumstances that justified dispersal of the protest.  The defendants have offered no evidence whatsoever that the plaintiff – or even the protest generally – inconvenienced any pedestrians, much less that they did "more than merely inconvenience" pedestrians as required by clearly established law.  No reasonable police officer could believe that it was lawful to arrest the plaintiff for blocking pedestrian traffic pursuant to Penal Law § 240.20(5) in the absence of 1) pedestrian traffic, and 2) more than mere inconvenience to such traffic.   For the same reasons, under clearly established law no reasonable police officer could believe that dispersal of the protest was lawful.  No reasonable officer would believe that it was lawful to arrest the plaintiff for failure to obey an **unlawful** order to disperse, whether under Penal Law §§ 240.20(6) or 195.05.  The plaintiff did not do more than approach Lt. Zielinski and speak to him, although "in an accusatory tone…[which] does not arguably satisfy the elements of any crime." *Ackerson*, 702 F.3d at 21 (denying qualified immunity).   The defendants are not entitled to qualified immunity.

# IX.   Monell

A municipality is liable for a deprivation of a citizen's rights pursuant to *42 U.S.C. § 1983* "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under *§ 1983.*" *Monell v. New York City Dept. of Social Services, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*. A municipality may be held liable for inadequate training, supervision or hiring where the failure to train, hire or supervise amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact. *City of Canton v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)*.  "To properly plead a Section 1983 claim against a municipality, plaintiff must allege three separate elements, (1) an official policy or custom that (2) subjected plaintiff to (3) a denial of a constitutional right."  *C.G. v. City of New York*, 2013 U.S. Dist. LEXIS 153020, *35 (E.D.N.Y. Oct. 24, 2013).

A claim for Monell based on a municipality's failure to train its employees can be stated where "the failure to train amounts to deliberate indifference to the rights" of those with whom the state officials will come into contact."  *City of Canton v. Harris*, 489 U.S. 378 (1989).   The Second Circuit set forth "three showings required to support a claim that a municipality's failure to train amounted to 'deliberate indifference' of the rights of citizens: (1) that a policymaker of the municipality knows to a moral certainty that its employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and (3) that the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights."  *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992) (citations omitted).

Throughout the past decade, from at least the 2004 Republican National Convention ("RNC"), the City of New York has been a focal point for protest concerning important matters of national concern, because the streets of New York are one of the few places that ordinary individuals can be heard in today's world of media conglomerates.  Well before the beginning of the Occupy Wall Street movement on September 17, 2011, the City of New York knew that its

33

police department would continuously be called upon to police street demonstrations.  By extension, the need to have a police force that was properly trained to perform this function was obvious.  For decades, it has been established that to be properly-trained in this function, police must be instructed that the First Amendment protects the right of street protestors to speak, and that it supersedes considerations of mere convenience that might be controlling in other circumstances.  Since at least the RNC, the City and its police department have known that the most common charges for which protestors are arrested in New York – by far – are Penal Law 240.20(5) & (6).  For decades, it has been well established that properly-trained police officers enforcing these statutes should know that an element of these offenses is public harm in the form of actual or threatened breach of the peace.

From the beginning of the Occupy Wall Street movement, it has been clear that the police department has not trained and instructed its officers to understand these basic and vital principles.  Making thousands of arrests in Manhattan alone, most of these for disorderly conduct, approximately 85% were either dismissed or were not prosecuted by the District Attorney's office because they were facially invalid.  Almost as many arrests fell into this latter category of 'decline to prosecute' (7.5%) as in the category of cases where guilt was established by trial or plea (15%).  This is a terrible record.  More terrible still is the police department's admitted disinterest in whether or not the arrests it makes in protest settings have sufficient basis to lead to convictions.  (Plaintiff 56.1 ¶ 176).

This terrible track record arises from the deployment of police officers, including high-ranking supervisors like Deputy Inspector Edward Winski, who have no correct understanding of the law applicable to policing protests, and who have received not training in that law.

The NYPD fails to properly train and supervise members of the service about the legal distinctions in the criminal application of disorderly conduct when people are engaged in expressive speech activity protected by the First Amendment to the United States Constitution.  Additionally, the NYPD fails to properly train the officers of the NYPD in relation to how the exercise of Constitutional Rights affects the policing of protests, including policing for the offense of disorderly conduct.

