IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JOSE MEDIAVILLA,                                     Index No. 14cv8624(VSB)
                                                     (HBP)

                                                     ECF CASE

PLAINTIFF,

           -against-                                 **Plaintiff's Responsive 56.1
                                                     Statement**


THE CITY OF NEW YORK, et al.,


                        DEFENDANTS.
------------------------------------------------------------------X


         Plaintiff Jose Mediavilla by his attorney, David A. Thompson of Stecklow Cohen &

Thompson, submits this response to the defendants' 56.1 statement.

### November 5, 2011 Incident

1.        Plaintiff was a participant in the Occupy Wall Street movement. Exhibit A, ¶ 41.

          Response 1 - 1:          Undisputed.

2.        On November 5, 2011 at around 3:30 plaintiff was in and around Foley Square.

Exhibit A, ¶ 50.

          Response 2 - 1:          Undisputed.

          Response 2 - 2:          The plaintiff notes that the defendants have typically
          used the term "Foley Square" to refer **solely** to Thomas Paine Park and its
          surrounding sidewalks (i.e., the triangular park).  Within this 56.1 statement, it is
          unclear whether defendants use the term in that sense, or whether they use it to
          refer to the entire area bordered by the building line on the north side of Worth
          Street, the building line on the east side of Centre Street, and the building line on
          the west side of Lafayette Street.  Regardless of which meaning is meant, the
          plaintiff was "around" Foley Square as stated.

3.        Plaintiff was present at Foley Square, until the time of his arrest, participating in

an Occupy Wall Street demonstration. Exhibit A, ¶ 51.

          Response 3 - 1:          Undisputed.

1

Response 3 - 2:          The plaintiff notes that the defendants have typically used the term "Foley Square" to refer **solely** to Thomas Paine Park and its surrounding sidewalks (i.e., the triangular park).  Within this 56.1 statement, it is unclear whether defendants use the term in that sense, or whether they use it to refer to the entire area bordered by the building line on the north side of Worth Street, the building line on the east side of Centre Street, and the building line on the west side of Lafayette Street.  The plaintiff was not within Thomas Paine Park when he was arrested.

4.      Police officers prevented Occupy protestors from ascending the steps of the Courthouse. Exhibit A, ¶ 52.

Response 4 - 1:          Undisputed.

Response 4 - 2:          While there were many police officers in the area, only six officers prevented the marchers from taking the steps, simply by asking them not to.  (Ex. M PO McNamara Transcript 27:9 – 28:24).

5.      Police officers issued orders to disperse through a bullhorn. Exhibit A, ¶ 56.

Response 5 - 1:          The officers issued multiple orders utilizing differing language.

6.      Police officers attempted to disperse demonstrators from in front of the Courthouse as 60 Centre Street. Exhibit A, ¶ 58.

Response 6 - 1:          The officers issued multiple orders utilizing differing language.

Response 6 - 2:

7.      The video attached as Exhibit C depicts the demonstration in front of the New York Supreme Court building at 60 Centre Street. Exhibit C.

Response 7 - 1:          The video identified as Exhibit C depicts some of the events of November 5, 2011 in front of the New York Supreme Court building at 60 Centre Street.

8.      The video attached as Exhibit D depicts the demonstration in front of the New York Supreme Court building at 60 Centre Street. Exhibit D.

Response 8 - 1:          The video identified as Exhibit D depicts some of the events of November 5, 2011 in front of the New York Supreme Court building at 60 Centre Street.

Response 8 - 2:          The video identified as Exhibit D is TARU video taken by a member of the NYPD.

Response 8 - 3:          The video identified as Exhibit D has jump cuts and discontinuities in the video, including in the 6 minutes leading up to the arrest of the plaintiff.

9.      The video attached as Exhibit E generally depicts the demonstration in front of

the New York Supreme Court building at 60 Centre Street. Exhibit E.

> Response 9 - 1:      The video identified as Exhibit E generally depicts some moments in time of the events of November 5, 2011 in front of the New York Supreme Court building at 60 Centre Street.

> Response 9 - 2:      In the first moments of the Def. Exhibit E, the protestors depicted are chanting "We are pedestrian traffic," expressing their belief – which was legally correct – that they had a clearly established legal right to occupy the sidewalk.  (Def. Video Ex. E 00:00 – 00:26).

10.      The video attached as Exhibit D depicts plaintiff's arrest approximately 14:50

into the video, with a timestamp on the video showing 3:19 p.m. Exhibit D, 14:50-15:00.

> Response 10 - 1:      The video identified as Exhibit D has jump cuts in the video, including in the 6 minutes leading up to the arrest of the plaintiff.

> Response 10 - 2:      The defendants have not alleged that the timestamp is accurate, and the plaintiff cannot take a position, without further discovery, as to whether the timestamp is accurate or inaccurate.

11.      A large crowd of protestors gathered at the base of the steps of 60 Centre Street.

Exhibit D, 00:00-04:15.

> Response 11 - 1:      The video identified as Exhibit D has jump cuts including at or around 03:47 and 04:10.

> Response 11 - 2:      Admitted.

12.      A less dense group of protestors can be seen across the street from 60 Centre

Street at Foley Square. Exhibit D, 00:00-01:00.

> Response 12 - 1:      This is not a material fact.

> Response 12 - 2:      Admitted that there was a group of protestors in front of 60 Centre Street, and that there were people in Thomas Paine Park or Foley Square, some of whom were protestors.  The term "dense" is not capable of precise meaning, so it is not factual and cannot be admitted or denied.

> Response 12 - 3:      It is unclear from the perspective of the video identified as Exhibit D the number of protesters in front of 60 Centre Street compared to the number of people across the Street at what is being termed Foley Square.

> Response 12 - 4:      The plaintiff notes that the defendants have typically used the term "Foley Square" to refer **solely** to Thomas Paine Park and its surrounding sidewalks (i.e., the triangular park).  Within this 56.1 statement, it is unclear whether defendants use the term in that sense, or whether they use it to refer to the entire area bordered by the building line on the north side of Worth Street, the building line on the east side of Centre Street, and the building line on

the west side of Lafayette Street.  The plaintiff was not within Thomas Paine Park when he was arrested.

13.     The protestors in front of 60 Centre street spanned the sidewalk from the building line to the street, and spanned at least the length of the courthouse steps. Exhibit D, 00:00- 04:15.

Response 13 - 1:          From the perspective of the Video identified as Exhibit D, much of the stairs of the courthouse can be seen, but not the complete full-length of the stairs.  The stairs to the south of the perspective are not seen at all.  The sidewalk in front of the stairs to the north do not seem to have protesters spanning from court stairs to the street.  At 4:00 the orange mesh netting at the northern part of the courthouse steps do not have protesters directly in front of it.

Response 13 - 2:          From the perspective of the Video identified as Exhibit D, the end of the curbside of the sidewalk is not seen nor identifiable.

Response 13 - 3:          Assuming, which is not indisputably demonstrated by the video, that the protestors occupied the entire sidewalk from the building line to the curb, pursuant to clearly established Second Circuit precedent [*Papineau v. Parmley*, 465 F.3d 46, 59 (2d Cir. 2006) (citing *People v. Nixon*, 248 N.Y. 182, 185, 187, 161 N.E. 463 (1928) (overturning disorderly conduct conviction where protesters who occupied the entire sidewalk forced pedestrians out into the street))], these protestors were not committing disorderly conduct even if they occupied the entire sidewalk, and caused pedestrians to step into the street to avoid them.  Given that these peaceful protestors were occupying a traditional public forum, protected by the First Amendment and fully in accordance with state law, they had the clearly-established legal right to occupy "the sidewalk from the building line to the street, and span[ing] at least the length of the courthouse steps."

Response 13 - 4:          Pursuant to long-standing practice, a portion of the street closest to the curb of the sidewalk in front of 60 Centre Street was closed to vehicular traffic. This portion of the street, approximately three feet wide, was closed to vehicular traffic by the placement of plastic traffic "cones" (actually, in this case, shaped like barrels).  In addition, scooter police who accompanied the protest formed a line outside this line of traffic cones, so that a portion of the street, approximately four to five feet wide running from the curb line, was free of traffic.  The street itself is wide enough that vehicular traffic was still able to, and in fact did, move freely and normally up Centre Street unimpeded by the presence of the line of scooter police who stationed themselves outside the line of traffic cones.  As a result of the presence of this double line of traffic cones and police scooters, any pedestrian who may have had to step off the curb of the sidewalk in front of 60 Centre Street to walk around the protestors could have done so safely.  The defendants have not demonstrated that any pedestrians were caused to step off the sidewalk by the presence of the protestors, but if any such pedestrians existed, they could have done so safely.  (Def. Video Ex. C at 01:25; Pl. Video Ex. H 02:16 - 2:18).

Response 13 - 5:          The defendants brought this motion for summary judgment, and assumed the movant's burden to demonstrate that evidence existed to support their defenses.  The defendants failed to do so.

14.     The protestors in front of 60 Centre street formed a dense crowd. Exhibit D, 00:00-04:15.

Response 14 - 1:     Admitted that there was a group of protestors in front of 60 Centre Street.  The term "dense" is not capable of precise meaning, so it is not factual and cannot be admitted or denied.

Response 14 - 2:     Given the failure of the defendants to identify particular incidents or particular moments within this four minute and fifteen seconds of video, the defendants have failed to state any factual matter within this allegation.

Response 14 - 3:     The defendants brought this motion for summary judgment, and assumed the movant's burden to demonstrate that evidence existed to support their defenses.  The defendants failed to do so.

15.     Pedestrians can be seen in the area walking in Foley Square, on Worth Street, and on Lafayette Street. Exhibit D, 00:00-04:15.

Response 15 - 1:     This is not a material fact.  The defendants state that there were – allegedly – some non-protestor civilians who could "be seen" somewhere in the vicinity of the protest during the four minute and fifteen second period of time shown in the video segment cited.  Almost all case law relating to protests presumes that non-protestor civilians will be somewhere to "be seen" in the vicinity of the protestors, because one of the principal goals of any protest is to "be seen" (and heard) by other citizens.  There is no binding case law of the Second Circuit or the Supreme Court which holds that protestors are required to protest only where other non-protestor civilians are not present and cannot be seen.

