UNITED STATES DISTRICT COURT
SOUTHER DISTRICT OF NEW YORK
-----------------------------------------------------------------x

JOSE MEDIAVILLA,                                    Index No. 14-cv-8624
(VSB)

     *Plaintiff,*

     v.                                    Plaintiff's Affirmative
                 56.1 Statement

THE CITY OF NEW YORK, a municipal entity,
NEW YORK CITY POLICE LIEUTENANT
ZIELINSKI, NEW YORK CITY POLICE CHIEF ANGER,
NEW YORK CITY  POLICE OFFICER CIARAMITARO,
NEW YORK CITY DEPUTY INSPECTOR TLOCZKOWKSI,
 NEW YORK CITY DEPUTY INSPECTOR COKKINOS,
NEW YORK CITY POLICE LIEUTENANT ALBANO and
NEW  YORK CITY POLICE OFFICERS "JOHN DOES
1-10,"
     *Defendants.*
-----------------------------------------------------------------x

   Plaintiff JOSE MEDIAVILLA, by his attorney, Wylie M. Stecklow of

Stecklow Cohen & Thompson, submit this statement of material facts concerning

which there is no issue to be tried.

**I.  Procedural History**

   1.  The complaint was filed on October 29, 2014, naming the City of

New York and Chief Anger, PO Ciaramitaro and Lieutenant Zielinski.  (Ex. B

10/29/14 Complaint).

   2.  On November 5, 2014, the First Amended Complaint was filed

adding additional defendants to the complaint (Ex. C 11/5/14 First Amended

Complaint).

3.      The City of New York was served with the original complaint on or about October 29, 2014 and the First Amended Complaint via ECF on November 5, 2014. (Docket 4).

4.      On December 5, 2014 service of the First Amended Complaint was made upon Defendants Zielinski, Ciarmitaro, and Anger.  (Dockes 33, 34, 35).

5.      On February 6, 2015, no answer or appearance had been filed for any defendants or counsel for defendants in this matter.  Counsel for the plaintiff contacted the City of New York Law Department and informed them that nobody had yet filed an appearance on this matter.  Later that same day, a notic of appearance was filed by a  member of the City Law Department (Docket # 37), and Plaintiff's counsel recognized the quickness of the response in an email to counsel. (Ex D 2/6/15 email).

6.      Subsequently Plaintiff's counsel had discussions with the City counsel about issues relating to service for a few of the defendants, summarized in an undated letter (Ex. E (i), emailed on March 10, 2015 (E.xE (ii))).

7.      On April 1, 2015, the undated letter of March 10, 2015, was sent to defendants' counsel with an email setting out that Plaintiff's counsel was still waiting to hear back regarding the service issues raised in the prior letter.  (Ex E (iii)).

8.      On May 18, 2015, a stipulation of discontinuance was signed by counsel for Plaintiff and Defendants and so-ordered and filed in this matter, and the following defendants remained in this action as THE CITY OF NEW YORK, A Municipal Entity, NEW YORK CITY POLICE LIEUTENANT  ZIELINSKI,

NEW YORK CITY POLICE CHIEF ANGER, NEW YORK CITY  POLICE OFFICER CIARAMITARO,  NEW YORK CITY DEPUTY INSPECTOR TLOCZKOWKSI, NEW YORK CITY DEPUTY INSPECTOR COKKINOS, NEW YORK CITY POLICE LIEUTENANT ALBANO And  NEW  YORK CITY POLICE OFFICERS "JOHN DOES. (Docket # 50) (Ex F).

9.     On May 28, 2015, Defendants filed a motion to Dismiss pursuant to 12(b)(6) (Docket # 53), along with a Declaration in support (Docket # 54).

10.     On May 29, 2015, Defendants filed a Memorandum of Law (Docket #55).

11.     Within the Defendants' Memorandum of Law was a request for the Court to convert this motion to one for summary judgment (rather than being unable to consider video evidence that was not submitted as part of the initial or amended complaint). (Docket #55, page 4).

12.     On June 10, 2015, Plaintiff's counsel informed the court that the parties had agreed to convert the motion to one for summary judgment and sought a call or a conference with the court to discuss the procedural aspects related to this conversion. (Docket 56).

13.     On June 12, 2015, the court issued an order accepting the conversion of this motion to one for summary judgment and set out the order for 56.1 statements, ordering the parties to meet and confer as to timing. (Docket 57).

14.     On June 18, 2015, Plaintiff's counsel followed up regarding the service issues raised on March 10 and April 1, and specifically inquired about retired MOS Cook.  (Ex E (iv)).

15.　　On June 18, 2015, four minutes after ending the email concerning MOS Cook service, the defendant informed Plaintiff's counsel that retired MOS Cook had consented to accept service of the subject lawsuit at One Police Plaza. (Ex E (v)).

## II.　　The SATURDAY November 5, 2011 Arrest

### A.　　WEDNESDAY Oct. 5, 2011 Event

16.　　On Wednesday October 5, 2011, there was a march and rally in and around Foley Square.  (Ex. G Affidavit of Joshua Wiles 10/5/11 paragraph 1 ("Ex G Wiles Aff para _").

17.　　The groups involved on Wednesday October 5, 2011 included some unions, as well as participants in Occupy Wall Street.  (Ex G Wiles Aff para 1).

18.　　The purpose of the rally on Wednesday October 5, 2011 was to demonstrate labor's support for Occupy Wall Street.  (Ex G Wiles Aff para 1).

19.　　October 5, 2011 was a workday and fell on a Wednesday.  (Ex. G Wiles Aff  para 2).

20.　　On Wednesday October 5, 2011, the protestors occupied the steps of 60 Centre Street for more than an hour.  (Ex G Wiles Aff Para 3) (Ex H (i) Photograph of 60 Centre Street).

21.　　There were a similar number of protestors on the steps of 60 Centre Street on Wednesday October 5, 2011, to the number that were present in front of 60 Centre Street, along with the plaintiff, on November 5, 2011.  (Ex G Wiles Aff. at Para 6).