Statistics provided by the City of New York (via its agency the New York District Attorney's Office ("DANY")) show that during Occupy Wall Street, 2311 arrests were made. The statistics do not indicate what percent of these arrests involved expressive speech activity, though the parties would likely agree that a large percentage of these arrests were related to individuals involved in First Amendment activity. (Plaintiff 56.1 ¶ 176).

Moreover, the NYPD does not utilize this type of statistical analysis to review its arrest polices and training and supervision around arrest.  (Ex W Raganella Transcript: 94, Ex. TT Czark Transcript: 153).

Additional evidence pertaining to training, retention or supervision policies includes testimony from the following police officers:  Deputy Inspector Brandon Del Pozo (Ex U), Inspector Raganella (Ex W), Lieutenant Czark (Ex TT), Lieutenant Konstantinidis (Ex X), Detective Pastula (Ex Z), PO Brehm (Ex AA),  PO Rinelli (Ex BB).

Additional evidence pertaining to training, retention or supervision policies includes the report published in July 2012, "Suppressing Protest: Human Rights Violations In The U.S. Response To Occupy Wall Street" ("The Report"); wherein, the authors state, "In many instances, the… [NYPD] have responded aggressively to nonviolent protests, and have escalated situations —— through arbitrary or misapplications of the law, an excessive police presence, or the use of unwarranted force.  The police response has thus . . . undermined basic assembly and expression freedoms [and] [a]t times . . . presented a threat to the safety of New Yorkers."

Specifically, Plaintiff asserts that on November 5, 2011, the NYPD knowingly violated his Constitutional rights and those of hundreds of others present in front of 60 Centre Street. Plaintiff asserts that the NYPD present, that included more than one dozen high-ranking officers of Lieutenants, Captains, Deputy Inspectors rank, understood that they would be escalating this peaceful assembly to a tense stand-off.

Deputy Inspector Del Pozo testified that the NYPD understood that "[w]henever we stop a march or contain it, people get more confrontational. .some of it, out of genuine concern for their rights, and others, just they see it as an opportunity for confrontation. (Del Pozo, p 141).

35

The City of New York has a policy that favors commercial opportunities over First Amendment expressive speech activity.

Evidence of this policy includes the use of the New York State Supreme Courthouse for multiple television (Law & Order) shows, movies and private events (Vanity Fair Tribeca Film Festival opening night gala).  (Plaintiff 56.1 ¶ 157-162).

Further evidence of this policy includes the volume of individuals present and allowed to walk on Broadway between 38th and 45th Street in the days leading up to the Super Bowl in 2013. (Plaintiff 56.1 ¶ 148-155).

Further evidence of this policy can be seen when individuals line up on public sidewalks to buy new apple iphones, to buy ice cream in Little Italy, to buy fish in Chinatown, or to buy coffee from a faux reproduction of a famous television set, as well as red carpets for movie premieres or even to block off an entire sidewalk or city block for a film shoot. (Plaintiff 56.1 ¶ 16e-167).

The NYPD had a policy not to have its officers interact and communicate with members of Occupy Wall Street.  Evidence of this policy can be found in the deposition of Edward Winski, the Commanding Officer of the 1st Prcinct during Occupy Wall Street (the precinct that Zuccotti Park was located), testified that he instructed his officers not to speak with members of OWS. (Plaintiff 56.1 ¶ 70).

## X.   Leave to Amend the Complaint Should Be Granted

Plaintiffs now respectfully seek this Court's leave to file a second amended complaint pursuant to FRCP 15(a)(2), which states that "a party may amend its pleading… [with] the court's leave. The court should freely give leave [to amend] when justice so requires."  Above and beyond the liberal amendment standard that is explicitly enunciated in FRCP 15(a)(2), the Second Circuit has expressed a strong preference towards liberally allowing amendments. *See, e.g., Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990) ["When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." (Internal citations and quotation marks omitted)]; *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) ["The rule in this

Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith."]. Defendant City of New York cannot validly argue that it has been prejudiced by undue delay in this case.

Secondly, absent affirmative proof of prejudice or bad faith by nonmovants, leave to amend a complaint may be denied pursuant to Second Circuit standards where the proposed amended complaint would not be able to survive dismissal. *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999) (internal citation omitted).  As Plaintiff has set out above, the defendants have not satisfied their burden regarding summary judgment, and this proposed amended complaint has survived a dismissal review.