Response 15 - 2:     Clearly established case law of both federal and state courts states that protestors cannot be arrested for "merely inconveniencing" other non-protestors.  Much less can protestors be lawfully arrested for seeing and being seen by non-protestor civilians.

Response 15 - 3:     Given the failure of the defendants to identify particular incidents or particular moments within this four minute and fifteen seconds of video, the defendants have failed to state any factual matter within this allegation.

Response 15 - 4:     The defendants brought this motion for summary judgment, and assumed the movant's burden to demonstrate that evidence existed to support their defenses.  The defendants failed to do so.

16.     Police officers stood near the base of the steps to 60 Centre and kept protestors off of the steps. Exhibit D, 00:00-04:15.

Response 16 - 1:     Admitted.

Response 16 - 2:     While there were many police officers in the area, only six officers prevented the marchers from taking the steps, at the beginning of the rally, simply by asking them not to.   The protestors obeyed.  (Ex. M PO McNamara Transcript 27:9 – 28:24).

5

Response 16 - 3: The police, by preventing the protestors from going onto the steps, unlawfully prevented the protestors from making use of a traditional public forum. This action by the police was unlawful. By preventing the protestors from going onto the courthouse steps, the police created any problem (which problem has not been demonstrated) that arose from the presence of the protestors on the sidewalk.

Response 16 - 4: When the police prevented the protestors from using their preferred traditional public forum of the courthouse steps, and then also directed the protestors not to use the next alternative of the sidewalk in front of the courthouse, the police violated the protestors clearly established First Amendment rights. The police did not, at least until after the arrest of the plaintiff, even suggest that the protestors would be granted an alternate forum anywhere in the vicinity of their chosen location for protest.

Response 16 - 5: On October 5, 2011 (a weekday) an even larger group of protestors was allowed to go onto the same courthouse steps. No injuries or problems of any kind were reported. (See Pl. Ex. G & H). The defendants have not demonstrated any reason why the protestors on Nov. 5, 2011 were not entitled to have the same access to the same traditional public forum.

Response 16 - 6: Lieutenant Zielinski, who made most of the announcements to the crowd, reviewed video of the incident including his orders, and the conduct that occurred before and after them. Lieutenant Zielinski admitted that the protestors were not committing disorderly conduct. (Ex. 2E (Zielinski Tr.) 173:3-12; Def. Video Ex. D  00:00 - 05:34)).

Response 16 - 7: Based on his review of Def. Video Ex. D,  from the beginning up to 05:34, Lieutenant Zielinski testified that at this point in time the group of protestors were not committing disorderly conduct.

65.  Lieutenant Zielinski testified as follows:

Q:  All right. So I stopped it at 00:05:34.  So at this point, are the members of the crowd committing disorderly conduct?

MR. LUCAS:  Objection. You can answer.

A:  (No answer.)

Q:  Based on your review of the video.

A:  No.  (Ex. 2E (Zielinski Tr.) 173:3-12; Def. Video Ex. D 00:00 - 05:34).

17.  Protestors pushed against the line of police to get through. Exhibit D, 01:20-

01:45; 02:30-02:34; 02:35-02:40.

Response 17 - 1: This is not a material fact, because the defendants have presented no evidence that the plaintiff was involved in the alleged conduct. Because individualized probable cause is required for any arrest, whether or not this allegation were true, it would not provide probable cause for the arrest of the plaintiff. None of the individuals shown in these video segments are the plaintiff.

Response 17 - 2:          Furthermore, this allegation is denied as completely false.

Response 17 - 3:          From Nov. 5, 2011 itself, and throughout litigation relating to that event in both the present case and in <u>Wiles v. City of New York</u>, the City of New York has provided a false narrative of the events concerning the protestors' alleged attempts to occupy the steps of the courthouse by force.

Response 17 - 4:          Then-spokesman for the NYPD, Paul Browne, falsely told the New York Times that the protestors chanted "Take the steps, take the steps," suggesting that the protestors were expressing a desire to take the steps by force.  (Ex. SS, p. 2).

Response 17 - 5:          In <u>Wiles v. City of New York</u>, the City's 30(b)(6) witness, defendant Chief Steven Anger, repeated this false narrative, testifying that by chanting "take the steps," plaintiff Wiles and others were inciting a riot. (Ex. O, 41:19-25).  Chief Anger testified:

> Q: Other than the conduct that you have just described, did the Plaintiff do anything else that justified his arrest?
> A: There was another part where he was yelling, "Take the steps. Take the steps." Who was -- I believe, was at the point of inciting to riot.

Response 17 - 6:          The defendants have since admitted that the group were chanting not "Take the steps!" but "We want the steps!"  (See below at ¶ 23). The video shows conclusively that no-one shouted "Take the steps!"  (Def. Ex. D 00:60 – 006:20).  The difference is significant, "Take the steps!" is a statement addressed to other protestors, and inviting them to 'take the steps' over the objection of the police, while "We want the steps!" is a statement addressed to the police, asking the police to allow the protestors to go onto the steps.

Response 17 - 7:          Chanting "We want the steps" is not unlawful.  (Pl. Ex. 2E (Zielinski Tr.) 173:3-19).   Lieutenant Zielinski testified as follows:

> Q:      So I stopped it at 00:06:02. Well, first of all, the crowd seems to be chanting at this point. "We want the steps," is that what you hear?
>
> A:      Yes.
>
> Q:      Is chanting like that unlawful?
>
> A:      No.      (Ex. 2E (Zielinski Tr.) 173:3-19).

> P.O. McNamara testified as follows:
> Q:      I am trying to focus specifically on the portion of the video after this chant to try to understand what, if anything, the crowd did in response to the chant that represented a physical threat to take the steps?
>
> A:      After the chanting stopped, the individuals were just standing there…  (Ex. 2H (PO McNamara Tr.) 69:10-20).

Response 17 - 8:          The chant which Paul Browne and Chief Anger intentionally mischaracterized can be seen in Def. Ex. D 06:00 – 06:19.  During the chant, no protestors make any moves to "take" the steps, or even to move closer to them.  The police officers standing immediately in front of the protestors engaged in this chant look bored, not threatened.

Response 17 - 9:        Def. Exhibit D, 01:20-01:45, cited by the defendants, shows a girl in a purple beret having minor contact and attempted conversation with the police.  It does not show a concerted effort by anyone to "push[] against the line of police to get through." The girl in question was separated from the police by orange plastic netting that was held by the officers along the line, and which is visible at approximately 01:15 in the same video.  It would have taken much more than the minor jostling visible here to penetrate this line.

Response 17 - 10:       Def. Exhibit D, 02:19 – 02:21 shows an officer push this same girl and two young men standing near her, causing them to fall backwards.

Response 17 - 11:       Def. Exhibit D, 02:30-02:34 and 02:35-02:40 shows the police interacting with a single young man in a black hoodie and a black and white checkered scarf, who took a step up the steps, and was pushed back by police.  Upon being pushed back, the young man appears to complain to the police, but does nothing further.

Response 17 - 12:       The defendants cannot seriously contend that the video cited to support this allegation shows a concerted effort by protestors to 'storm the barricades' and push through the line of police.

Response 17 - 13:       During the time the police lined the stairs at 60 Centre Street, the protesters abided by the orders not to ascend the stairs.

18.     Protestors grabbed and pulled the orange mesh police used to maintain the police line between police. Exhibit D, 02:25-02:30.

Response 18 - 1:        This is not a material fact, because the defendants have presented no evidence that the plaintiff was involved in the alleged conduct.  Because individualized probable cause is required for any arrest, whether or not this allegation were true, it would not provide probable cause for the arrest of the plaintiff.  None of the individuals shown in these video segments are the plaintiff.

Response 18 - 2:        Denied.  The defendants cannot seriously suggest that the five seconds of video cited, Def. Exhibit D, 02:25-02:30, demonstrate a factually or legally significant amount of 'grabbing and pulling' the orange police mesh.

Response 18 - 3:        While there were many police officers in the area, only six officers prevented the marchers from taking the steps, simply by asking them not to.  (Ex. M PO McNamara Transcript 27:9 – 28:24).

Response 18 - 4:        During the time the police lined the stairs at 60 Centre Street, the protesters abided by the orders not to ascend the stairs.

Response 18 - 5:        The defendants brought this motion for summary judgment, and assumed the movant's burden to demonstrate that evidence existed to support their defenses.  The defendants failed to do so.

19.     After several attempts to push through the police lines various protestors began signaling for protestors to sit down on the sidewalk. Exhibit D, 03:14-4:05.

Response 19 - 1:          This is not a material fact, because the defendants have presented no evidence that the plaintiff was involved in the alleged conduct. Because individualized probable cause is required for any arrest, whether or not this allegation were true, it would not provide probable cause for the arrest of the plaintiff.  None of the individuals shown in these video segments are the plaintiff.

Response 19 - 2:          The video from 00:00 through 03:14 shows absolutely no attempts to "push through the police lines," much less "several" such attempts.

Response 19 - 3:          The defendants have no-where alleged that – if any protestors sat – these protestors, by sitting, created any harm to the public sufficient to amount to a breach of the peace.  The defendants have not alleged that any protestors who sat, by doing so, created anything more than "mere inconvenience" to any non-protestors who may have been present on that sidewalk.  The defendants have not presented evidence that there **were** any non-protestors present on that sidewalk.  The defendants allegation that "Pedestrians can be seen in the area walking in Foley Square, on Worth Street, and on Lafayette Street" (citing Exhibit D, 00:00-04:15), fails to establish that these pedestrians who "can be seen" were in any way any harmed by the presence o the protestors.  The defendants have not shown that the protestors had nay effect, however trivial, on the general public.