22.     On this earlier date when the protesters were allowed on the courthouse steps, two members of the NYPD Legal Bureau were present, including defendant NYPD Legal Lieutenant Albano, and neither interfered with the public assembly occurring on the steps.  (Ex H (ii) A small portion of the H (i) photograph magnified on the area where Defendant Albano is seen).

23.     On Wednesday October 5, 2011, no one was told to leave the steps by the police.  (Ex G Wiles Aff. Para 3).

24.     On Wednesday October 5, 2011, no one who went on the steps was arrested.  (Ex G Wiles Aff. Para 4).

25.     On Wednesday October 5, 2011, no one who went on the steps was injured.  (Ex G Wiles  Aff. Para 5).

26.     The presence of protestors on the steps of 60 Centre Street on Wednesday October 5, 2011, although it was a weekday, did not interfere with the business of the court.  (Ex G Wiles Aff. Para 7).


**B.     FRIDAY October 28, 3011 Event**


27.     On Friday October 28, 2011, sixteen (16) members of the NYPD were arraigned in the Bronx State Supreme Courthouse on corruption charges related to a parking ticket fixing scandal. (Exh I).

http://www.cbsnews.com/news/nypd-cops-plead-not-guilty-in-ticket-fixing-case/

28.     On Friday October 28, 2011, the hallway outside the courtroom where the criminal defendant NYPD officers were being arraigned was over-crowded with members of the NYPD. (Ex J).

29.     On Friday October 28, 2011, an additional five hundred (500)

members of the NYPD were protesting these arrests directly in front of the Bronx

State Supreme Courthouse . A journalist described the scene outside, reporting

that these officers were using "epithets like 'you piece of s---!' hurled at

prosecutors.   It was a disgrace."  (Ex K (1-ii)).

http://www.nydailynews.com/news/ticket-fixing-case-brings-worst-nypd-potty-mouthed-supporters-scandal-article-1.968588

30.     On Friday October 28, 2011, the five hundred (500) members of

the NYPD were given access to protest directly in front of the main entrance

doorway to the Bronx State Supreme Courthouse, including on the sidewalk and

in the roadway.  (Ex K (iii) photograph of David Karp AP for NBC News).

http://www.nbcnews.com/id/45078456/ns/us_news-crime_and_courts/t/nyc-cops-plead-not-guilty-drug-ticket-fixing-probe/#.VYHpAVxVhBc


C.     SATURDAY November 5, 2011 Event

31.     The plaintiff participated in a political demonstration in front of 60

Centre Street in Manhattan on Saturday Nov. 5, 2011.  (Exh A Aff Pars 1 - 5).

32.     This political demonstration was related to a consumer action,

"Bank Transfer Day". (Exh A Aff Para 4).

33.     Bank Transfer Day was a consumer activism initative calling for a

voluntary switch from commercial banks to not-for-profit credit unions by

Saturday November 5, 2011. "Together we can ensure that these banking

institutions will ALWAYS remember the 5th of November!! If the 99% removes

our funds from the major banking institutions to non-profit credit unions on or by

6

this date, we will send a clear message to the 1% that conscious consumers won't support companies unethical business practices."  (Ex L (i)).

http://abcnews.go.com/blogs/business/2011/10/bank-transfer-day-gains-momentum-on-facebook/

34.     The Bank Transfer initiative was a major success resulting in more than 600,000 new accounts for credit unions and over 4 billion dollars in new deposits, ostensibly removed from institutional banks.  (Ex L (ii)).

http://www.foxbusiness.com/personal-finance/2011/11/07/credit-unions-feel-boost-from-bank-transfer-day/

35.     In the afternoon of Saturday November 5, 2011, members of Occupy Wall Street sought to celebrate this success and amplify the message of institutional inequality by marching to the Courthouse and engaging in discussions, celebrations and continuing to petition their government for redress of grievances. (Exh A Aff Para 5).

36.     The marchers, including Jose Mediavilla, sought to use the stairs of the Courthouse for this moment for a few reasons including the belief of Occupy that the institutional inequality that favored large banks over the individual was supported by the government and through the Courts, as well as for the symbolic nature of justice that is obvious on the steps of a courthouse that has the words, "the true administration of justice is the firmest pillar of good government" across the top of it.  (Exh A Aff Para 6).

37.     The NYPD understood that the marchers wanted to use the steps of the courthouse at 60 Centre Street for their rally.  (E. M PO McNamara Transcript 26:25 – 27:13).

38.     Police officers instructed the marchers not to use the steps, and the marchers obeyed the instruction.  (Ex M PO McNamara Transcript 27:9 – 28:24).

39.     The marchers did not go up onto the steps.  (Ex M PO McNamara Transcript 27:9-17).

40.     While there were many police officers in the area, only six officers prevented the marchers from taking the steps, simply by asking them not to.  (Ex M PO McNamara Transcript 27:9 – 28:24).

41.     Some Marchers chanted, "We want the steps."    (Defendants Exhibit E Morales video  05:50 – 06:20).

42.     It was not illegal to chant "We want the steps."  (Ex N (ii) Zielinski Tr. 173:20-25; Defendants Exhibit E Morales video  05:50 – 06:20).

43.     There is no video of anyone chanting, "Take the steps."

44.     Lieutenant Zielinski issued various orders via his bullhorn to the protesters.  56.1 Statement of City of NY Paragraph 20 ("NYC 56 Para _") ("keep moving"), NYC 56 Para 24 ("leave the sidewalk"),  NYC 56 Para 28 ("move back"), NYC 56 Para 33 ("leave this area"), NYC 56 Para 44 ("sidewalk is temporarily closed, leave the area."), NYC 56 Para 45 ("clear the sidewalk, it's a hazard"), NYC 56 Paras 46, 47 & 48 ("clear the sidewalk"), paragraph 51 ("temporarily closed, clear the sidewalk"), NYC 56 Para 54 ("Sidewalk is closed,

will be open very soon, we need you to move on so nobody gets hurt"), NYC 56 Para 59 ("temporarily closed and a safety hazard").