As a threshold matter, alleging any §1983 claim requires two elements: (1) the conduct in controversy must be committed by a person acting under color of state law, and (2) the conduct must deprive the plaintiff of rights, privileges, or immunities secured by the Constitution or the laws of the United States. Gomez v. Toledo, 446 U.S. 635, 640, 100 S. Ct. 1920 (1980).

In the Second Amended Complaint, Plaintiff introduce new specific allegations regarding the November 12, 2011 arrest, including identifying and naming the arresting officer, DEFENDANT MICHAEL HO. Moreover, the Plaintiff cited numerous testimony of officers of the NYPD showing that they are neither properly trained or educated in the law of disorderly conduct as it applies to First Amendment activity.  Additionally, Plaintiff has dismissed numerous officers named in the Amended Complaint, and replaced one officer with Deputy Inspector Tlockowski.  Additionally, there were more than a dozen white shirt supervisor officers present, including Chief, Deputy Inspectors and Lieutenants, who either made the decision to close the stairwell and then the sidewalk, or failed to intervene to stop this conduct.

Defendant Lt. Zielinski testified that these decisions were made above his rank. (Ex N (ii)).

"[Justice] requires leave to amend when the moving party has demonstrated at least colorable grounds for the proposed amendment." *Martinez v. Robinson*, 2001 WL 498407 (S.D.N.Y.), *quoting Walton v. Waldron,* 886 F.Supp. 981, 984-85 (N.D.N.Y.1995). Here, the

Plaintiffs have shown colorable grounds for amendment, and should be granted leave to amend in keeping with the Second Circuit's liberal amendment standards.

The Plaintiffs' request for leave to file a proposed Second Amended Complaint ("Amended Complaint") should be reviewed under the three-pronged prejudice standard enunciated by the Second Circuit.  "The rule in this Circuit has been to allow a party to amend its pleadings **in the absence of a showing by the nonmovant of prejudice or bad faith**." *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993); *citing State Teachers Retirement Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir. 1981) (emphasis added).

The Second Circuit has set down a three-pronged approach to analyze claims of prejudice in a Leave to Amend setting:

> In determining what constitutes 'prejudice,' we consider whether the assertion of the new claim[s] would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii)  prevent the… [opposing party] from bringing a timely action in another jurisdiction." Block at 350 (2d Cir. 1993); *citing* Tokio Marine & Fire Ins. Co. v. Employers Ins. of Wausau, 786 F.2d 101, 103 (2d Cir. 1986); State Teachers Retirement Bd. v. Fluor Corp., 654 F.2d at 856; Strauss v. Douglas Aircraft Co., 404 F.2d 1152, 1157-58 (2d Cir. 1968); Calloway v. Marvel Entertainment Group, 110 F.R.D. 45, 48 (S.D.N.Y. 1986).

The Second Circuit has repeatedly recognized that prejudice is less likely to accrue to an opposing party when that party was in possession of the facts supporting the proposed amended claims.  *Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 284 (2d Cir. 2000); *citing Block* at 350-51; *Han v. Mobil Oil Corp.,* 73 F.3d 872, 877-78 (9th Cir. 1995).   All of the new facts pled in the Proposed Second Amended Complaint regarding the two incidents of November 5, 2011 and November 12, 2011 were in possession of the City of New York.

Additionally, the vast preponderance of the new facts pled in support of Plaintiffs' amplified Monell claims were drawn from exhibits and deposition testimony wherein the City was a party, and represented by some of the very same counsel as those involved in the current litigation.

Local Rule 83.10 (6) allows for an amended complaint to be filed to name additional defendants without leave of the presiding judge within six weeks after the first defendant files its answer. This rule does not set out specifically that this amended complaint as of right would be waived if a prior amended complaint had been filed.  As such, the Local Rule 83.10 is ambiguous at best, and the Plaintiff should be granted his request to file the Second Amended Complaint.