Response 19 - 4:          The defendants have neither alleged nor offered evidence to show that the protestors who sat, if any, had any effect on anyone or anything that amounted to the "public harm" which is legally required before a lawful order to disperse may be made pursuant to 240.20; nor have they shown that any protestors who sat, by doing so, forfeited their First Amendment right to make use of this traditional public forum for core First Amendment activity.

Response 19 - 5:          Pursuant to long-standing practice, a portion of the street closest to the curb of the sidewalk in front of 60 Centre Street was closed to vehicular traffic. This portion of the street, approximately three feet wide, was closed to vehicular traffic by the placement of plastic traffic "cones" (actually, in this case, shaped like barrels).  In addition, scooter police who accompanied the protest formed a line outside this line of traffic cones, so that a portion of the street, approximately four to five feet wide running from the curb line, was free of traffic.  The street itself is wide enough that vehicular traffic was still able to, and in fact did, move freely and normally up Centre Street unimpeded by the presence of the line of scooter police who stationed themselves outside the line of traffic cones.  As a result of the presence of this double line of traffic cones and police scooters, any pedestrian who may have had to step off the curb of the sidewalk in front of 60 Centre Street to walk around the protestors could have done so safely.  The defendants have not demonstrated that any pedestrians were caused to step off the sidewalk by the presence of the protestors, but if any such pedestrians existed, they could have done so safely.  (Def. Video Ex. C at 01:25; Pl. Video Ex. H 02:16 - 2:18).

Response 19 - 6:          The defendants brought this motion for summary judgment, and assumed the movant's burden to demonstrate that evidence existed to support their defenses.  The defendants failed to do so.

20.     Police used a bullhorn from the steps of 60 Centre Street to order the crowd to disperse stating: "You got to keep it moving. You've got to get off of this sidewalk. Ladies and Gentlemen you have to move you cannot stand here, you cannot stand here, you will be subject to arrest if you don't keep it moving. Folks you've got to keep moving. Ladies and gentlemen you've got to keep this area clear. Ladies and gentlemen can you clear this area? You've got to keep it moving. Ladies and Gentlemen you've got to clear this area." Exhibit D, 04:18-5:25.

Response 20 - 1:        The video speaks for itself as to the nature of the order.

Response 20 - 2:        The order, assuming it is correctly transcribed by the defendants in this statement of alleged fact, was an unlawful order.  At the time the announcement was made, the group of protestors was quiet enough that a single harmonica and individual voices can be heard even through the imperfect aural record of the video.  Def. Exhibit D, 04:00 – 04:05.  At approximately 04:05 in the video, a male voice can be heard chanting, "Shame! Shame!," and between 04:05 and 04:08 other members of the group join in that chant.  [The video in question was filmed by a police officer.  There is a discontinuity at approximately 04:09-04:10.]  At 04:10, a police officer, defendant Lieutenant Cook, can be seen delivering this announcement, as defendant Deputy Chief Anger (in the cap with gold braid on the brim) looks on.  The group of protestors are doing nothing but standing on the sidewalk, speaking to one another, and (some of them) chanting to the police that they should be ashamed of themselves.  Assuming, which is not indisputably demonstrated by the video, that the protestors occupied the entire sidewalk from the building line to the curb, pursuant to clearly established Second Circuit precedent [*Papineau v. Parmley*, 465 F.3d 46, 59 (2d Cir. 2006) (citing *People v. Nixon*, 248 N.Y. 182, 185, 187, 161 N.E. 463 (1928) (overturning disorderly conduct conviction where protesters who occupied the entire sidewalk forced pedestrians out into the street))], these protestors were not committing disorderly conduct even if they occupied the entire sidewalk and caused pedestrians to step into the street to avoid them.  Given that these peaceful protestors were occupying a traditional public forum, protected by the First Amendment and fully in accordance with state law, the instructions given by Lieutenant Cook were patently unlawful.

Response 20 - 3:        The announcement given, asking the protestors to "clear this area" and to "keep moving," did not offer any alternative forum for the protestors to gather.  To the contrary, to instructions imply that the protestors would not be permitted to exercise their First Amendment rights anywhere in the "area."  This too was an unlawful abuse of police power in clear contravention of well-established Second Circuit and Supreme Court precedent.

Response 20 - 4:        Pursuant to long-standing practice, a portion of the street closest to the curb of the sidewalk in front of 60 Centre Street was closed to vehicular traffic. This portion of the street, approximately three feet wide, was closed to vehicular traffic by the placement of plastic traffic "cones" (actually, in this case, shaped like barrels).  In addition, scooter police who accompanied the protest formed a line outside this line of traffic cones, so that a portion of the

street, approximately four to five feet wide running from the curb line, was free of traffic. The street itself is wide enough that vehicular traffic was still able to, and in fact did, move freely and normally up Centre Street unimpeded by the presence of the line of scooter police who stationed themselves outside the line of traffic cones. As a result of the presence of this double line of traffic cones and police scooters, any pedestrian who may have had to step off the curb of the sidewalk in front of 60 Centre Street to walk around the protestors could have done so safely. The defendants have not demonstrated that any pedestrians were caused to step off the sidewalk by the presence of the protestors, but if any such pedestrians existed, they could have done so safely. (Def. Video Ex. C at 01:25; Pl. Video Ex. H 02:16 - 2:18).

Response 20 - 5:        It is a matter for a jury to determine exactly what Lieutenant Cook said, and in addition, to attempt to assess whether his words, difficult to decipher in the video, would have been intelligible to those present.

Response 20 - 6:        The defendants brought this motion for summary judgment, and assumed the movant's burden to demonstrate that evidence existed to support their defenses. The defendants failed to do so.

21.     The timestamp on the video for the order in ¶ 18 is approximately 3:02 p.m..

Exhibit D, 04:18-05:25.

Response 21 - 1:        This is not a material statement of fact. It is unclear what order and what paragraph 18 is being referenced here.

22.     In response to the orders to disperse, protestors again signaled for protestors to sit

on the sidewalk, performed a human microphone calling for protestors to sit down, and a number

of protestors did sit down on the sidewalk at that time. 05:05-06:37.

Response 22 - 1:        This is not a material fact, because the defendants have presented no evidence that the plaintiff was involved in the alleged conduct. Because individualized probable cause is required for any arrest, whether or not this allegation were true, it would not provide probable cause for the arrest of the plaintiff. None of the individuals shown in these video segments are the plaintiff.

Response 22 - 2:        The stated fact is ambiguous, because it does not identify which video is cited.

Response 22 - 3:        Lieutenant Zielinski, who made most of the announcements to the crowd, reviewed video of the incident including his orders, and the conduct that occurred before and after them. Lieutenant Zielinski admitted that the protestors were not committing disorderly conduct. (Ex. 2E (Zielinski Tr.) 173:3-12; Def. Video Ex. D  00:00 - 05:34)).

Response 22 - 4:        Based on his review of Def. Video Ex. D,  from the beginning up to 05:34, Lieutenant Zielinski testified that at this point in time the group of protestors were not committing disorderly conduct.

65.     Lieutenant Zielinski testified as follows:

Q:      All right. So I stopped it at 00:05:34.  So at this point, are the members of the crowd committing disorderly conduct?

MR. LUCAS:   Objection. You can answer.

A:      (No answer.)

Q:      Based on your review of the video.

A:      No.     (Ex. 2E (Zielinski Tr.) 173:3-12; Def. Video Ex. D 00:00 - 05:34).

Response 22 - 5:        The defendants have no-where alleged that – if any protestors sat – these protestors, by sitting, created any harm to the public sufficient to amount to a breach of the peace.  The defendants have not alleged that any protestors who sat, by doing so, created anything more than "mere inconvenience" to any non-protestors who may have been present on that sidewalk.  The defendants have not presented evidence that there **were** any non-protestors present on that sidewalk.  The defendants allegation that "Pedestrians can be seen in the area walking in Foley Square, on Worth Street, and on Lafayette Street" (citing Exhibit D, 00:00-04:15), fails to establish that these pedestrians who "can be seen" were in any way any harmed by the presence o the protestors.  The defendants have not shown that the protestors had nay effect, however trivial, on the general public.

Response 22 - 6:        The defendants have neither alleged nor offered evidence to show that the protestors who sat, if any, had any effect on anyone or anything that amounted to the "public harm" which is legally required before a lawful order to disperse may be made pursuant to 240.20; nor have they shown that any protestors who sat, by doing so, forfeited their First Amendment right to make use of this traditional public forum for core First Amendment activity.

Response 22 - 7:        Pursuant to long-standing practice, a portion of the street closest to the curb of the sidewalk in front of 60 Centre Street was closed to vehicular traffic. This portion of the street, approximately three feet wide, was closed to vehicular traffic by the placement of plastic traffic "cones" (actually, in this case, shaped like barrels).  In addition, scooter police who accompanied the protest formed a line outside this line of traffic cones, so that a portion of the street, approximately four to five feet wide running from the curb line, was free of traffic.  The street itself is wide enough that vehicular traffic was still able to, and in fact did, move freely and normally up Centre Street unimpeded by the presence of the line of scooter police who stationed themselves outside the line of traffic cones.  As a result of the presence of this double line of traffic cones and police scooters, any pedestrian who may have had to step off the curb of the sidewalk in front of 60 Centre Street to walk around the protestors could have done so safely.  The defendants have not demonstrated that any pedestrians were caused to step off the sidewalk by the presence of the protestors, but if any such pedestrians existed, they could have done so safely.  (Def. Video Ex. C at 01:25; Pl. Video Ex. H 02:16 - 2:18).

Response 22 - 8:        The defendants brought this motion for summary judgment, and assumed the movant's burden to demonstrate that evidence existed to support their defenses.  The defendants failed to do so.

23.     Another protestor led a chant of "We want the steps" in response to the orders to

disperse. Exhibit D, 05:57-06:22.

Response 23 - 1:     This is not a material fact, because the defendants have
presented no evidence that the plaintiff was involved in the alleged conduct.
Because individualized probable cause is required for any arrest, whether or not
this allegation were true, it would not provide probable cause for the arrest of the
plaintiff.  None of the individuals shown in these video segments are the plaintiff.