45.     Another officer, believed to be Defendant Cook, also gave orders via bullhorn to the protesters. NYC 56 Para 37 ("clear the sidewalk").

46.     However, when Lieutenant Zielinski gave these orders, the protestors were **not** committing disorderly conduct.  (Ex. N (ii) Zielinski Transcript173:3-12; Defendants Exhibit E Morales video  00:00 - 05:34).

47.     Lieutenant Zielinski admitted that the protestors were **not** committing disorderly conduct.  (Ex. N (ii) Zielinski Transcript 173:3-12; Defendants Exhibit E Morales video  00:00 - 05:34).

48.     Lieutenant Zielinski admitted that the protestors were **not** blocking the sidewalk.  (Ex. N (ii) Zielinski Transcript 180:19-23; Defendants Exhibit E Morales video  11:46).

49.     There was sufficient space within the group of demonstrators for people to move freely on the sidewalk.  (Ex. N (ii) Zielinski Transcript 180:19-23).

50.     At that point in time, the sidewalk was **not** blocked.  (Ex. N (ii) Zielinski Trasncript 181:1-5; Video E (Morales) 11:46)).

51.     Chief Anger, testifying as a fact witness and as a City of New York 30(b)(6) witness, initially testified that he did not believe there were any safety concerns in front of 60 Centre Street on November 5, 2011 that resulted in the closing of the sidewalk. (Ex O Anger Transcript 210:13-16).

52.     Chief Anger, testifying as a fact witness and as a City of New York 30(b)(6) witness, added that one safety concern he remembered if the sidewalk was closed by the protesters "if there was an emergency inside the Court of getting personnel either fire or EMS or police inside because the sidewalk was closed by the demonstrators there." (Ex O Anger Transcript 211:1-5).

53.     Chief Anger, testifying as a fact witness and as a City of New York 30(b)(6) witness, testified that the police officers were deployed along the steps of 60 Centre Street on November 5, 2011 "to protect the courthouse." (Ex O Anger Transcript 78:8-21).

54.     Chief Anger , testifying as a fact witness and as a City of New York 30(b)(6) witness, did not know if anyone from the NYPD spoke to anyone at the courthouse before deploying police along the stairs.  Nor did he know whether there were any court sessions being held on that particular Saturday, though he testified "courthouses are in operation at all the time." (Ex O Anger Transcript 79:1-25).

55.     PO McNamara testified that the reason the protesters were forced off of the sidewalk in front of 60 Centre Street was because some of the protesters were talking about taking the steps at 100 Centre Street. (Ex M McNamara Transcript 40:1-5).

56.     Lieutenant Zielinski's orders were not lawful orders.  (Ex. N (ii) Zielinski Transcript 173:3-12, 180:19-23, 181:1-5, 187:8 – 188:2, 188:23 – 189:4; Defendants Exhibit E Morales video  00:00 – 17:56).

57.     Lieutenant Zielinski directed the positioning and the movement of the police orange plastic netting.  In Video E, he can be heard giving instructions to the officers holding the netting.  (Defendants Exhibit E Morales video 15:40 – 15:51).

58.     On November 5, 2011, Jose Mediavilla was at Zuccotti Park and marched to 60 Centre Street with other individuals.  (Exh A Aff Para 1-5).

59.     Jose Mediavilla wanted to celebrate the success of the Bank Transfer action and discuss with other individuals the future plans for more successful actions related to Occupy Wall Street and institutional inequality.  (Exh A Aff Para 5).

60.     Jose Mediavilla served in the Marines for seven (7) years and took an oath to support and defend the Constitution of the United States. (Exh A Aff Para 7).

61.     After being honorably discharged, Jose Mediavilla obtained a college education before moving to New York City. (Exh A Aff Para 7).

62.     In September 2011, he became involved in Occupy Wall Street. (Exh A Aff Para 7).

63.     On Saturday November 5, 2011, Jose Mediavilla understood that members of the service of the NYPD each take an oath of office, that pledges and declares to uphold the Constitution of the United States and the Constitution of the State of New York, and faithfully discharge their duties as NYPD officers. (Exh A Aff Para 8) (See video of NYPD officers being sworn in by Mayor Bill

DeBlasio: http://www1.nyc.gov/office-of-the-mayor/news/018-14/video-mayor-bill-de-blasio-administers-oath-office-nypd-recruits at 10:20).

64.    When Jose Mediavilla approached the New York State Supreme Courthouse on Saturday November 5, 2011, he saw and understood that members of the NYPD were blocking access for these marchers to publicly assemble and discuss issues they believed important, which led him to believe that these members of the NYPD were violating the Constitution and betraying their oath of office. (Exh A Aff Para 9).

65.    Another protester was handing out copies of the U.S. Constitution and Jose Mediavilla began to display one in his hand. (Exh A Aff Para 10, Defendants video Exhibit C 3:43-3:51).

66.    Jose Mediavilla, wearing a black hooded jacket with a large blue 'Occupy' fist on the back, began to discuss this with various members of how the denial of this peaceful public assembly was a betrayal of their oath of office. (Defendants video Exhibit C 4:04-4:45, (Exh A Aff Paras 3, 11).

67.    As Jose Mediavilla approached the Courthouse steps, he walked next to a line of police officers, and began speaking to many of them about how the denial of this peaceful public assembly was a betrayal of their oath of office. (Defendants video Exhibit C 7:46 - 8:01, (Exh A Aff Paras 11-13).