## XI.    The Court Should Grant the Plaintiff's Cross-Motion To Extend the Time For Service of the First Amended Complaint

The complaint was filed on October 29, 2014, naming the City of New York and Chief Anger, PO Ciaramitaro and Lieutenant Zielinski.  (Plaintiff 56.1 ¶ 1).  On November 5, 2014, the First Amended Complaint was filed adding additional defendants to the complaint (Plaintiff 56.1 ¶ 2).  The City of New York was served with the original complaint on or about October 29, 2014 and the First Amended Complaint via ECF on November 5, 2014. (Plaintiff 56.1 ¶ 3).  On December 5, 2014 service of the First Amended Complaint was made upon Defendants Zielinski, Ciarmitaro, and Anger.  (Plaintiff 56.1 ¶ 4).  When, ninety-three days after service upon them, these defendants had not appeared or answered, counsel for the plaintiff contacted the City of New York Law Department and informed them that nobody had yet filed an appearance on this matter.  Later that same day, ACC Lucas filed a notice of appearance (Plaintiff 56.1 ¶ 5).  The remaining defendants were served on March 9, 2015, which was 124 days after filing.  The plaintiff now cross-moves this court to extend the time to serve these defendants, either through new service to be performed after this motion is decided, or by an order directing the defendants to accept the service performed on March 9, 2015 *nunc pro tunc*.

*Fed R. Civ. Pro* 4(m) states that "[i]f a defendant is not served within 120 days after the complaint is filed, the court--on motion or on its own after notice to the plaintiff--must dismiss the action without prejudice against that defendant **or order that service be made within a specified time.**" (emphasis added).  This authorizes a court on its own discretion to relieve the consequences of a plaintiff's error in effecting service, without requiring a showing of "good cause." *Fed R. Civ. Pro* 4(m); *Notes of Advisory Committee on Rules—1993 Amendment*.  The amendment of the rule

39

The advisory committee noted that the purpose of the amendment was to "explicitly …

authorize[] the court to relieve a plaintiff of the consequences of an application of this subdivision

even if there is no good cause shown."  *See* Fed. R. Civ. Pro. § 4 (Notes of Advisory Committee

on 1993 amendments).  Henderson v. United States, 517 U.S. 654, 662 (U.S. 1996) ("Most

recently, in 1993 amendments to the Rules, courts have been accorded discretion to enlarge the

120-day period 'even if there is no good cause shown.'").  "The Rule thus gives the court

considerable discretion with respect to handling failures of service." *Tishman v. AP*, 2005 U.S.

Dist. LEXIS 34356 (S.D.N.Y. Dec. 15, 2005) (citing *Thompson v. Maldonado*, 309 F.3d 107, 110

(2d Cir. 2002) as holding that district courts' dismissals for failure to serve process under Rule

4(m) are reviewed for abuse of discretion).  *Accord Bunim v. City of New York*, 2006 U.S. Dist.

LEXIS 50309 (S.D.N.Y. July 21, 2006).  The authority cited by the defendants stating a different

rule, Yosef v. Passamaquoddy Tribe, 876 F.2d 283 (2nd Cir. 1989), predates the 1993 amendment

and is no longer good law.  *See FBM Holdings LLC v. Goldwerks, Inc.*, 2006 U.S. Dist. LEXIS

26735 (E.D.N.Y. May 5, 2006) ("Yosef was decided prior to the 1993 amendments, however,

which changed the language of the rule so that dismissal is no longer mandatory").

As the Supreme Court stated in Henderson: "The Federal Rules thus convey a clear

message: Complaints are not to be dismissed if served within 120 days, or within such additional

time as the court may allow."  *Henderson*, 517 U.S. at 663.  "The Advisory Committee Notes to

Rule 4(m) also provide guidance as to when the court should exercise its discretion, stating that

'relief may be justified, for example, if the applicable statute of limitations would bar the refiled

action."  (quoting Advisory Committee Notes to Fed. R. Civ. P. Rule 4(m) and citing *Mejia v.

Castle Hotel, Inc.*, 164 F.R.D. 343, 345 (S.D.N.Y. 1996); *Cody v. Mello*, 59 F.3d 13, 15 (2d Cir.

1995)).

When a court considers whether or not to grant a motion to dismiss because of

insufficiency of service, it considers four factors:

> "(1) whether the applicable statute of limitations would bar the refiled
> action; (2) whether the defendant had actual notice of the claims asserted
> in the complaint; (3) whether the defendant had attempted to conceal the

> defect in service; and (4) whether the defendant would be prejudiced by
> the granting of plaintiff's request for relief from the provision."