Response 23 - 2:     Chanting "We want the steps" is not unlawful.  (Pl. Ex.
2E (Zielinski Tr.) 173:3-19).   Lieutenant Zielinski testified as follows:

Q:     So I stopped it at 00:06:02. Well, first of all, the crowd seems to
be chanting at this point. "We want the steps," is that what you hear?

A:     Yes.

Q:     Is chanting like that unlawful?

A:     No.     (Ex. 2E (Zielinski Tr.) 173:3-19).

P.O. McNamara testified as follows:
Q:     I am trying to focus specifically on the portion of the video after
this chant to try to understand what, if anything, the crowd did in
response to the chant that represented a physical threat to take the steps?

A:     After the chanting stopped, the individuals were just standing
there… (Ex. 2H (PO McNamara Tr.) 69:10-20).

Response 23 - 3:     This is not a material fact because the defendants have
not established any manner in which the fact that some protestors changed "we
want the steps," might have justified the further unlawful orders, unlawful use of
force, and unlawful arrests, committed by the police officers at the scene,
including the defendants.

Response 23 - 4:     From Nov. 5, 2011 itself, and throughout litigation
relating to that event in both the present case and in Wiles v. City of New York,
the City of New York has provided a false narrative of the events concerning the
protestors' alleged attempts to occupy the steps of the courthouse by force.

Response 23 - 5:     Then-spokesman for the NYPD, Paul Browne, falsely
told the New York Times that the protestors chanted "Take the steps, take the
steps," suggesting that the protestors were expressing a desire to take the steps by
force.  (Ex. SS, p. 2).

Response 23 - 6:     In Wiles v. City of New York, the City's 30(b)(6)
witness, defendant Chief Steven Anger, repeated this false narrative, testifying
that by chanting "take the steps," plaintiff Wiles and others were inciting a riot.
(Ex. O, 41:19-25).  Chief Anger testified:

Q: Other than the conduct that you have just described, did the Plaintiff
do anything else that justified his arrest?
A: There was another part where he was yelling, "Take the steps. Take
the steps." Who was -- I believe, was at the point of inciting to riot.

Response 23 - 7:        The defendants have since admitted that the group were chanting not "Take the steps!" but "We want the steps!"  (See below at ¶ 23). The video shows conclusively that no-one shouted "Take the steps!"  (Def. Ex. D 00:60 – 006:20).  The difference is significant, "Take the steps!" is a statement addressed to other protestors, and inviting them to 'take the steps' over the objection of the police, while "We want the steps!" is a statement addressed to the police, asking the police to allow the protestors to go onto the steps.

Response 23 - 8:        The chant which Paul Browne and Chief Anger intentionally mischaracterized can be seen in Def. Ex. D 06:00 – 06:19.  During the chant, no protestors make any moves to "take" the steps, or even to move closer to them.  The police officers standing immediately in front of the protestors engaged in this chant look bored, not threatened.

Response 23 - 9:        This chant never was, as the defendants used to argue, an incitement to riot.  This chant never was, as the defendants still argue, unlawful.

Response 23 - 10:        The nature of the orders given up to this point in time, and the question of whether the plaintiff heard these orders (to the extent material), is a question for the jury, because it is not established by the evidence submitted by the defendants.

Response 23 - 11:        The defendants brought this motion for summary judgment, and assumed the movant's burden to demonstrate that evidence existed to support their defenses.  The defendants failed to do so.

24.    Lieutenant Zielinski issued orders to disperse through a bullhorn from the steps of 60 Centre Street stating "Ladies and gentlemen my name is Lieutenant Zielinski, I am with the Manhattan South Task Force, you are blocking pedestrian traffic. I am ordering you to leave the sidewalk. If you do so voluntarily no charges will be filed against you. If you refuse to leave you will be placed under arrest and charged with disorderly conduct." Exhibit D, 06:42-07:08.

Response 24 - 1:        Admitted that Lieutenant Zielinski said these words.

Response 24 - 2:        The defendant do not offer this statement for the truth of the matter asserted by Lt. Zielinski, that the group of protestors were "blocking pedestrian traffic."  The exhibit offered, Def. Exhibit D, 06:42-07:08, does not establish that anyone was blocking pedestrian traffic.

Response 24 - 3:        Lieutenant Zielinski reviewed video of the incident including his orders, and the conduct that occurred before and after them. Lieutenant Zielinski admitted that the protestors were not committing disorderly conduct.  (Ex. 2E (Zielinski Tr.) 173:3-12; Def. Video Ex. D  00:00 - 05:34)).

Response 24 - 4:        Based on his review of Def. Video Ex. D,  from the beginning up to 05:34, Lieutenant Zielinski testified that at this point in time the group of protestors were not committing disorderly conduct.

65.    Lieutenant Zielinski testified as follows:

Q:      All right. So I stopped it at 00:05:34.  So at this point, are the members of the crowd committing disorderly conduct?

MR. LUCAS:    Objection. You can answer.

A:      (No answer.)

Q:      Based on your review of the video.

A:      No.     (Ex. 2E (Zielinski Tr.) 173:3-12; Def. Video Ex. D 00:00 - 05:34).

25.     The timestamp on the video for the order in ¶ 24 is approximately 3:05 p.m. Exhibit D, 06:42-07:08.

Response 25 - 1:        Admitted.  It has not been established that the timestamp is accurate.

26.     A woman can be seen being placed under arrest at the base of the steps. Exhibit D, 07:12.

Response 26 - 1:        This is not a material fact, because the defendants have presented no evidence that the plaintiff was involved in the alleged conduct. Because individualized probable cause is required for any arrest, whether or not this allegation were true, it would not provide probable cause for the arrest of the plaintiff.  None of the individuals shown in these video segments are the plaintiff.

Response 26 - 2:        There is a jump cut removing approximately 3 seconds of this video according to the time stamp.  If this person did anything to provoke or justify her arrest, it occurred during the 3 seconds of missing video. Alternatively, if she did nothing to provoke or justify her arrest, the 3 seconds of missing video would have shown her innocence.

Response 26 - 3:        At 07:10 of the video the time stamp is 3:05:27, at 7:11, the time stamp surges ahead to 3:05:30 and the NYPD are pulling a young woman through the bottom of the orange meshing and carrying her up the stairs by her arms and legs.

Response 26 - 4:        This same woman can be seen at 04:49 - 05:43 holding up her left hand in a peace sign while trying to engage the officer directly in front of her in a conversation.

Response 26 - 5:        At approximately 08:37 this same woman can be heard repeatedly screaming "I've done nothing wrong."

27.     In response to her arrest the crowd becomes agitated, yelling, pushing against the police line, with one man clearly yelling "get off of her" multiple times. Exhibit D, 07:12- 07:40.

Response 27 - 1:        This is not a material fact, because the defendants have presented no evidence that the plaintiff was involved in the alleged conduct. Because individualized probable cause is required for any arrest, whether or not

15

this allegation were true, it would not provide probable cause for the arrest of the plaintiff.  None of the individuals shown in these video segments are the plaintiff.

Response 27 - 2:　　　　The evidence submitted simply does not support the statement.

Response 27 - 3:　　　　With respect to the allegation that the group of protestors were "pushing against the police line" during the 30 seconds depicted in Def. Video Exhibit D, 07:12- 07:40, review of the video shows, after the girl being arrested was dragged by police on the ground under the plastic mesh (07:12), that at about 07:19 a single young man fell forward toward the police line, and was forcibly thrown backwards by three officers.

Response 27 - 4:　　　　Other than this single individual falling forward, the video sequence cited shows nobody "pushing against the police line."

Response 27 - 5:　　　　It is true that one or more persons yelled "Get off her." This, in itself, is not unlawful.  Given that the conduct which may or may not have justified this girl's arrest was not filmed, or was deleted, by the police officer that made this video, it cannot be said that the person who said "Get off her" was wrong to do so.

Response 27 - 6:　　　　The initial part of the cited video, Def. Video Exhibit D, 07:12- 07:40, shows the arrest of this girl *in media res*, and as far as the video shows, any "agitation" arises as a combination of the police using force on this girl, the girl moving in reaction to that force, and the efforts of people immediately nearby to film or photograph what was happening.  Assuming that this girl had committed an offense that justified her arrest,

Response 27 - 7:　　　　This is too vague to be considered a statement of material fact.

Response 27 - 8:　　　　There were many people in the crowd not yelling or pushing against the police line.

Response 27 - 9:　　　　Many in the crowd joined in a chant, "Shame.  Shame. Shame"

28.　　Lieutenant Zielinski twice ordered the crowd back from the steps through his

bullhorn stating "Ladies and gentlemen you need to move back. Ladies and gentlemen you need

to move back." Exhibit D, 07:33-07:43.

Response 28 - 1:　　　　Admitted.

Response 28 - 2:　　　　This was not a dispersal order.

Response 28 - 3:　　　　This is not a material fact, because the defendants have presented no evidence that the plaintiff was involved in the alleged conduct. Because individualized probable cause is required for any arrest, whether or not this allegation were true, it would not provide probable cause for the arrest of the plaintiff.  None of the individuals shown in these video segments are the plaintiff.

Response 28 - 4:　　　　When the police prevented the protestors from using their preferred traditional public forum of the courthouse steps, and then also directed the protestors not to use the next alternative of the sidewalk in front of

the courthouse, the police violated the protestors clearly established First
Amendment rights.  The police did not, at least until after the arrest of the
plaintiff, even suggest that the protestors would be granted an alternate forum
anywhere in the vicinity of their chosen location for protest.

29.     A second police officer can be heard to order the crowd back through a bullhorn

stating "Ladies and gentlemen you need to move back, lets go, you need to move back. Ladies

and gentlemen you need to move back." Exhibit D, 07:41-07:52.