68.    No officer responded to Jose Mediavilla in any meaningful way. (Exh A Aff Para 14).

69.    Pursuant to long-standing practice, a portion of the street closest to the the curb of the sidewalk in front of 60 Centre Street was closed to vehicular

traffic. This portion of the street, approximately three feet wide, was closed to vehicular traffic by the placement of plastic traffic "cones" (actually, in this case, shaped like barrels).  In addition, scooter police who accompanied the protest formed a line outside this line of traffic cones, so that a portion of the street, approximately four to five feet wide running from the curb line, was free of traffic.  The street itself is wide enough that vehicular traffic was still able to, and in fact did, move freely and normally up Centre Street unimpeded by the presence of the line of scooter police who stationed themselves outside the line of traffic cones.  As a result of the presence of this double line of traffic cones and police scooters, any pedestrian who may have had to step off the curb of the sidewalk in front of 60 Centre Street to walk around the protestors could have done so safely.  The defendants have not demonstrated that any pedestrians were caused to step off the sidewalk by the presence of the protestors, but if any such pedestrians existed, they could have done so safely.  (Plaintiff's Video Exhibit H 2:17-2:20).

70.    Inspector Edward Winski had previously instructed all officers working under his command, via what he described as a standing order, "not to engage in any conversation" with activists at Occupy Wall Street activities.  The refusal of officers to engage in a discussion of the unconstitutionality of their conduct breaking this peaceful assembly was part of a policy of the City of New York promulgated by its policy maker, Inspector Edward Winski (Ex  Winski Transcript 79:23 – 80:1-4).

71.     Eventually Jose Mediavilla was directed towards Lt. Zielinski, as the NYPD officer who seemed to be in charge as he was making announcements. (Exh A Aff Para 14).

72.     Lt. Zielinski was standing in front of a line of officers, facing a group of approximately 15 protestors, one of which was the plaintiff, Mr. Mediavilla.  Most of the protestors were standing still, apparently observing the activity of the police.  About half of them appear to be using a device to film or photograph what is happening.  None are acting in a violent or tumultuous manner. (Defendants video Exhibit C 7:35 - 8:01).

73.     One protester is saying to the NYPD, "What you're doing is unlawful.  You are preventing a peaceful assembly.  This is breaking the law."  At the same time, Jose Mediavilla has informed officers that they are violating their oath to uphold the Constitution and violating the First Amendment rights of protesters by breaking this peaceful assembly.  Jose Mediavilla eventually conflates this explanation into one word and begins to repeat it,  "treason." (Defendants Exhibit D Morales video 14:33 – 14:39).

74.     Neither the other protesters nor members of the NYPD appear to be disturbed or alarmed by Jose Mediavilla.  (Defendants Exhibit D Morales video 14:33 – 14:39).

75.     Lt. Zielinski does not acknowledge Mr. Mediavilla, instead he continues to make various announcements via an amplified bullhorn including, "the sidewalk is closed.  You need to move."  (Defendants Exhibit D Morales video14:40 – 14:41).

76.     Lieutenant Zielinski turns and states to Defendant Cokkinos some words to the effect, "they are moving. They are moving." (Defendants video Exhibit C 7:57-8:00).

77.     Jose Mediavilla repeats treason several times.  (Defendants Exhibit D Morales video 14:41 – 14:42).

78.     In the next three to four seconds, Lt. Zielinski turns to walk away from Mr. Mediavilla, taking approximately three steps away from him.  At this point, Lt. Zielinski's back is turned to the plaintiff.  The plaintiff takes a single step forward to follow.  The plaintiff's hands remain at his sides.  He is holding a cardboard sign underneath his right arm, a gas mask in one hand and the U.S. Constitution in his other hand.  Lt. Zielinski unexpectedly stops and turns around. (Defendants Exhibit D Morales video 14:42 – 14:46).  (Exh A Aff Para 18).

79.     In the next one to two seconds, Mr. Mediavilla, while moving no closer to Lt. Zielinski (in fact, while moving slightly away from him), says the word "treason" twice more.  (Defendants Exhibit D Morales video 14:46 – 14:47).

80.     Lt. Zielinski displays no sign of fear.  However, Mr. Mediavilla is already being grabbed by other officers to be placed under arrest. In another six seconds, Mr. Mediavilla in on the ground with police all over him.  (Defendants Exhibit D Morales 14:47).

81.     At least six (6) different members of the service are physically active in the detention and arrest of Jose Mediavilla, including Defendant Ciarmirtaro, Albano, Cook and others.  Defendant Albano removes the U.S.

15

Constitution from Jose Mediavilla's hand.  (Defendants Video Exhibit C 8:29 - 8:31)

82.     Defendants Cook, Tcolkowski, Albano, Ciarmitaro, Zielinski are each close enough to the arrest of Jose Mediavilla that they had an opportunity to intervene in this unlawful arrest. (Defendants Video Exhibit C 8:26-9:01).

83.     Subsequent to the arrest of Jose Mediavilla, other individuals were also arrested including Joshua Wiles, Chris Darden (Defendants Exhibit C 9:02), Marily Collins, Jenny Heinz, Elizabeth Lapenne, Emiloy Maclean, Ann Shirazi, Asya Weisenhaus, Chloe Weisenhaus (Ex T) (Plaintiffs Video Exhibit  I).

84.     On Saturday November 5, 2011, the NYPD utilized orange mesh to close the sidewalk in front of the New York State Supreme Courthouse, New York County and continued to close the sidewalk from Worth Street south to One Centre Street, a stretch of sidewalk in downtown Manhattan more than 1/10 of a mile in length.  (Plaintiffs Video Exhibit G: 0:00-0:10, 4:17 – 4:45) (Plaintiffs Video Exhibit F: 6:34 – 7:04).

85.     The City of New York denied that the NYPD shut the sidewalk at all.  (Ex O Anger Transcript 205:10-11).

86.     As the NYPD closed the sidewalk in front of 60 Centre Street, they pushed individuals south and west.  One individual can be heard to state, "They are pushing us into the street to get hit by cars."   (Defendants Video Exhibit C 10:23-31).

87.     At the same time, a chant is undertaken, "Freedom Assembly" (Defendants Video Exhibit C 10:20).

16

88.     Someone is heard to reference the NYPD protest at the Bronx Supreme Courthouse of October 28, 2011 stating, "The police department were allowed to protest at a courthouse last week. You protested last week.  We are not allowed to protest at a courthouse."  (Defendants Video Exhibit C 10:46-10:53).