*Tieman* at \*28 U.S. Dist. LEXIS 38703 quoting *E. Refractories Co. v. Forty Eight*

*Insulations, Inc*., 187 F.R.D. 503, 506 (S.D.N.Y. 1999).

Under the first factor, as the defendants concede, if the service effected on March 9, 2015

were deemed ineffective, or an extension of time denied, the statute of limitations would prevent

refiling claims against those defendants.  Courts in the Southern district have held that this would

prejudice a plaintiff, and that this factor weighs heavily in favor of granting an extension of time.

*Bunim v. City of New York*, No. 05-CV-1562 2006 U.S. Dist. LEXIS 50309, at \*9 (S.D.N.Y. July

21, 2006); *See Alvarado v. Am. Freightways, Inc*., No. 04-CV-9536, 2005 U.S. Dist. LEXIS

12226, at \*15 (S.D.N.Y. June 21, 2005); *Castro v. City of New York*, 2007 U.S. Dist. LEXIS

77878, \*25 (S.D.N.Y. October 15, 2007), *adopted by*, 2007 U.S. Dist. LEXIS 101433 (S.D.N.Y.

Nov. 1, 2007).

For the second factor, the discussion in <u>Castro</u> is instructive. In <u>Castro</u>, the court held

that, because all defendants were represented by the New York City Law Department, and the

Law Department unquestionably had timely notice of the suit, that all the defendant parties had

timely notice of the suit, even if not properly served.  *Castro,* 2007 U.S. Dist. LEXIS 77878, at

\*25-27.

In the matter of <u>Wiles v. The City of New York</u>, 12-cv-2898, which is also before this

Court, the City of New York failed to answer on behalf of several defendants, and was in default

for months.  In that case, the defendants argued that those defendants should be relieved of their

default, because, due to the fact that all defendants were represented by the same counsel, details

concerning whether responsive pleadings were filed on behalf of particular defendants were so

unimportant that to raise them bordered on the frivolous.  The defendants prevailed on that

argument in that matter.  The present situation is similar.  There is no question that the City of

New York was timely served, along with several of the individual defendants, and that all

defendant parties, including both those served on Nov. 5, 2014 and those served on March 9,

2015 are represented by the same counsel.  It would seem fair that, if an answer served by the

41

Law Department can be attributed to all defendants it represents, then it should follow that an amended complaint served upon the Law Department should be deemed to give notice to all the defendants represented by the Law Department.  Implicit in the argument made by the defendants in Wiles was the idea that the Law Department is representing involved police officers long before it formally appears on their behalf.  As such, all the Law Department's police officer clients should be deemed to have had notice of the First Amended Complaint when the Law Department first received it on November 5, 2014.

The third is the only factor is not present here – the defendants did not conceal lack of service.

The defendants have not identified any prejudice to them that would accrue from being required to accept service made 4 days after the 120 presumptive deadline.  The Law Department had timely notice of the suit, and of the fact that these individual defendants were named.  The Law Department has been engaged in a litigation regarding one of the same incidents (that of Nov. 5, 2011) for several years, and so there is no question that the City of New York might have failed to preserve necessary evidence due to lack of notice of a pending suit.  It is difficult to imagine any prejudice that a 4 day delay beyond the normal 120 day deadline would cause these defendants.

For the foregoing reasons, the defendants' motion to dismiss for late service should be denied, and the Court should grant the plaintiff's motion to extend the time to serve these defendants, either through new service to be performed after this motion is decided, or by an order directing the defendants to accept the service performed on March 9, 2015 *nunc pro tunc*.

## XII.  Conclusion

The defendants, who sought summary judgment, have utterly failed to establish even a prima facie case for their affirmative defense of probable cause.  The plaintiff, however, has established his lawful conduct at the time of his arrest with substantial evidence.  Accordingly, the Court should grant summary judgment to the plaintiff.  In addition and/or in the alternative,

for the reasons stated herein, the Court should grant the plaintiff leave to file his Second

Amended Complaint, and grant leave to serve all defendants.

Respectfully submitted,


_____//s//_____

David A. Thompson

Wylie M. Stecklow