> Response 29 - 1:          Admitted.
>
> Response 29 - 2:          This was not a dispersal order.
>
> Response 29 - 3:          Upon information and belief this second officer is
>                           Defendant Bill Cook.  ExO Anger Transcript 89:9-14.
>
> Response 29 - 4:          This is not a material fact, because the defendants have
> presented no evidence that the plaintiff was involved in the alleged conduct.
> Because individualized probable cause is required for any arrest, whether or not
> this allegation were true, it would not provide probable cause for the arrest of the
> plaintiff.  None of the individuals shown in these video segments are the plaintiff.
>
> Response 29 - 5:          When the police prevented the protestors from using
> their preferred traditional public forum of the courthouse steps, and then also
> directed the protestors not to use the next alternative of the sidewalk in front of
> the courthouse, the police violated the protestors clearly established First
> Amendment rights.  The police did not, at least until after the arrest of the
> plaintiff, even suggest that the protestors would be granted an alternate forum
> anywhere in the vicinity of their chosen location for protest.

30.     The woman being placed under arrest in ¶ 26 was walked up the steps of 60

Centre Street by three female officers, two of whom are wearing light blue windbreakers. Exhibit

D, 08:47-08:49.

> Response 30 - 1:          Admitted.
>
> Response 30 - 2:          This is not a material fact, because the defendants have
> presented no evidence that the plaintiff was involved in the alleged conduct.
> Because individualized probable cause is required for any arrest, whether or not
> this allegation were true, it would not provide probable cause for the arrest of the
> plaintiff.  None of the individuals shown in these video segments are the plaintiff.
>
> Response 30 - 3:          When this same young woman was pulled underneath
> the orange mesh netting it was by male officers who then physically handled her
> in a way that clearly disturbed her as she could be hurt in a disturbed voice
> repeatedly screaming in a shaky voice, "I have done nothing wrong."

31.     The same moment referenced in ¶ 30 can be seen on Defendant's Exhibit E.

Exhibit E, 01:19-01:23.

> Response 31 - 1:        Admitted.
>
> Response 31 - 2:        A view of this video from 0:00 to 01:28 does not
> indicate the area to be dense to a point of difficulty or lack of space for the
> individuals present to walk around the area.
>
> Response 31 - 3:        See responses to ¶ 30 above.

32.     The timestamp on the video for the woman being taken up the steps in ¶ 30 is

approximately 3:07 p.m. Exhibit D, 08:47-08:49.

> Response 32 - 1:        Admitted.

33.     Lieutenant Zielinski continued to issue orders to disperse stating "Good

afternoon ladies and gentlemen, my name is Lieutenant Zielinski, I am with the Manhattan South

Task Force. I am ordering you to leave this area. If you don't leave this area you will be charged

with disorderly conduct." Exhibit D, 08:57-09:10; Exhibit E, 01:30-01:46.

> Response 33 - 1:        Deny.
>
> Response 33 - 2:        See responses to ¶ ¶ 24, 28 above.

34.     Throughout these warnings the crowd remains dense, agitated, and pushed

against the police line. Exhibit D, 08:50-09:10.

> Response 34 - 1:        Deny.
>
> Response 34 - 2:        A view of the video identified as E from 0:00 to 01:28
> does not indicate the area to be dense to a point of difficulty or lack of space for
> the individuals present to walk around the area.
>
> Response 34 - 3:        See responses to 17, 19, 27 above.

35.     However, following Lt. Zielinski's order to disperse, some members of the crowd

begin to leave, headed in the direction of Foley Square, across the street. Exhibit E, 01:30- 02:39.

> Response 35 - 1:        There were many people in the crowd that did not begin
>                         to leave, or head in the direction of Foley Square.
>
> Response 35 - 2:        During this moment in time, officers can be seen exiting
>                         the stairwell of 60 Centre Street to the south carrying
>                         orange mesh netting and members of the crowd seem to

become concerned that they may soon be surrounded by orange mesh netting and be unable to leave.

Response 35 - 3:        See the response to 1 above in regards to Foley Square.

Response 35 - 4:        The order, assuming there was a correctly worded order to disperse, was an unlawful order.  Assuming, which is not indisputably demonstrated by the video, that the protestors occupied the entire sidewalk from the building line to the curb, pursuant to clearly established Second Circuit precedent [*Papineau v. Parmley*, 465 F.3d 46, 59 (2d Cir. 2006) (citing *People v. Nixon*, 248 N.Y. 182, 185, 187, 161 N.E. 463 (1928) (overturning disorderly conduct conviction where protesters who occupied the entire sidewalk forced pedestrians out into the street))], these protestors were not committing disorderly conduct even if they occupied the entire sidewalk and caused pedestrians to step into the street to avoid them.  Given that these peaceful protestors were occupying a traditional public forum, protected by the First Amendment and fully in accordance with state law, the instructions given by Lieutenant Cook were patently unlawful.

36.     A protestor called for additional protestors to cross from Foley Square to 60 Centre Street, and the crowd chanted "Who's streets?" "Our streets!" In response to the orders to disperse. Exhibit E, 02:49-03:18.

Response 36 - 1:        There were many individuals in the crowd not chanting "Who's streets?" "Our streets!"

Response 36 - 2:        There were some individuals in the crowd chanting, "This is what democracy looks like."

Response 36 - 3:        The order, assuming there was a correctly worded order to disperse, was an unlawful order.  Assuming, which is not indisputably demonstrated by the video, that the protestors occupied the entire sidewalk from the building line to the curb, pursuant to clearly established Second Circuit precedent [*Papineau v. Parmley*, 465 F.3d 46, 59 (2d Cir. 2006) (citing *People v. Nixon*, 248 N.Y. 182, 185, 187, 161 N.E. 463 (1928) (overturning disorderly conduct conviction where protesters who occupied the entire sidewalk forced pedestrians out into the street))], these protestors were not committing disorderly conduct even if they occupied the entire sidewalk and caused pedestrians to step into the street to avoid them.  Given that these peaceful protestors were occupying a traditional public forum, protected by the First Amendment and fully in accordance with state law, the instructions given by Lieutenant Cook were patently unlawful.

Response 36 - 4:        Any chants by the crowd such as "Who's streets?" "Our streets!" is protected First Amendment expressive speech activity.  As this conduct took place on a sidewalk in front of a courthouse in an, otherwise empty, commercial area on a Saturday, it is protected by the First Amendment.  *Grayned v. City of Rockford,* 408 U.S. 104, 115 (1972) ("The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time.").

37.     A second officer with a bullhorn proceeded through the crowd from the opposite side of the protests issuing orders to disperse. Exhibit D, 09:36-10:25.

| | |
|---|---|
| Response 37 - 1: | Deny.  This time indication on Video D does not show any officer walking through the crowd issuing orders to disperse. |
| Response 37 - 2: | Any officer that would issue orders to disperse during this time period would be making an unlawful order. |
| Response 37 - 3: | See response 36-3 above. |

38.     The second officer with a bullhorn issued orders to disperse as he proceeded through the crowd, stating "Folks we need you to clear the sidewalk, thank you. Folks you have to clear the sidewalk, thank you. Folks we have to clear the sidewalk thank you." Exhibit D, 09:35-10:10.

| | |
|---|---|
| Response 38 - 1: | Deny.  This time indication on Video D does not show an officer issuing orders to disperse. |
| Response 38 - 2: | See response to 36, 37 above. |

39.     The timestamp on the video for the orders in ¶ 38 is approximately 3:08 p.m. Exhibit D, 09:36-10:25.

| | |
|---|---|
| Response 39 - 1: | Admitted that the time stamp for Exhibit D from 9:36-10:25 is approximately 3:08pm. |

40.     The second officer with a bullhorn continued to issue orders to disperse from within the crowd. Exhibit D, 10:10-11:00.

| | |
|---|---|
| Response 40 - 1: | Deny that an officer continued to give consistent orders. |
| Response 40 - 2: | Deny that an officer continued to give orders to disperse. |
| Response 40 - 3: | See response to 36, 37 above. |

41.     A third officer with a bullhorn issued orders to disperse from the courthouse steps, stating "folks you have to clear the sidewalk, thank you." Exhibit D, 10:59-11:02; 11:14-11:17.

Response 41 - 1:       Admit that an unidentified officer next to the TARU officer taking video states at a volume that is not understood from the video to be heard on the sidewalk, "folks you have to clear the sidewalk, thank you."

Response 41 - 2:       See response to 36, 37 above.

42.    The crowd responded to the numerous orders to disperse by starting a chant of "We're blocking pedestrian traffic." Exhibit D, 10:54-11:10.

Response 42 - 1:       Deny.

Response 42 - 2:       At 0:00-0:26 of Video E, and 9:58 of Video D, a chant of "We are pedestrian traffic can be heard."

Response 42 - 3:       It is not clear the exact chant, if any, occurring at 10:54-11:10 of Exhibit D.

Response 42 - 4:       At 10:38 a person is heard to exclaim to the police, "you are blocking pedestrian traffic."  It is not clear if that is a chant that is then picked up and repeated to the police, "You are blocking pedestrian traffic."  Not, "We are blocking pedestrian traffic."

Response 42 - 5:       Even if the individuals present were stating "We're blocking pedestrian traffic," which they clearly are not, this too would be expressive speech protected by the First Amendment.

Response 42 - 6:       See response to 36-4 above.

43.    An officer announced though a bullhorn "Folks you need to clear the sidewalk thank you." Exhibit D, 11:45-11:47.

Response 43 - 1:       At 11:35 a voice can be heard stating, "Folks you need to clear the sidewalk."

Response 43 - 2:       See response to 36, 37 above.

44.    Lieutenant Zielinski announced through a bullhorn "Ladies and gentlemen you're going to have to leave this area. Right now it's temporarily closed. Right now you have to leave the sidewalk. Right, because you're blocking the walkways, it's unsafe. You're blocking the walkway, you need to move. Right now it's a danger, it's a hazard, you need to move." Exhibit E, 03:25-03:46.

Response 44 - 1:       Admit that at the time stamp referenced in this paragraph, Lieutenant Zielinski uses these words or words similar.