89.     Eventually, the NYPD had pushed many of the individuals into the street where vehicular traffic became slow, and the protesters were now in harm's way as the roadway became congested and one of the lanes of traffic became filled with individuals who previously had been safely standing and walking in front of 60 Centre Street. (Defendants Video Exhibit D Morales 17:33).

90.     On November 5, 2011, there were no warrants for the plaintiff's arrest.  (Ex. Q).

91.     Jose Mediavilla was held for approximately twenty-four (24) hours before being released on his own recognizance. (Exh A Aff Para 20).

92.     Jose Mediavilla was conscious of this detention and did not consent to it.  (Exh A Aff Para 20).

93.     This detention was not otherwise authorized.  (Exh A Aff Para 20).

94.     Jose Mediavilla returned to court on multiple occasions to fight these charges. (Exh A Aff Para 21).

95.     On or around July 24, 2013, the charges against Jose Mediavilla were dismissed and sealed pursuant to New York Criminal Procedure Law 170.55. (Exh A Aff Para 21).


**D.     SATURDAY November 12, 2011**

96.     On Saturday November 12, 2011, Jose Mediavilla participated in a evening silent night march. (Exh A Aff Para 23).

97.     This nighttime silent march from Zuccotti Park had been ongoing for many of the days in November prior to Saturday November 12, 2011. (Exh A Aff Para 25).

98.     The participants in this march left Zuccotti Park and were intending to march past the Federal Reserve Bank and around the financial center before returning to Zuccotti Park. (Exh A Aff Para 25).

99.     The march was in the evening since that would be a less crowded time on the sidewalk, streets and buildings in and around the march route, so as to ensure that the NYPD did not have a valid reason to arrest those participating in the march. (Exh A Aff Para 26).

100.    The march was silent so that it could not be alleged that they were noisy and breaching the peace, so as to ensure that the NYPD did not have a valid reason to arrest those participating in the march. (Ex A Aff Para 26).

101.    People that participated in the march were warned by other marchers not to wear any mask, including Guy Fawkes mask, over their face.  But if they desired to wear a mask, to do so on the side of their head, so as to ensure that the NYPD did not have a valid reason to arrest those participating in the march. (Exh A Aff Para 28).

102.    Members of Occupy Wall Street had become familiar with the nuances of the mask loitering law so "if they were gonna wear masks, wear it in a way where they were less likely to be breaking the law or – intentionally breaking

18

the law.. they became more aware of the nuances of the law." (Ex U Del Pozo Transdcript 80:1:15)  (Defendants Exhibit D 13:04-13:07).

103.    Jose Mediavilla was walking with the march out of Zuccotti Park on Liberty Street past Broadway towards the Federal Reserve Bank. (Exh A Aff Para 27).

104.    Jose Mediavilla was wearing a Guy Fawkes mask on the side of his head. (Exh A Aff Para 28).

105.    At approximately 10:15pm, Jose Mediavilla was grabbed by a large police office wearing a blue Community Affairs jacket and arrested.  This arrest was then handed off to PO Michael Hu who process the arrest and charged Jose Mediavilla with violating PL Section 240.35(4), Loitering –Disguised in a public place. (Ex O) (Exh A Aff Para 29).

106.    Jose Mediavilla, like other individuals that participated in Occupy Wall Street understood that wearing a mask in public with two or three other indivdiuals could lead to his arrest.  (Exh A Aff Para 30) (Ex U Del Pozo Transcript 80:1:15)  (Defendants Exhibit D 13:04-13:07).

107.    On November 3, 2011, Jose Mediavilla was in Zuccotti Park wearing his Marine uniform and a Guy Fawkes mask on his head.  He was standing near a few other friends who also had the mask on their head but not covering their faces. (Exh A Aff Para 31).

108.    On November 3, 2011, a photographer asked Jose Mediavilla and his friends if he could take a photo of them, and requested that they place the masks properly over their faces. (Exh A Aff Para 32).

109.    On November 3, 2011, Jose Mediavilla and his friends placed their masks over their face for a few seconds so that a photograph could be taken. (Exh A Aff Para 33).

110.    On November 3, 2011, immediately after this photograph was taken, Jose Mediavilla was requested to walk over and speak with Deputy Inspector Edward Winski. (Exh A Aff Para 34).

111.    Deputy Inspector Edward Winski placed Jose Mediavilla under arrest, and had PO Jerome Allen process the arrest, charging Jose Mediavilla with violating PL Section 240.35(4), Loitering. (Ex P) (Exh A Aff Para 34).

112.    On November 12, 2011, Jose Mediavilla was detained by an unknown police office and processed by PO Michael Hu, and released with a summons to return to court on or about January 27, 2012. (Ex. Q).

113.    On November 12, 2011, there were no warrants for the plaintiff's arrest.  (Ex. Q).

114.    Jose Mediavilla was held for approximately ten (10) hours before being released on his own recognicanze. (Exh A Aff Para 36).

115.    Jose Mediavilla was conscious of this detention and did not consent to it.  (Exh A Aff Para 37).

116.    This detention was not otherwise authorized.  (Exh A Aff Para 37).

117.    On January 27, 2012, Jose Mediavilla appeared in court at 346 Broadway, New York, NY, at which time he was arraigned, released on his own recognizance and told to return to court on February 28, 2012.  (Ex R).

20

118.    On February 28, 2012, Jose Mediavilla returned to court at 346 Broadway, New York, NY and the prosecution was dismissed for failure to prosecute. (Ex S).

### III.    Failure to Train

119.    The City of New York was aware that individuals were going to participate in First Amendment protest activity in the financial center on September 17, 2011. (Ex V Inspector Edward Winski Transcript 52:23-25, 53:1-9).

120.    Subsequent to the Republican National Convention in 2004, the City of New York was sued by hundreds of individuals who claimed to be falsely arrested for participating in protest and other expressive speech activity protected by the First Amendment to the United States Constitution.  In January 2015, the City of New York paid $18 million dollars to settle these cases. (Ex VV).