Response 44 - 2:        The use of these words does not indicate the truth of the statement made by Lieutenant Zielinski.

Response 44 - 3:        Individuals present that could hear Lieutenant Zielinski responded "There is no hazard," "Keep walking," "We have a right to be here" Exhibit E 3:45-3:50.

Response 44 - 4:        An individual can be heard saying, "Just keep waking, round in a circle."  Exhibit E 4:03-4:08.

Response 44 - 5:        See response to 36, 37 above.

45.     Lieutenant Zielinski announced through a bullhorn "Ladies and gentlemen right now you need to clear the sidewalk, it's a hazard. You need to clear - it's temporarily closed, we don't want nobody to get hurt. Ladies and gentlemen, we need to you to move temporarily, start walking through, we don't want nobody to get hurt." Exhibit C, 00:09- 00:13; Exhibit D, 12:05-12:23; Exhibit E, 04:00-04:15.

Response 45 - 1:        Admit that at the time stamp referenced in this paragraph, Lieutenant Zielinski uses these words or words similar.

Response 45 - 2:        The use of these words does not indicate the truth of the statement made by Lieutenant Zielinski.

Response 45 - 3:        Individuals present that could hear Lieutenant Zielinski responded "There is no hazard," "Where is the hazard?" "There is no hazard here except for the cops." Exhibit E 4:00-4:23.

Response 45 - 4:        See response to 36, 37 above.

46.     Lieutenant Zielinski announced through a bullhorn "Ladies and gentlemen you need to clear the sidewalk. Right now it's temporarily closed, we don't want nobody to get hurt." Exhibit C, 00:18-00:24; Exhibit D, 12:25-12:31; Exhibit E, 04:29-04:35.

Response 46 - 1:        Admit that at the time stamp referenced in this paragraph, Lieutenant Zielinski uses these words or words similar.

Response 46 - 2:        The use of these words does not indicate the truth of the statement made by Lieutenant Zielinski.

Response 46 - 3:        Individuals present that could hear Lieutenant Zielinski responded "They're blocking the stairs (indicating the police)," "if you walk in a circle, they can't arrest you," "What f**king hazard?"  4:20-4:55.

Response 46 - 4:        See response to 36, 37 above.

47.     An officer announced though a bullhorn "Ladies and gentlemen you got to clear the sidewalk please. Ladies and gentlemen please clear the sidewalk, thank you. Ladies and gentlemen please clear the sidewalk." Exhibit D, 12:37-12:45.

| | |
|---|---|
| Response 47 - 1: | Admit that these words can be heard. |
| Response 47 - 2: | See response to 36, 37 above. |

48.     An officer announced through a bullhorn "Ladies and gentlemen please clear the sidewalk, thank you. Ladies and gentlemen please clear the sidewalk, thank you." Exhibit C, 00:51-00:57; Exhibit D, 12:58-13:05.

| | |
|---|---|
| Response 48 - 1: | At 12:58-13:01, an individual can be heard saying, "The police are not respecting our First Amendment rights." |
| Response 48 - 2: | At 13:04-13:07, two individuals can be seen wearing Guy Fawkes masks on their heads so as not to cover their face. |
| Response 48 - 3: | Admit. |
| Response 48 - 4: | See response to 36, 37 above. |

49.     The second officer with a bullhorn announced "Clear the sidewalk, thank you. Thank you. Folks we have to clear the sidewalk. Clear the sidewalk. Clear the sidewalk. Thank you. Clear the sidewalk, nice and easy. Folks we got to clear the sidewalk. Thank you. Sir you got to go this way. This way sir. You got to go that way, thank you. Folks you have to clear the sidewalk, thank you. Folks you've got to go that way – sir you have to go that way - thank you. Exhibit D, 13:32-13:57.

| | |
|---|---|
| Response 49 - 1: | Deny to the extent that these exact words in this order are not heard. |
| Response 49 - 2: | See response to 36, 37 above. |

50.     The timestamp on the video for the order in ¶ 49 is approximately 3:12 p.m. Exhibit D, 13:32-13:57.

| | |
|---|---|
| Response 50 - 1: | Admit. |

51.     Lt. Zielinski announced through a bullhorn "Ladies and gentlemen, you need to clear the sidewalk. Right now it's a hazard. It's temporarily closed. It will be opened up later on." Exhibit C, 01:13-01:18.

| | |
|---|---|
| Response 51 - 1: | Admit. |
| Response 51 - 2: | An individual can be heard stating, "There is no hazard." |
| Response 51 - 3: | Another individual can be heard stating, "Do not touch us." |
| Response 51 - 4: | See response to 36, 37 above. |

52.     A uniformed officer can be seen directing a protestor to disperse, stating "go that way, go that way." Exhibit C, 01:25-01:28.

| | |
|---|---|
| Response 52 - 1: | Deny. |
| Response 52 - 2: | At this point a uniformed member of the NYPD can be seen pushing a protester while stating move "you have got to move that way." |
| Response 52 - 3: | An individual can be heard stating, "Do not touch us." |
| Response 52 - 4: | See response to 36, 37 above. |

53.     Lt. Zielinski announced through a bullhorn "Right now the sidewalk is closed, you need to move on." Exhibit C, 01:30-01:34; Exhibit E, 05:44-05:50.

| | |
|---|---|
| Response 53 - 1: | Admit that these words, or words close to these words were used by Lieutenant Zielinski at this time. |
| Response 53 - 2: | See response to 36, 37 above. |

54.     Lt. Zielinski announced through a bullhorn "Right now the sidewalk is closed, it will be open very soon, we need you to move on so nobody gets hurt." Exhibit E, 05:50- 06:00.

| | |
|---|---|
| Response 54 - 1: | Admit that these words, or words close to these words were used by Lieutenant Zielinski at this time. |
| Response 54 - 2: | See response to 36, 37 above. |

24

55.     The group across the street from 60 Centre, at Foley Square, grew considerably

larger over the minutes while officers ordered the protestors to disperse. Exhibit D, 00:00-01:00;

12:20-13:50; 14:10-14:14; Exhibit E, 06:38-06:40.

Response 55 - 1:     This statement is too vague to be considered a material fact.

Response 55 - 2:     Admit that the sidewalk in front of 60 Centre Street was not blocked or congested.

Response 55 - 3:     See response to 2-2 above.

56.     There is no indication that officers issued any orders, or attempted to disperse the

group at Foley Square. Exhibit C; Exhibit D; Exhibit E.

Response 56 - 1:     This is not a material fact.

Response 56 - 2:     The lack of an indication of an order or attempted order to disperse is vague and cannot be proven or disproven by the video evidence.

Response 56 - 3:     See Platintiff's Video Exhibit G 03:40-03:50   for police seeking to enforce a specific pedestrian lane of travel on the Foley Square – Thomas Paine Park side of Centre Street.

57.     The second officer with a bullhorn announced "Folks you've got to clear the

sidewalk, thank you. Folks this way please. Folks you've got to clear the sidewalk, thank you."

Exhibit D, 14:07-14:14.

Response 57 - 1:     Deny that this can be heard clearly at this time mark.

Response 57 - 2:     See response to 36, 37 above.

58.     The second officer with a bullhorn announced "Folks you've got to clear the

sidewalk, thank you." Exhibit D, 14:25-14:28.

Response 58 - 1:     Deny that this can be heard clearly at this time mark.

Response 58 - 2:     See response to 36, 37 above.

59.     Lieutenant Zielinski announced through a bullhorn "Ladies and gentlemen, the sidewalk is temporarily closed and a safety hazard, we need you to move –" Exhibit D,14:30-14:37.

| | |
|---|---|
| Response 59 - 1: | Deny. |
| Response 59 - 2: | During this time stamp, a voice can be heard saying, "This is a peaceful assembly." |
| Response 59 - 3: | See response to 36, 37 above. |

60.     Lieutenant Zielinski announced through a bullhorn "Ladies and gentlemen, you have to clear this sidewalk right now. It's a safety hazard, it's temporarily closed. We'll allow you back later. You're going to have to move, alright. Right now it's a safety hazard you have to keep on moving." Exhibit C, 06:34-06:46.

| | |
|---|---|
| Response 60 - 1: | Admit. |
| Response 60 - 2: | See response to 36, 37 above. |

61.     A group of protestors ignoring Lieutenant Zielinski's order began a human microphone, and Lieutenant Zielinski announced through a bullhorn "Ladies and gentlemen, the sidewalk is closed, you have to move on. Ladies and gentlemen the sidewalk is temporarily closed. We need you to move on. We don't want nobody to get hurt. Thank you for your cooperation. " Exhibit C, 06:53-07:08.

| | |
|---|---|
| Response 61 - 1: | The mic check was a question to the police, "Would the police please inform us what law we are in violation of?" |
| Response 61 - 2: | See response to 36, 37 above and specifically 36-4. |

62.     Lieutenant Zielinski announced through a bullhorn "Ladies and gentlemen, just keep moving. Watch your step, we don't want you to fall and get hurt." Exhibit C, 07:10- 07:13.

| | |
|---|---|
| Response 62 - 1: | Admit. |
| Response 62 - 2: | This is not a material fact. |
| Response 62 - 3: | See response to 36, 37 above. |

63.    Lieutenant Zielinski announced "Ladies and gentlemen, this is all closed now. Go on, keep moving. Ladies and gentlemen we're closing this temporarily, you need to keep moving. Move out of my way please, I'm asking you nicely. You have to move. You have to move sir. You have to move." Exhibit C, 07:37-07:55.

Response 63 - 1:        Admit.

Response 63 - 2:        This is not a material fact.

Response 63 - 3:        See response to 36, 37 above.

64.    When Lieutenant Zielinski stated "Move out of my way please, I'm asking you nicely." He spoke to an individual in a hooded sweatshirt and backpack who had approached him very closely while he made the announcements. Exhibit C, 07:43-07:47.