121.    On August 12, 2011, the NYPD conducted disorder control training on Randall's Island.  The focus of the training was on riot control and not policing First Amendment activity. (Ex UU).

122.    Once Occupy Wall Street began its occupation of Zuccotti Park, the City of New York and the NYPD was on notice that the policing in and around Zuccotti Park would encounter individuals involved in expressive speech activity protected by the First Amendment to the United States Constitution.

123.    Due to the occupation of Zuccotti Park, the City of New York should have ensured that the Commanding Officer in charge of supervising the

policing of Zuccotti Park was trained in the rights of individuals involved in expressive speech activity protected by the First Amendment to the United States Constitution.  Instead, the City of New York allowed Inspector Edward Winski to supervise all police officers involved in the policing of the individuals involved in expressive speech activity protected by the First Amendment to the United States Constitution  (Ex V Inspector Edward Winski Transcript 168:11-25, 169:1-5).

124.    The City of New York had officers who understood the appropriate manner in which policing of individuals involved in expressive speech activity protected by the First Amendment to the United States Constitution should have been conducted.  (Ex U Deputy Inspector Brandon Del Pozo Transcript 86:8-23) (Ex W Deputy Inspector Anthony Raganella Transcript p. 74:18-24, 81:8-16, 88:8-25, 89:1-4).

125.    One of these officers was the commanding officer of the Disorder Control Unit responsible for training of officers.  (Ex W Deputy Inspector Anthony Raganella Transcript 6:2-4).

126.    One of these officers was at the onset of Occupy Wall Street, the Commanding Officer of a downtown Manhattan precinct.  (Ex U Deputy Inspector Brandon Del Pozo Transcript 9:16-19).

127.    Former Deputy Inspector (and newly confirmed Police Chief of Burlington, Vermont) Brandon Del Pozo testified about the degree of inconvenience needed to make a lawful arrest relating to disorderly conduct changes when First Amendment rights are involved.  "When people are exercising their First Amendment rights, it goes beyond de minimis that you should try to

22

give as much consideration as possible to the protestors.  I mean, First

Amendment Rights are not de minimis.  You owe more considerations to the

protesters than merely the de minimis measurement."  (Ex Del Pozo Transcript

86:8-23).

128.    The City of New York, by its 30(b0(6) witness, the Commanding

Officer of the Disorder Control Unit, Deputy Inspector Anthony Raganella,

testified about how to handle a protest that takes up an entire sidewalk and

explained the need for a substantial disruption, more than mere inconvenience,

and then described appropriate factors to consider when making this

determination.  (Ex W Raganella Transcript p. 74:18-24, 81:8-16, 88:8-25, 89:1-

4).

129.    When asked about how to police a protest that takes up the entire

sidewalk, the City of New York, via Deputy Inspector Raganella, explained, "Our

first method would probably be asking them – communicating with them to open

up the sidewalk and clear it for pedestrians that wanna utilize the sidewalk.  This

is under the assumption that there's a substantial disruption to people being able

to use the sidewalk that aren't involved in the protest."  (Ex W Raganella

Transcript 74:18-24).

130.    When asked about what factors he would take in consideration

under such circumstances, he testified: "I would have to take into consideration

the location of where they are, the time of day, how many people there are, the

physical environment that we're involved in, maybe even the weather conditions.

There's a lot of factors that may go into a decision like that."

131.    The individual who was put in charge of supervising the policing of Occupy Wall Street and training "hundreds of officers" (Ex V Winski Transcript 168:11-14, 168:15-22) in the appropriate application of laws such as disorderly conduct to individuals engaged in expressive speech activity protected by the First Amendment to the United States Constitution did not understand that a different standard must be used to apply penal statutes such as disorderly conduct to expressive speech activity.  (Ex V Winski Transcript 168:1:5).

132.    Deputy Inspector Edward Winski was asked if he was aware of any interplay between individual's constitutional rights to free speech and free expression and the disorderly conduct charge for obstructing pedestrian traffic, and he responded, "Not specifically, no."  (Ex V Winski Transcript 168:1:5).

133.    The individual who was put in charge of supervising the policing of Occupy Wall Street and training "hundreds of officers" (Ex V Winski Transcript 168:11-14, 168:15-22) in the appropriate application of laws such as disorderly conduct to individuals engaged in expressive speech activity protected by the First Amendment to the United States Constitution did not believe that there was any amount of time that traffic, vehicular or auto, needed to be blocked before he or his subordinates could make an arrest for disorderly conduct. (Ex V Winski Transcript 167:19:23.)

134.    The individual who was put in charge of supervising the policing of Occupy Wall Street and training "hundreds of officers" (Ex V Winski Transcript 168:11-14, 168:15-22) in the appropriate application of laws such as disorderly conduct to individuals engaged in expressive speech activity protected

by the First Amendment to the United States Constitution did not have the understanding that there was a mens rea requirement in the disorderly conduct statute." (Ex V Winski Transcript 165:14:23, 166:6:17.)

135.    The individual who was put in charge of supervising the policing of Occupy Wall Street and training "hundreds of officers" (Ex V Winski Transcript 168:11-14, 168:15-22) in the appropriate application of laws such as disorderly conduct to individuals engaged in expressive speech activity protected by the First Amendment to the United States Constitution believed the only training necessary was "that they should personally observe the violation." (Ex V Winski 168:5:10).

136.    The individual who was put in charge of supervising the policing of Occupy Wall Street and training "hundreds of officers" (Ex V Winski Transcript 168:11-14, 168:15-22) in the appropriate application of laws such as disorderly conduct to individuals engaged in expressive speech activity protected by the First Amendment to the United States Constitution regularly failed to read and review Legal Bureau Bulletins. (Ex V Winski Transcript 65: 13-25, 66:1-25, 67:1-10).