Response 64 - 1:        Admit that Lieutenant Zielinski spoke to a person in a black hooded sweatshirt and a backpack.

Response 64 - 2:        Deny that it was the individual in the hooded sweatshirt was moving.

Response 64 - 3:        Lieutenant Zielinski was mobile and this individual was stationary but for lifting up a phone to photograph or videotape Lieutenant Zielinski before being told he had to move.

Response 64 - 4:        This is not a material fact.

Response 64 - 5:        By creating a confrontation with individuals involved in expressive speech activity in a location and at a time that was appropriate for such activity, the NYPD not only violated the Constitutional rights of these individuals, but quite possibly violated their oaths to uphold the Constitution.

65.    When Lieutenant Zielinski stated "You have to move. You have to move sir. You have to move." He spoke to an individual in a green hat. Exhibit C, 07:51-07:55.

Response 65 - 1:        Admit that there was an individual in a knit green hat in the video image at the time that Lieutenant Zielinski used these words.

Response 65 - 2:        Deny that the video indicates that these words were directed at the individual in the knit green hat.

Response 65 - 3:        This is not a material fact.

Response 65 - 4:        See response to 36, 37 above.

Response 65 - 5:        See response to 64-5 above.

66.     After giving the orders in ¶ 63 Lieutenant Zielinski turned to a higher ranking

officer behind him, and explained "They are moving. They are." Exhibit C, 07:56-07:59.

             Response 66 - 1:          Admit that Lieutenant Zielinski seems to be using these
words, or words close to these words.

             Response 66 - 2:          Deny that the video indicates exactly who these words
were directed at, though at some point the words seem directed towards a female
officer believed to be Defendant Deputy Inspector Cokkinos.

             Response 66 - 3:          This is not a material fact.

67.     Plaintiff approached Lieutenant Zielinski wearing a green camouflage hat, a

black coat with an orange arm band, and holding a Constitution at approximately eye level.

Exhibit C, 07:58-08:06.

             Response 67 - 1:          Admit that the Plaintiff is seen in this image walking in
the general direction of Lieutenant Zielinski.

             Response 67 - 2:          Deny that this is a material fact.

             Response 67 - 3:          The very fact of carrying the U.S. Constitution at the
foot of a courthouse may very well be expressive speech activity protected by the
very same U.S. Constitution.

             Response 67 - 4:          In Marine parlance, the green camouflage hat is called a
Marine Corps cover.

68.     As plaintiff approached, Lieutenant Zielinski announced through a bullhorn "You

have to move." Exhibit C, 08:00-08:02.

             Response 68 - 1:          Deny that these words are heard in this time stamp.

             Response 68 - 2:          See response to 36, 37.

69.     Plaintiff attempted to alert officers that he believed their actions violated the

Constitution of the United States by yelling "Treason!" Exhibit A, ¶¶ 57, 59; Exhibit C, 07:58-

08:28.

| | |
|---|---|
| Response 69 - 1: | Admit that among other words and phrases used, Plaintiff used the word treason. |
| Response 69 - 2: | Previous to this moment in the video, the Plaintiff has been seeking to speak to multiple Police Officers about the action being taken that day, including Lieutenant Zielinski. |
| Response 69 - 3: | Plaintiff and others can also be heard saying, "What you are doing is unlawful, we remain a peaceful assembly." |
| Response 69 - 4: | Another individual can be seen pointing at the police who are blocking the sidewalk and saying, "Do you see the irony in this.  You just threatened a bunch of people for blocking this." |
| Response 69 - 5: | See response to 64-5 above. |

70.     Lt. Zielinski personally told plaintiff "Move back, and get out of my way" when plaintiff came too close to the Lieutenant. Exhibit C, 08:03-08:05.

| | |
|---|---|
| Response 70 - 1: | Deny that these words are specifically audible in the video. |
| Response 70 - 2: | See response to 64-5 above. |
| Response 70 - 3: | See response to 36, 37 above. |

71.     Lieutenant Zielinski then began to make another announcement to the crowd, beginning "Ladies and gentlemen - " Exhibit C, 08:05-08:07.

| | |
|---|---|
| Response 71 - 1: | Admit that in or around this time, Lieutenant Zielinski can be heard stating something that begins with the words, "Ladies and Gentlemen." |
| Response 71 - 2: | Deny this is a material fact. |
| Response 71 - 3: | See response to 36, 37 above. |

72.     As Lieutenant Zelinski turned and raised his bullhorn to begin the announcement to the lingering protestors, plaintiff approached him from behind, holding the Constitution up and shaking it as he stated "You swore an oath. You swore an oath." Exhibit C, 08:05- 08:07.

| | |
|---|---|
| Response 72 - 1: | Deny that the Plaintiff approached Lieutenant Zielinski from behind. |

| | |
|---|---|
| Response 72 - 2: | Admit that Plaintiff stated in the general direction of the NYPD and to Lieutenant Zielinski, "You swore an oath." |
| Response 72 - 3: | See responses  64-5, 67-3 above. |

73.    Lieutenant Zielinski stopped his announcement to the crowd to personally order Plaintiff back, stating "Move back. Move back sir. Move back. Move back." Exhibit C, 08:06-08:10.

| | |
|---|---|
| Response 73 - 1: | Deny that this video shows that these words were stated by Lieutenant Zielinski, or that they were directed at Jose Mediavilla. |
| Response 73 - 2: | Admit that these words, or similar words to this effect, are audible. |
| Response 73 - 3: | See response 36, 37 above. |
| Response 73 - 4: | See responses 64-5, 67-3 above. |

74.    Plaintiff remained near Lieutenant Zielinski with his fist holding a Constitution at eye level, yelling "treason." Exhibit C, 08:09-08:13.

| | |
|---|---|
| Response 74 - 1: | Deny that the Plaintiff had his hand in a fist. |
| Response 74 - 2: | Admit that the Plaintiff remained in the area with Lieutenant Zielinski and was holding a copy of the U.S. Constitution. |
| Response 74 - 3: | Admit that Plaintiff was repeating the word treason. |
| Response 74 - 4: | See responses 64-5, 67-3 above. |

75.    Plaintiff can be heard yelling "Treason" at least three times shortly after being personally asked to step back from Lieutenant Zielinski. Exhibit C. 08:09-08:19.

| | |
|---|---|
| Response 75 - 1: | Admit that the word Treason can be heard in this time period. |
| Response 75 - 2: | See response  64-5, 67-3 above. |
| Response 75 - 3: | Deny that the video shows who states these words, but believe it to be the Plaintiff. |

76.     Plaintiff was yelling in Lieutenant Zielinski's face from a close distance, and moving to stay directly in front of Lieutenant Zielinski while he tried to order the crowd to disperse. Exhibit D, 14:37-14:45.

>            Response 76 - 1:          Deny.
>
>            Response 76 - 2:          During the time cited in this paragraph, Plaintniff is not remaining in front of Lieutenant Zielinski and is not seeking to disrupt Lieutenant Zielinski from performing an official police function.
>
>            Response 76 - 3:          To be an official police function this must be a lawful order, and it is not a lawful order.
>
>            Response 76 - 4:          See response to 36, 37 above.

77.     Lieutenant Zielinski, still trying to clear the sidewalk, announced through a bullhorn "The sidewalk is closed. You need to move." Exhibit C, 08:15-08:19; Exhibit D, 14:42-14:44.

>            Response 77 - 1:          Admit that Lieutenant Zielinski says these words.
>
>            Response 77 - 2:          See response  36, 37 above.

78.     The last time plaintiff yelled "treason" into Lieutenant Zielinski's face, plaintiff made a sharp movement even closer to the Lieutenant's face. Exhibit D, 14:43-14:45.

>            Response 78 - 1:          Deny.
>
>            Response 78 - 2:          See response 64-5, 67-3 above.

79.     Lieutenant Zielinski turned away from plaintiff and took a step towards the building line. Exhibit D, 14:45-14:47.

>            Response 79 - 1:          Admit that Lieutenant Zielinski took a few steps in the southerly direction.

80.     Plaintiff followed closely behind the Lieutenant, shouting "treason." Exhibit D, 14:46-14:48.

>            Response 80 - 1:          The video cited speaks for itself, and should be interpreted by a jury.

> Response 80 - 2:    Admit that the Plaintiff took a single step in the southerly direction.
>
> Response 80 - 3:    Admit that the Plaintiff said "treason."
>
> Response 80 - 4:    See response 64-5, 67-3 above.

81.    Lieutenant Zielinski turned around quickly, startled by plaintiff. Exhibit D, 14:47-14:48.

> Response 81 - 1:    The video cited speaks for itself, and should be interpreted by a jury.
>
> Response 81 - 2:    This is not a material fact.  "Startling" a police officer is not a crime.
>
> Response 81 - 3:    Admit that Lieutenant Zielinski stopped and turned suddenly.
>
> Response 81 - 4:    Deny that the video shows Lieutenant Zielinski to be startled.  Lt. Zielinski looks completely unconcerned.
>
> Response 81 - 5:    See response 64-5, 67-3 above.

82.    Officer Ciaramitaro reached across the orange barrier and placed plaintiff under arrest. Exhibit D, 14:47-14:55.

> Response 82 - 1:    The video cited speaks for itself, and should be interpreted by a jury.
>
> Response 82 - 2:    Admit that Officer Ciaramitaro, with other officers, and with the direction or approval of the other defendants, reached across the orange mesh netting and physically grabbed the Plaintiff.

83.    Plaintiff continued shouting treason, and waived his left arm in the air nearly striking Lieutenant Zielinski while Officers attempted to get him under control. Exhibit D, 14:47 14:54.

> Response 83 - 1:    The video cited speaks for itself, and should be interpreted by a jury.
>
> Response 83 - 2:    The video cited shows police officers grabbing the plaintiff from behind on quickly pulling him to the ground.  Within these few seconds, while police officers destabilized him, the plaintiff's arm moved. The defendants do not allege that this arm movement was intentional.  The video does not reflect that it was intentional.  Even if it was intentional, the plaintiff was clearly under arrest before his arm moved, because police officers were already in the process of grabbing him from behind and throwing him on the ground.