137.    Unfortunately, this failure of training permeated throughout the policing of Occupy Wall Street at all levels.  As an example Chief Steven Anger believed that only mere inconvenience was required to arrest someone for disorderly conduct.  He testified, that if someone has to walk around another, then the second person is "obstructing" the sidewalk and "inconveniencing" people

25

sufficiently to justify the charge of disorderly conduct.  (Ex O Anger 30(b)(6)

Transcript  200:4-6).

138.    NYPD Lieutenant Konstantinidis was assigned to supervise police

officers at Zuccotti Park at least a couple days every week during the existence of

Occupy Wall Street from September 17 – November 15, 2011.  (Ex X

Konstantinidis Transcript 33:4-15).

139.    NYPD Lieutenant Konstantinidis had no understanding of the First

Amendment or that Occupy Wall Street participants were engaged in expressive

speech activity protectd by the United States Constitution.  (Ex X Konstantinidis

Transcript  58:8-18).

140.    Prior to being assigned as a supervising officer at Occupy Wall

Street, Lieutenant Konstantinidis received no training in First Amendment activity

and the policing of individuals involved in these activities, except for some

training which he probably received at the police academy twenty years earlier

that he did not recall.  When he was asked about the training he received relating

to the First Amendment and testified, "That was probably back in the Academy. I

don't remember…." But he did not recall what if any training he received at the

academy.  (Ex X Konstantinidis Transcript 57:6-9, 59:22-25).)

141.    NYPD Lieutenant Konstantinidiswas asked what the First

Amendment means in his police work, and he answered, "I don't know." (Ex X

Konstantinidis Transcript 57:10-12)

142.    As another example, Detective Pastula, an officer who arrested an

individual at an Occupy Wall Street demonstration for disorderly conduct, never

received any training in the First Amendment rights of people engaging in demonstrations (Ex Z Pastula Transcript 37:10-13) and did not have a proper understanding of the application of disorderly conduct as it applied to individuals involved in First Amendment expressive speech activity.  Detective Pastula testified that a sidewalk is "obstructed" if you cannot "continue walking at pace as if no-one is in front of you."  (Ex Z Pastula Tr. 99:15-100:9).

143.    The City of New York and the NYPD failed to properly train its officers in how to police First Amendment activity.  (Ex Y Perkins Transcript at 11:2-9) (Ex AA Brehm Transcript 80:17-25, 81:1-14) (Ex BB Rinelli Transcript 12:12-25, 13:1-16).

144.    NYPD PO Perkins who was involved with policing Occupy Wall Street on at least one occasion was asked in a deposition about whether he had any training or instruction concerning civilian's constitutional rights of freedom of assembly, or rights to freedom of expression and responded the same to both questions, "No."  (Ex Y Perkins Transcript at 11:2-9).

145.    As another example, NYPD Police Officer Brehm was involved in policing of Occupy Wall Street at least on one occasion, and did not have an understanding of policing Firsst Amendment Activity. "I don't know of a specific training of that, but I don't – I can't recall what specific training… I believe there was some training given to us about the First Amendment … I think at the Police Academy… Freedom of speech and freedom of lawful assembly… that we were to respect their First Amendment rights … (but when asked about what the NYPD

were to do to respect those rights ) Not to—I'm not really sure.  They would –

what they would instruct us." (Ex AA Brehm Transcript 80:17-25, 81:1-14).

146.    As another example, NYPD PO Rinelli testified that he learned at

the academy about what protesters would look like ("basically a group of people

arguing about something or trying to state what they want changed") and when

questioned about how the First Amendment relates to policing public protests, he

stated "yes…basically just freedom of speech, you know, say what you want."

(Ex BB Rinelli Transcript 12:12-25, 13:1-16).

147.    As a result of the failure of the City of New York to properly

supervise and train officers in the policing of individuals involved in First

Amendment activity, more than 80 lawsuits, involving hundreds of individual

plaintiffs, have been filed in the Southern District of New York arising from

expressive speech activity associated with Occupy Wall Street. (Ex WW).


**IV.    NYPD Favors Commercial Endeavors over Expressive Speech
Activity**

148.    The City of New York and the NYPD allow for the blocking of

sidewalks when it involves commercial activity such as the Super Bowl

Boulevard, the twenty year anniversary of Friends, a bakery shop with a

permanent ice cream stand on the sidewalk, Chinatown stalls of fish.  (Ex CC. DD

(i-v)).

149.    On Sunday January 26 to February 2, 2014, the NYPD closed

Broadway On from 34th Street to 47th Street and temporarily renamed it Super

Bowl Boulevard. (Ex EE).

150.    Hundreds of thousands of people walked around Super Bowl Boulevard during the week January 26 to February 2, 2014. (Ex CC, FF (i-ii)).

151.    In addition to the hundreds of thousands of people that walked along Super Bowl Boulevard, media corporations such as Fox and ESPN were broadcasting from Super Bowl

Boulevard.  (Ex GG).

152.    In addition to media corporations such as Fox and ESPN, other large corporations were given public space on Super Bowl Boulevard to display advertising and engage the public with interactive marketing tools. Along Super Bowl Boulevard this included the NFL Rush Zone and  Microsoft on 36th to 37th Street, Pepsi/Frito and Papa Johns on 37th to 38th Street, Bridgestone and CNN on 38th to 39th Street, an Autograph and concert stage on 39th to 40th Street, a Toboggan Run on 40th to 41st Street (Ex HH Toboggan Run), NFL Network and MARS Product Display on 41st to 42nd Street, SAP (Software and Solutions Co.) and General Motors on 42nd to 43rd Street and more (including Good Morning America set in the morning on 44th to 45th Street). (Ex GG).

153.    The NYPD worked with the Times Square Alliance to ensure the safety of all individuals and corporate participants in the Superbowl Boulevard. (Ex II).

154.    Super Bowl Boulevard impacted the local businesses in a negative manner.  (Ex JJ).

155.     The NYPD expected between 400,000 and 450,000 people to come to Super Bowl Boulevard. (Ex FF (i-ii)).

156.    The City of New York and the NYPD favor commercial use of the stairs, sidewalks and building of the New York State Supreme Courthouse at 60 Centre Street on a regular basis and have sold access to use these areas for commercial purposes for decades.  (Exs KK (i-iii), LL, MM, NN).