Anything the plaintiff did after he was already under arrest – including "waiv[ing] his left arm in the air," cannot provide probable cause for the arrest that was already in progress.

Response 83 - 3:        As the defendants admit in paragraph 82, above, the plaintiff was being placed under arrest from the beginning of this same eight second interval identified in Exhibit D, 14:47 - 14:54.

Response 83 - 4:        Admit that Plaintiff continued to say the word treason.

Response 83 - 5:        See response 64-5, 67-3 above.

84.     Plaintiff was taken away from the other protestors and placed under arrest. Exhibit A, ¶ 60.

Response 84 - 1:        Admit.

85.     Plaintiff accepted an adjournment in contemplation of dismissal for those charges on or about July 24, 2013. Exhibit A, ¶¶ 72-73.

Response 85 - 1:        Admit.

Response 85 - 2:        The case was dismissed on July 24, 2013.

86.     An officer subsequently directed "All right everybody out at the crosswalk, lets go. Get these people out of here." Directing the protestors to Foley Square. Exhibit C, 09:22-09:29.

Response 86 - 1:        The video cited speaks for itself, and should be interpreted by a jury.

Response 86 - 2:        This is an immaterial fact to establishing probable cause for the plaintiff's arrest.  The plaintiff had already been arrested at 08:28 in the same video.

Response 86 - 3:        This alleged fact establishes – to the extent supported by the video cited – that no officer told any protestors that go across the street, or implied that protestors who crossed the street would not be arrested, until the plaintiff's arrest had already been completed.

Response 86 - 4:        The statement seems to state "everybody out of the crosswalk."

Response 86 - 5:         "Directing the protestors to Foley Square" is not a complete sentence, and does not state a fact.

Response 86 - 6:        This is not a material fact.

Response 86 - 7:        See response 36, 37 above.

87.     An officer with a bullhorn ordered "everybody's got to move across the street, come on." Exhibit C, 09:33-09:36.

Response 87 - 1:      There are several officers speaking at once during the cited video.  The video does not establish that an officer said everybody's got to move across the street, come on," or that he said it with a bullhorn.

Response 87 - 2:      This is an immaterial fact to establishing probable cause for the plaintiff's arrest.  The plaintiff had already been arrested at 08:28 in the same video.

Response 87 - 3:      This alleged fact establishes – to the extent supported by the video cited – that no officer told any protestors that go across the street, or implied that protestors who crossed the street would not be arrested, until the plaintiff's arrest had already been completed.

Response 87 - 4:      See response  36, 37 above.

Response 87 - 5:      At 10:48 someone yells, "The police were allowed to protest at a courthouse last week." This is in fact true. Plaintiffs Exhs. I, J, K(i-iii).

88.     The only force Plaintiff alleges is that his handcuffs were tight and painful. He suffered no injury, and required no treatment. He did not ask for officers to loosen his handcuffs. Exhibit A, ¶ 65.

Response 88 - 1:      Deny.

Response 88 - 2:      The multiple officers that grabbed the Plaintiff and brought him to the ground was excessive.

### November 12, 2011 Incident

89.     On November 12, 2011, plaintiff was participating in another Occupy Wall Street demonstration. Exhibit A, ¶ 74.

Response 89 - 1:      Admit that on November 12, 2011, Plaintiff was participating in a silent march.

Response 89 - 2:      In relation to the plaintiff's November 12, 2011 arrest, the plaintiff alleged that he was engaged in a lawful activity (protesting), when he was subjected to a warrantless arrest.  That is all that the plaintiff needs to allege to state a claim.  The plaintiff not only stated a claim, but the elements of this claim are now undisputed facts.  (Def. 56.1 ¶¶ 89-91).  The defendants' gripes concerning the (admittedly laconic) pleading of this claim all relate to the plaintiff's failure to plead facts which are not necessary to the plaintiff's claim,

34

but which might help the defendants establish their affirmative defense of probable cause (assuming the defendants have any such defense – they have provided zero facts and evidence on this summary judgment motion indicating that they do).

Response 89 - 3:        If these defendants had not stated the elements of the plaintiff's cause of action as "undisputed" facts, the defendants could conceivably have made an "Iqbal" argument that the pleading of this cause of action was insufficient.  However, Iqbal teaches that "conclusory" facts are insufficient to state a claim.  The fact stated in paragraph 89 of this 56.1 statement is not conclusory, it is a fact that could be proven true or false without reference to any other fact.  Moreover, because it is now and **admitted** fact, it matters not whether under Iqbal it would be considered conclusory or plausible. It has been admitted by the defendants.


90.      Plaintiff was arrested at the November 12, 2011 demonstration. Exhibit A, ¶ 76.

Response 90 - 1:        Admit that Plaintiff was arrested while participating in a silent night march.

Response 90 - 2:        If these defendants had not stated the elements of the plaintiff's cause of action as "undisputed" facts, the defendants could conceivably have made an "Iqbal" argument that the pleading of this cause of action was insufficient.  However, Iqbal teaches that "conclusory" facts are insufficient to state a claim.  The fact stated in paragraph 89 of this 56.1 statement is not conclusory, it is a fact that could be proven true or false without reference to any other fact.  Moreover, because it is now and **admitted** fact, it matters not whether under Iqbal it would be considered conclusory or plausible. It has been admitted by the defendants.


91.      Plaintiff was held for ten hours and released with a summons. Exhibit A, ¶ 77.

Response 91 - 1:        Admit.

Response 91 - 2:        If these defendants had not stated the elements of the plaintiff's cause of action as "undisputed" facts, the defendants could conceivably have made an "Iqbal" argument that the pleading of this cause of action was insufficient.  However, Iqbal teaches that "conclusory" facts are insufficient to state a claim.  The fact stated in paragraph 89 of this 56.1 statement is not conclusory, it is a fact that could be proven true or false without reference to any other fact.  Moreover, because it is now and **admitted** fact, it matters not whether under Iqbal it would be considered conclusory or plausible. It has been admitted by the defendants.


92.      Plaintiff did not provide any additional facts regarding his November 12, 2011 arrest in either his complaint or amended complaint apart from those set forth in paragraphs 74-79 of his amended complaint. Exhibit A, ¶¶ 74-79.

Response 92 - 1:          Deny.

Response 92 - 2:          Other paragraphs in the amended complaint contain information concerning the November 12, 2011 arrest.

Response 92 - 3:          Because the defendants have admitted in this 56.1 statement that the plaintiff was arrested while engaging in protest demonstration, there is no need for further facts to be established – through pleading or otherwise – to establish the plaintiff's claim.

Response 92 - 4:          Because the defendants have admitted the truth of the elements of the plaintiff's claim, and have not established (or attempted to establish) their affirmative defense of probable cause, the defendants cannot invoke "Iqbal" to invite this Court to rule these admitted facts to be "implausible."

93.       Plaintiff necessarily had some knowledge of what occurred to him on November 12, 2011, but did not set that forth in bringing his lawsuit on the eve of the statute of limitations. Exhibit B, p. 10: 13-16.

Response 93 - 1:          Deny.

Response 93 - 2:          This is not a material fact.

Response 93 - 3:          Because the defendants have admitted in this 56.1 statement that the plaintiff was arrested while engaging in protest activity, there is no need for further facts to be established – through pleading or otherwise – to establish the plaintiff's claim.

Response 93 - 4:          Because the defendants have admitted the truth of the elements of the plaintiff's claim, and have not established (or attempted to establish) their affirmative defense of probable cause, the defendants cannot invoke "Iqbal" to invite this Court to rule these admitted facts to be "implausible."

Response 93 - 5:          The City of New York, via the District Attorney of the County of New York, kept statistics on the number of Occupy Wall Street arrests and dispositions.  The arrests were separated by date, location, charge and disposition. On November 12, 2011, it indicated a total of six arrest, where 1 was decline to prosecute, 1 was convicted, 2 were ACDs.  That indicates only two other arrests, one of which was the Plaintiff, since his arrest was dismissed on February 2012 (Defendants Exhibit A, ¶ 79).  That some arrests occurred in Central Park and some in Liberty Street.  One of the arrest charges includes Loitering with masks.  (Ex PP, page Wiles 000377).

Response 93 - 6:          The City of New York had more specific information about the arrest including the exact time, the exact location, the name of the arresting officer and the facts alleged by the arresting officer.

94.     Plaintiff did not seek a tolling agreement prior to filing the above facts for the November 12, 2011. Exhibit B, p. 12: 19-20.

Response 94 - 1:        Admit.

Response 94 - 2:        This is not a material fact.


95.     Plaintiff's counsel conceded at the April 23, 2015 pre-motion conference "here we have a situation where within the statute we did not have sufficient facts that we could plead [regarding the November 12, 2011 incident] consistent with our obligations under Rule 11." Exhibit B, p. 12: 14-17.

Response 95 - 1:        Admit that one of the attorneys made that statement according to the transcript.

Response 95 - 2:        Deny that the allegations contained in the complaint are insufficient to withstand a motion to dismiss.

Response 95 - 3:        Deny that the allegations contained in the complaint and amended complaint do not set out all of the elements of claim of unlawful arrest for the November 12, 2011.

Response 95 - 4:        Deny that the defendant City of New York did not have all of the knowledge of the facts of the Plaintiff's November 12, 2011 arrest.


96.     Plaintiff alleges no injury or force related to the November 12, 2011 incident. Exhibit A, ¶¶ 74-79.

Response 96 - 1:        Admit.


DATED:          New York, New York
                July 17, 2015


                                        Respectfully submitted,


                                        _____//s//_____
                                        DAVID A. THOMPSON [DT 3991]
                                        STECKLOW COHEN & THOMPSON
                                        ATTORNEYS FOR PLAINTIFF
                                        217 Centre Street, 6th Floor
                                        Phone:  (212) 566-8000
                                        Fax:    (212) 202-4952
                                        dave@sctlaw.nyc