157.    Since at least 2012, Vanity Fair has sponsored the opening party of the Tribeca Film Festival at the New York State Supreme Courthouse at 60 Centre Street. (Ex KK (i)).

158.    As part of this event, this corporate entity is allowed to utilize the stairs and sidewalk in front of the courthouse for advertising and a red carpet.  (Ex KK (ii)).

159.    As part of this private use of the New York State Supreme Courthouse, Vanity Fair is allowed to paint the logo of the Tribeca Film Festival into the sidewalk in front of the courthouse.  (Ex KK (iii)).

160.    In 2014, Mayor Bill DeBlasio attended this private event at the courthouse. (Ex LL).

161.    The stairs of the New York Supreme Court have also been utilized in more episodes of Law & Order than even a fan blog devoted to the show could muster to guess, "I wonder over the years how many times Jack McCoy (Sam Waterston) and his various ADAs have traipsed up and down those stairs, those stairs, not to mention the occasion fictional defense attorney or criminal."

http://allthingslawandorder.blogspot.com/2007/12/law-order-locations-new-york-county.html   (Ex MM).

162.    The stairs of the New York Supreme Court, as well as the building, have been used for films such as Wall Street, The Bounty Hunter, What Happens in Vegas, It Could Happen to You, Greencard, True Believer, and dozens of other movies.  (Ex NN).

http://www.onthesetofnewyork.com/mostpopularsupremecourtbuilding.html

163.    Every day in New York City, commercial enterprise are given more leeway to block sidewalks than those involved in expressive speech activity, as an example in 2014 on the 20th Anniversary of the television show Friends, an imitation Central Perk Coffee Shop opened in Soho.  (Ex DD 1-ii).

164.    The 'disney length' lines wrapped around three blocks , including the very narrow sidewalk on the west side of Centre Street between Broome and Kenmare (Ex DD (iv)).

165.    The NYPD did not shut down this commercial event that blocked pedestrian traffic for more than a week during work hours. (Ex  DD (i, ii, iv)).

166.    As another example of the NYPD favoring commercial enterprise over expressive speech activity, is the Ferrara Bakery on Grand Street that has had an ice cream stand out front of its commercial space that sits on half the sidewalk. (Ex DD (iii))[1].

167.    As an another example of the NYPD favoring commercial enterprise over expressive speech activity, the streets of Chinatown, Mott Street and Elizabeth have commercial fish markets that come out onto the sidewalk and also set up buckets and other items on the curbside of the sidewalk leaving almost

---

[1] Counsel does not seek to add Ferrara in this matter in any way nor criticize this bakery, that is a NYC institution, in any fashion.

no room for pedestrians to walk every weekday of the year without interference or arrest by the NYPD.  (Ex DD (v)).

**V.      60 Centre Street and Foley Square**

168.    The New York State Supreme Courthouse, New York County at 60 Centre Street is located in a location that is zoned as commercial.  (Ex  OO).

169.    On any given weekday, there are many buildings in and around this area operating as businesses and governmental offices.  (Ex  QQ).

170.    The area around Foley Square and 60 Centre Street has more than three times the distance from building line to building line, heading east to west than the same comparison in and around Seventh Avenue by Madison Square Garden.  (Ex QQ).

171.    On a Saturday, this area becomes an empty desolate canyon with virtually no commerce and no residential aspect.  (Ex PP).

172.    The only pedestrians that would be inconvenienced by being unable to use the east side of Centre Street between Worth and Pearl Street would be pedestrians seeking to access Pearl Street from the North.  (Ex  QQ).  Any pedestrians seeking to proceed further South on the east side of Centre Street could just as easily walk on the west side of Centre Street or continue on Worth and cut through Cardinal Hayes Place to the pedestrian entrance to the Brooklyn Bridge and all points south.

173.    Any pedestrian that sought to access Pearl Street from the north had multiple options that would allow them to access Pearl Street if for any

reason, the east side of Centre Street was blocked.  Each of these options would add at most one to two minutes of travel time to their trip.  (Ex  QQ).

174.    Any pedestrian that was blocked from walking south on Centre Street from Worth Street to Pearl Street (1) can walk on the east side of Centre Street and turn left on Pearl Street (time), the west side of Centre Street and cross Centre Street at Pearl Street and continue on Pearl Street (time), walk south on Lafayette Street and turn left on Duane Street and then cross to Pearl Street (time), walk through Foley Square and turn onto Pearl Street (time) or walk through Foley Square to Duane Street and then cross Centre and navigate to Pearl Street (time) or walk east on Worth Street and turn right at the back entrance to the Daniel Patrick Moynihan Courthouse and walk towards Cardinal Hayes Place at the front entrance of the Federal Courthouse.  (Ex QQ).

175.    As of June 18, 2012, over 2,500 participants in Occupy Wall Street activities had been arrested in Manhattan alone. (Ex RR).

176.    The District Attorney of New York, New York County, kept statistical analysis of the number of arrests, location and charges of those arrested involved in Occupy Wall Street protests.  (Ex SS).

177.    As of July 17, 2015, more than 80 lawsuits, involving many hundreds of claimants, have been filed in the Southern District of New York arising out of constitutional violations at Occupy Wall Street activities. (Ex WW).

178.    The NYPD does not believe that there is any reason to review the dispositions of their arrests, even when it involves Constitutionally protected activity.  (Ex SS Czark 30(b)(6) witness Transcript 114:16-25, 115:1-3).

DATED:        New York, New York
              July 17, 2015


                           Respectfully submitted,


                           _____//s//_____

                           DAVID A. THOMPSON [DT 3991]
                           STECKLOW & THOMPSON
                           ATTORNEYS FOR PLAINTIFF
                           217 Centre Street, 6th Floor
                           Phone: (212) 566-8000
                           Fax:     (212) 202-4952
                           dave@sctlaw.nyc