UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- x

JOSE MEDIAVILLA,

                                         Plaintiff,

                -against-

THE CITY OF NEW YORK, a municipal entity, NEW
YORK CITY POLICE LIEUTENANT ZIELINSKI, NEW
YORK CITY POLICE CHIEF ANGER, NEW YORK
CITY POLICE OFFICER CIARAMITARO, NEW YORK
CITY DEPUTY INSPECTOR TLOCZKOWKSI, NEW
YORK CITY DEPUTY INSPECTOR COKKINOS, NEW
YORK CITY POLICE LIEUTENANT ALBANO and
NEW YORK CITY POLICE OFFICERS "JOHN DOES 1-
10,"

                                   Defendants.

---------------------------------------------------------------------- x

**DEFENDANTS'
RESPONSE TO
PLAINTIFF'S
AFFIRMATIVE 56.1
STATEMENT**

Index No. 14-cv-8624

        Defendants City of New York, Michael Zielinski, Steven Anger, Anthony Ciaramitaro, Elisa Cokkinos, Daniel Albano, and William Cook, by their attorney Zachary Carter, Corporation Counsel of the City of New York, submit this reply Rule 56.1 statement in response to plaintiff's 56.1 statement pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York.

**56.1 ¶ 1:**

        The complaint was filed on October 29, 2014, naming the City of New York and Chief Anger, PO Ciaramitaro and Lieutenant Zielinski.  (Ex. B 10/29/14 Complaint).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 1:**

        Admit.

**56.1 ¶ 2:**

On November 5, 2014, the First Amended Complaint was filed adding additional defendants to the complaint (Ex. C 11/5/14 First Amended Complaint).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 2:**

Admit.

**56.1 ¶3:**

The City of New York was served with the original complaint on or about October 29, 2014 and the First Amended Complaint via ECF on November 5, 2014. (ECF No. 4).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 3:**

Dispute the timing of service, but admit that the City was timely served.

**56.1 ¶ 4:**

On December 5, 2014 service of the First Amended Complaint was made upon Defendants Zielinski, Ciarmitaro, and Anger. (ECF Nos. 33, 34, 35).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 4:**

Dispute the timing of the service with respect to Defendants Ciaratmitaro and Anger, but admit they were timely served.

**56.1 ¶ 5:**

On February 6, 2015, no answer or appearance had been filed for any defendants or counsel for defendants in this matter. Counsel for the plaintiff contacted the City of New York Law Department and informed them that nobody had yet filed an appearance on this matter. Later that same day, a notice of appearance was filed by a member of the City Law Department (Docket# 37), and Plaintiff's counsel recognized the quickness of the response in an email to counsel. (Ex D 2/6/15 email).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 5:**

Admit that a notice of appearance was filed as noted in Docket entry No. 37, and note that this fact is not material.

**56.1 ¶ 6:**

Subsequently Plaintiff's counsel had discussions with the City counsel about issues relating to service for a few of the defendants, summarized in an undated letter (Ex. E (i), emailed on March 10,2015 (Ex. E (ii))).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 6:**

Admit those letters were exchanged, and note that plaintiff has omitted the comprehensive and prompt response sent to him providing service information where possible and raising other service issues for those proposed defendants. Further note that this fact is not material.

**56.1 ¶ 7:**

On April 1, 2015, the undated letter of March 10, 2015, was sent to defendants' counsel with an email setting out that Plaintiff's counsel was still waiting to hear back regarding the service issues raised in the prior letter. (Ex E (iii)).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 7:**

Admit that letters was exchanged, and note that plaintiff has omitted the comprehensive and prompt response sent to him providing service information where possible and raising other service issues for those proposed defendants sent on April 3, 2015. Additionally note that the letter sent noted plaintiff's ongoing Rule 11 violations by alleging Constitutional violations by defendants who were not even present. Further note that plaintiff's fact is not material.

**56.1 ¶ 8:**

On May 18, 2015, a stipulation of discontinuance was signed by counsel for Plaintiff and Defendants and so-ordered and filed in this matter, and the following defendants remained in this action as THE CITY OF NEW YORK, A Municipal Entity, NEW YORK CITY POLICE LIEUTENANT ZIELINSKI, NEW YORK CITY POLICE CHIEF ANGER, NEW YORK CITY POLICE OFFICER CIARAMITARO, NEW YORK CITY DEPUTY INSPECTOR TLOCZKOWKSI, NEW YORK CITY DEPUTY INSPECTOR COKKINOS, NEW YORK CITY POLICE LIEUTENANT ALBANO And NEW YORK CITY POLICE OFFICERS "JOHN DOES. (Docket# 50) (Ex F).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 8:**

Admit that plaintiff discontinued against over half of his proposed defendants following receipt of a Rule 11 letter leaving the above individual defendants in this action. Dispute that the stipulation left "John Doe" officers in the action.

**56.1 ¶ 9:**

On May 28, 2015, Defendants filed a motion to Dismiss pursuant to 12(b)(6) (Docket# 53), along with a Declaration in support (Docket # 54).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 9:**

Admit and further note that this fact is not material.

**56.1 ¶ 10:**

On May 29, 2015, Defendants filed a Memorandum of Law (Docket #55).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 10:**

Admit that the memorandum of law was filed eight minutes (00:08) after midnight, on May 29, 2015. Further note that this fact is not material.

**56.1 ¶ 11:**

Within the Defendants' Memorandum of Law was a request for the Court to convert this motion to one for summary judgment (rather than being unable to consider video evidence that was not submitted as part of the initial or amended complaint). (Docket #55, page 4).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 11:**

Admit that defendants raised conversion in their papers as an alternative to extensive discovery of plaintiff's claim when evidence readily established the facts and that probable cause existed for his arrest. Further note that this fact is not material.

**56.1 ¶ 12:**

On June 10, 2015, Plaintiff's counsel informed the court that the parties had agreed to convert the motion to one for summary judgment and sought a call or a conference with the court to discuss the procedural aspects related to this conversion. (Docket 56).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 12:**

Admit, and note that plaintiff reached out to request consent for conversion of the motion. Further note that this fact is not material.

**56.1 ¶ 13:**

On June 12, 2015, the court issued an order accepting the conversion of this motion to one for summary judgment and set out the order for 56.1 statements, ordering the parties to meet and confer as to timing. (Docket 57).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 13:**

Admit.  Further note that this fact is not material.

**56.1 ¶ 14:**

On June 18, 2015, Plaintiff's counsel followed up regarding the service issues raised on March 10 and April 1, and specifically inquired about retired MOS Cook. (Ex E (iv)).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 14:**

Admit. Further note that this fact is not material.

**56.1 ¶ 15:**

On June 18, 2015, four minutes after ending the email concerning MOS Cook service, the defendant informed Plaintiff's counsel that retired MOS Cook had consented to accept service of the subject lawsuit at One Police Plaza. (Ex E (v)).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 15:**

Dispute as it appears to be three minutes. Further note that this fact is not material.

**56.1 ¶ 16:**

On Wednesday October 5, 2011, there was a march and rally in and around Foley Square. (Ex. G Affidavit of Joshua Wiles 10/5/11 paragraph 1 ("Ex G Wiles Aff para_").

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 16:**

Admit that plaintiff's affidavit discussed an October 5, 2011, rally. Further note that this fact is not material.

**56.1 ¶ 17:**

The groups involved on Wednesday October 5, 2011 included some unions, as well as participants in Occupy Wall Street. (Ex G Wiles Aff para 1).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 17:**

Admit that plaintiff's affidavit discussed an October 5, 2011, rally. Further note that this fact is not material.

**56.1 ¶ 18:**

The purpose of the rally on Wednesday October 5, 2011 was to demonstrate labor's support for Occupy Wall Street. (Ex G Wiles Aff para 1).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 18:**

Admit that plaintiff's affidavit discussed an October 5, 2011 rally. Further note that this fact is not material.

**56.1 ¶ 19:**

October 5, 2011 was a workday and fell on a Wednesday. (Ex. G Wiles Aff para 2).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 19:**

Admit that plaintiff's affidavit discussed an October 5, 2011, rally. Further note that this fact is not material.

**56.1 ¶ 20:**

On Wednesday October 5, 2011, the protestors occupied the steps of 60 Centre Street for more than an hour. (Ex G Wiles Aff Para 3) (Ex H (i) Photograph of 60 Centre Street).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 20:**

Admit that plaintiff's affidavit discussed an October 5, 2011, rally. Further note that this fact is not material, plaintiff was never arrested for being on or near steps, and note that conditions and policing at different events is necessarily incident specific and requires discretion.

**56.1 ¶ 21:**

There were a similar number of protestors on the steps of 60 Centre Street on Wednesday October 5, 2011, to the number that were present in front of 60 Centre Street, along with the plaintiff, on November 5, 2011. (Ex G Wiles Aff. at Para 6).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 21:**

Admit that plaintiff's affidavit discussed an October 5, 2011 rally. Further note that this fact is not material, plaintiff was never arrested for being on or near steps, and note that conditions and policing at different events is necessarily incident specific and requires discretion.

**56.1 ¶ 22:**

On this earlier date when the protesters were allowed on the courthouse steps, two members of the NYPD Legal Bureau were present, including defendant NYPD Legal Lieutenant Albano, and neither interfered with the public assembly occurring on the steps. (Ex H (ii) A small portion of the H (i) photograph magnified on the area where Defendant Albano is seen).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 22:**

Admit that plaintiff's photo appears to show numerous individuals on the courthouse steps. Further note that this fact is not material, plaintiff was never arrested for being on or near steps, and note that conditions and policing at different events is necessarily incident specific and requires discretion. Further admit that the photo may show defendant Albano, but the magnified photo is somewhat unclear.

**56.1 ¶ 23:**

On Wednesday October 5, 2011, no one was told to leave the steps by the police. (Ex G Wiles Aff. Para 3).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 23:**

Admit that plaintiff's affidavit discussed an October 5, 2011, rally, but dispute that plaintiff would have any basis to make this statement. Further note that this fact is not material, plaintiff was never arrested for being on or near steps, and note that conditions and policing at different events is necessarily incident specific and requires discretion. This is discussed in *inter alia*, plaintiff's Decl. Ex. N and O.

**56.1 ¶ 24:**

On Wednesday October 5, 2011, no one who went on the steps was arrested. (Ex G Wiles Aff. Para 4).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 24:**

Admit that plaintiff's affidavit discussed an October 5, 2011, rally, but dispute that plaintiff would have any basis to make this statement. Further note that this fact is not material, plaintiff was never arrested for being on or near steps, and note that conditions and policing at different events is necessarily incident specific and requires discretion. This is discussed in *inter alia*, plaintiff's Decl. Ex. N and O.

**56.1 ¶ 25:**

On Wednesday October 5, 2011, no one who went on the steps was injured. (Ex G Wiles Aff. Para 5).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 25:**

Admit that plaintiff's affidavit discussed an October 5, 2011, rally, but dispute that plaintiff would have any basis to make this statement. Further note that this fact is not material, plaintiff was never arrested for being on or near steps, and note that conditions and policing at different events is necessarily incident specific and requires discretion. This is discussed in *inter alia*, plaintiff's Decl. Ex. N and O.

**56.1 ¶ 26:**

The presence of protestors on the steps of 60 Centre Street on Wednesday October 5, 2011, although it was a weekday, did not interfere with the business of the court. (Ex G Wiles Aff. Para 7).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 26:**

Admit that plaintiff's affidavit discussed an October 5, 2011, rally, but dispute that plaintiff would have any basis to make this statement. Further note that this fact is not material, plaintiff was never arrested for being on or near steps, and note that conditions and policing at different events is necessarily incident specific and requires discretion.

**56.1 ¶ 27:**

On Friday October 28, 2011, sixteen (16) members of the NYPD were arraigned in the Bronx State Supreme Courthouse on corruption charges related to a parking ticket fixing scandal. (Exh I).

http://www.cbsnews.com/news/nypd-cops-plead-not-guilty-in-ticket-fixing-case/

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 27:**

Object to the inclusion of this flatly irrelevant allegation. Object to the use of this news article as the factual record.

**56.1 ¶ 28:**

On Friday October 28, 2011, the hallway outside the courtroom where the criminal defendant NYPD officers were being arraigned was over-crowded with members of the NYPD. (Ex J).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 28:**

See response to Fact ¶ 27.

**56.1 ¶ 29:**

On Friday October 28, 2011, an additional five hundred (500) members of the NYPD were protesting these arrests directly in front of the Bronx State Supreme Courthouse. A journalist described the scene outside, reporting that these officers were using "epithets like 'you piece of s---!' hurled at prosecutors. It was a disgrace." (Ex K (1-ii)).

http://www.nydailynews.com/news/ticket-fixing-case-brings-worst-nypd-potty-mouth-supporters-scandal-article-1.968588

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 29:**

See response to Fact ¶ 27.

**56.1 ¶ 30:**

On Friday October 28, 2011, the five hundred (500) members of the NYPD were given access to protest directly in front of the main entrance doorway to the Bronx State Supreme Courthouse, including on the sidewalk and in the roadway. (Ex K (iii) photograph of David Karp AP for NBC News).

http://www. nbcnews.com/id/45078456/ns/us_news-crime_and_courts/t/nyc-cops-plead-not-guilty-drug-ticket-fixing-probe/#.VYHpAVxVhBc

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 30:**

See response to Fact ¶ 27, and further note that the photo depicts individuals apparently complying with barricades keeping them out of the way of vehicular and pedestrian traffic, and not attempting to push past police lines onto steps.

**56.1 ¶ 31:**

The plaintiff participated in a political demonstration in front of 60 Centre Street in Manhattan on Saturday Nov. 5, 2011. (Exh A Aff Pars 1 - 5).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 31:**

Admit that plaintiff participated in an Occupy Wall Street march and demonstration.

**56.1 ¶ 32:**

This political demonstration was related to a consumer action, "Bank Transfer Day". (Exh A Aff Para 4).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 32:**

Admit that plaintiff's affidavit discussed bank transfer day. Further note that this fact is not material.

**56.1 ¶ 33:**

Bank Transfer Day was a consumer activism initiative calling for a voluntary switch from commercial banks to not-for-profit credit unions by Saturday November 5, 2011. "Together we can ensure that these banking institutions will ALWAYS remember the 5th of November!! If the 99% removes our funds from the major banking institutions to non-profit credit unions on or by this date, we will send a clear message to the 1% that conscious consumers won't support companies unethical business practices." (Ex L (i)). http://abcnews.go.com/blogs/business/2011/10/bank-transfer-day-gains-momentum-on-facebook/

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 33:**

See response to ¶ 32.

**56.1 ¶ 34:**

The Bank Transfer initiative was a major success resulting in more than 600,000 new accounts for credit unions and over 4 billion dollars in new deposits, ostensibly removed from institutional banks. (Ex L (ii)). http://www.foxbusiness.com/personal-finance/2011/11/07/credit-unions-feel-boost-from-bank-transfer-day/

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 34:**

See response to ¶ 32.

**56.1 ¶ 35:**

In the afternoon of Saturday November 5, 2011, members of Occupy Wall Street sought to celebrate this success and amplify the message of institutional inequality by marching to the Courthouse and engaging in discussions, celebrations and continuing to petition their government for redress of grievances.  (Exh A Aff Para 5).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 35:**

See response to ¶ 32.

**56.1 ¶ 36:**

The marchers, including Jose Mediavilla, sought to use the stairs of the Courthouse for this moment for a few reasons including the belief of Occupy that the institutional inequality that favored large banks over the individual was supported by the government and through the Courts, as well as for the symbolic nature of justice that is obvious on the steps of a courthouse that has the words, "the true administration of justice is the firmest pillar of good government" across the top of it.  (Exh A Aff Para 6).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 36:**

Admit that plaintiff's affidavit discussed the purported reasons the marchers intended to use the steps, but dispute that plaintiff would have any basis to make this statement, and note that the only sworn testimony from another individual in that crowd, Joshua Wiles, stated no reason to get on the steps except maybe a photo opp. Further note that this fact is not material and plaintiff was not arrested for being on or near steps.

**56.1 ¶ 37:**

The NYPD understood that the marchers wanted to use the steps of the courthouse at 60 Centre Street for their rally.  (E. M PO McNamara Transcript

26:25-27:13)

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 37:**

Dispute, but note that Officer McNamara testified that he believed they wanted to mount the steps. Further admit that at one point protestors chanted "We want the steps."

**56.1 ¶ 38:**

Police officers instructed the marchers not to use the steps, and the marchers obeyed the instruction. (Ex M PO McNamara Transcript 27:9- 28:24).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 38:**

Admit that Officer McNamara discussed his efforts to keep protestors off of the steps. Dispute that the protestors did not get on the steps. <u>See</u> e.g. McNamara Transcript, at 33:13-23. See also 56.1 ¶ 16-19, 23. Further note that this fact is not material and plaintiff was not arrested for being on or near steps.

**56.1 ¶ 39:**

The marchers did not go up onto the steps. (Ex M PO McNamara Transcript 27:9-17).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 39:**

Disputed; see ¶ 38.

**56.1 ¶ 40:**

While there were many police officers in the area, only six officers prevented the marchers from taking the steps, simply by asking them not to. (Ex M PO McNamara Transcript 27:9- 28:24).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 40:**

Disputed.  See ¶ 38.  Plaintiff has attempted to apply a statement describing when a small group of officers and protestors first arrived at 60 Centre Street to describe this entire incident.

**56.1 ¶ 41:**

Some Marchers chanted, "We want the steps." (Defendants Exhibit E Morales video 05:50- 06:20).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 41:**

Admit.

**56.1 ¶ 42:**

It was not illegal to chant "We want the steps."  (Ex N (ii)

Zielinski Tr. 173:20-25; Defendants Exhibit E Morales video 05:50- 06:20).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 42:**

Admit that no arrests were made for engaging in the chant "we want the steps" alone.  Dispute that this chant could not form the element of a crime or raise valid concerns regarding the ongoing policing of the demonstration.

**56.1 ¶ 43:**

There is no video of anyone chanting, "Take the steps."

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 43.**

Admit that in the video before the court that chant is not captured.  Further state this fact is not material.

**56.1 ¶ 44:**

Lieutenant Zielinski issued various orders via his bullhorn to the protesters.   56.1 Statement  of City of NY Paragraph  20 ("NYC  56 Para_") ("keep moving"),  NYC 56 Para 24

("leave the sidewalk"), NYC 56 Para 28 ("move back"), NYC 56 Para 33 ("leave this area"), NYC 56 Para 44 ("sidewalk is temporarily closed, leave the area."), NYC 56 Para 45 ("clear the sidewalk, it's a hazard"), NYC 56 Paras 46, 47 & 48 ("clear the sidewalk"), paragraph 51 ("temporarily closed, clear the sidewalk"), NYC 56 Para 54 ("Sidewalk is closed, will be open very soon, we need you to move on so nobody gets hurt"), NYC 56 Para 59 ("temporarily closed and a safety hazard").

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 44:**

Admit that the Lieutenant issued various orders and warnings to disperse and rely upon the video and the warnings as described in defendants' 56.1 statement for the content of those warnings.

**56.1 ¶ 45:**

Another officer, believed to be Defendant Cook, also gave orders via bullhorn to the protesters. NYC 56 Para 37 ("clear the sidewalk").

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 45:**

Admit that Lieutenant Cooke also issued orders to disperse by bullhorn.

**56.1 ¶ 46:**

However, when Lieutenant Zielinski gave these orders, the protestors were **not** committing disorderly conduct. (Ex. N (ii) Zielinski Transcript173:3-12; Defendants Exhibit E Morales video 00:00- 05:34).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 46:**

Disputed. Plaintiff is attempting to mischaracterize the Lieutenant's testimony by taking a series of questions counsel asked which were limited to what was visible to the Lieutenant as he viewed video. In fact the Lieutenant testified very clearly that the orders to disperse were lawful and proper and that protestors were committing disorderly conduct. (Pl.

Decl. Ex. N, Zielinski Dep., at: 75:1-76:21; 79:13-80:10; 174: 14-25; 204:12-20.)  Also notably, the portion of the video plaintiff represents as related to that question is inaccurate, the Lieutenant was responding to a narrowly drawn question about a short clip shown from the Morales video that depicts from 04:42-05:34 only.  Decl. Ex. N, Zielinski Dep. p. 172:14-173:10.  Also notable is that plaintiff played the clip so that any warnings issued were not audible, in addition to limiting the scope of his question to a few seconds, or the still image when he paused it.  Id. P. 172:14-24.

**56.1 ¶ 47:**

Lieutenant Zielinski admitted that the protestors were **not** committing disorderly conduct.  (Ex. N (ii) Zielinski Transcript 173:3-12; Defendants Exhibit E Morales video 00:00-05:34).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 47:**

Disputed.  See response to ¶ 46.

**56.1 ¶ 48:**

Lieutenant Zielinski admitted that the protestors were **not** blocking the sidewalk. (Ex. N (ii) Zielinski Transcript 180:19-23; Defendants Exhibit E Morales video 11:46).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 48:**

Disputed.  See response to ¶ 46.  Also note that Lieutenant Zielinski is clearly responding to a question about what is depicted at the 11:46 mark of that video.  Further note that some individuals complying with the order does not mean the remaining individuals can disregard the lawful orders of the police.  United States v. Nelson, 500 Fed. Appx. 90, 93 (2d Cir. 2012).

**56.1 ¶ 49:**

There was sufficient space within the group of demonstrators for people to move freely on the sidewalk. (Ex. N (ii) Zielinski Transcript 180:19-23).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 49:**

Disputed. See response to ¶ 48. Plaintiff is mischaracterizing testimony that described a specific moment visible on video describing the scene after at least seven and a half minutes of dispersal orders.

**56.1 ¶ 50:**

At that point in time, the sidewalk was not blocked. (Ex. N (ii) Zielinski Trasncript 181:1-5; Video E (Morales) 11:46)).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 50:**

Disputed. See response to ¶ 48. Plaintiff is mischaracterizing testimony that described a specific moment visible on video describing the scene after at least seven and a half minutes of dispersal orders.

**56.1 ¶ 51:**

Chief Anger, testifying as a fact witness and as a City of New York 30(b) (6) witness, initially testified that he did not believe there were any safety concerns in front of 60 Centre Street on November 5, 2011 that resulted in the closing of the sidewalk. (Ex O Anger Transcript 210: 13-16)

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 51:**

Disputed and state that this is not a material fact. The Chief did identify safety concerns, as did Lieutenant Zielinski. (Pl. Decl. Ex. N, Anger Dep., at 224:1-225:23; Pl. Decl. Ex. O, Zielinski Dep, at 77:5-13; 56.1 ¶ 15.)

**56.1 ¶ 52:**

Chief Anger, testifying as a fact witness and as a City of New York 30(b)(6) witness, added that one safety concern he remembered if the sidewalk was closed by the protesters "if there was an emergency inside the Court of getting personnel either fire or EMS or police inside because the sidewalk was closed by the demonstrators there." (Ex O Anger Transcript 211: 1-5).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 52:**

Admit, but state this does not capture the extent of his testimony regarding safety concerns. Further note that this fact is not material, plaintiff was never arrested for being on or near steps.

**56.1 ¶ 53:**

Chief Anger, testifying as a fact witness and as a City of New York 30(b)(6) witness, testified that the police officers were deployed along the steps of 60 Centre Street on November 5, 2011 "to protect the courthouse." (Ex O Anger Transcript 78:8-21).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 53:**

Admit, but state this does not capture the extent of his testimony regarding safety concerns. Further note that this fact is not material as plaintiff was never arrested for being on or near steps.

**56.1 ¶ 54:**

Chief Anger, testifying as a fact witness and as a City of New York 30(b)(6) witness, did not know if anyone from the NYPD spoke to anyone at the courthouse before deploying police along the stairs. Nor did he know whether there were any court sessions being held on that particular Saturday, though he testified "courthouses are in operation at all the time." (Ex O Anger Transcript 79:1-25).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 54:**

Dispute. Object to the use of irrelevant transcripts and further state that this fact is not material. These transcripts come from depositions unrelated to the events of November 5, 2011, and regardless they do not resolve any legal issues or even present relevant facts. Further note that plaintiff is again selectively quoting transcripts to misrepresent testimony.

**56.1 ¶ 55:**

PO McNamara testified that the reason the protesters were forced off of the sidewalk in front of 60 Centre Street was because some of the protesters were talking about taking the steps at 100 Centre Street. (Ex M McNamara Transcript 40: 1-5).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 55:**

Disputed, and note that that portion of Officer McNamara's transcript cited consists of him generally describing the events that led to the arrest of Joshua Wiles, such as sitting down on the sidewalk in response to the orders to disperse. Also note Officer McNamara does not indicate a reason for dispersal orders at that point in his testimony.

**56.1 ¶ 56:**

Lieutenant Zielinski's orders were not lawful orders. (Ex. N (ii) Zielinski Transcript 173:3-12, 180:19-23, 181:1-5, 187:8-188:2, 188:23-189:4; Defendants Exhibit E Morales video 00:00- 17:56).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 56:**

Disputed. See responses to *inter alia* ¶ 46, 48 and 50. Plaintiff has deliberately turned to a 15 page portion of the transcript where testimony was elicited only about what was visible on certain videos when paused. As described above, plaintiff has attempted to take that testimony out of context and inappropriately apply it to the entire event on November 5, 2011.

Additionally, defendants note that whether the orders were lawful is a question of law, not solely subject to the determination of Lieutenant Zielinski.

**56.1 ¶ 57:**

Lieutenant Zielinski directed the positioning and the movement of the police orange plastic netting. In Video E, he can be heard giving instructions to the officers holding the netting. (Defendants Exhibit E Morales video 15:40-15:51).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 57:**

Disputed that the Lieutenant was generally responsible for the positioning of the netting, but admit that at certain points he did give instruction. Further note that this fact is not material.

**56.1 ¶ 58:**

On November 5, 2011, Jose Mediavilla was at Zuccotti Park and marched to 60 Centre Street with other individuals. (Exh A Aff Para 1-5).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 58:**

Admit that plaintiff's affidavit states the above fact.

**56.1 ¶ 59:**

Jose Mediavilla wanted to celebrate the success of the Bank Transfer action and discuss with other individuals the future plans for more successful actions related to Occupy Wall Street and institutional inequality. (Exh A Aff Para 5).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 59:**

Admit that plaintiff's affidavit indicates he intended to celebrate Bank Transfer Day. Further note that this fact is not material.

**56.1 ¶ 60:**

Jose Mediavilla served in the Marines for seven (7) years and took an oath to support and defend the Constitution of the United States. (Exh A Aff Para 7).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 60:**

Admit that plaintiff's affidavit indicates this fact. Further note that this fact is not material.

**56.1 ¶ 61:**

After being honorably discharged, Jose Mediavilla obtained a college education before moving to New York City. (Exh A Aff Para 7).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 61:**

Admit that plaintiff's affidavit indicates this fact. Further note that this fact is not material.

**56.1 ¶ 62:**

In September 2011, he became involved in Occupy Wall Street. (Exh A Aff Para 7).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 62:**

Admit that plaintiff's affidavit indicates this fact. Further note that this fact is not material.

**56.1 ¶ 63:**

On Saturday November 5, 2011, Jose Mediavilla understood that members of the service of the NYPD each take an oath of office that pledges and declares to uphold the Constitution of the United States and the Constitution of the State of New York, and faithfully discharge their duties as NYPD officers. (Exh A Aff Para 8) (See video of NYPD officers being sworn in by Mayor Bill DeBlasio: http://www1.nyc.gov/office-of-the_mayor/news/018-14/video-mayor-bill-de-blasio-administers-oath-office-nypd-recruits at 10.20)

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 63:**

Admit that plaintiff's affidavit indicates this fact. Further note that this fact is not material.

**56.1 ¶ 64:**

When Jose Mediavilla approached the New York State Supreme Courthouse on Saturday November 5, 2011, he saw and understood that members of the NYPD were blocking access for these marchers to publicly assemble and discuss issues they believed important, which led him to believe that these members of the NYPD were violating the Constitution and betraying their oath of office. (Exh A Aff Para 9).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 64:**

Admit that plaintiff's affidavit indicates these facts, but dispute that officers were blocking the right to assemble, or in any way preventing individuals from discussing issues.

**56.1 ¶ 65:**

Another protester was handing out copies of the U.S. Constitution and Jose Mediavilla began to display one in his hand. (Exh A Aff Para 10, Defendants video Exhibit C 3:43-3:51).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 65:**

Admit.

**56.1 ¶ 66:**

Jose Mediavilla, wearing a black hooded jacket with a large blue 'Occupy' fist on the back, began to discuss this with various members of how the denial of this peaceful public assembly was a betrayal of their oath of office. (Defendants video Exhibit C 4:04-4:45, (Exh A Aff Paras 3, 11)

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 66:**

Admit.

**56.1 ¶ 67:**

      As Jose Mediavilla approached the Courthouse steps, he walked next to a line of police officers, and began speaking to many of them about how the denial of this peaceful public assembly was a betrayal of their oath of office. (Defendants video Exhibit C 7:46-8:01, (Exh A Aff Paras 11-13).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 67:**

      Dispute that plaintiff was walking, or discussing, and turn to the video evidence for a depiction which could be more accurately characterized as storming and screaming respectively. But admit that he was vocalizing near a line of police officers and accusing them of violating their oaths of office.

**56.1 ¶ 68:**

      No officer responded to Jose Mediavilla in any meaningful way. (Exh A Aff Para 14).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 68:**

      Admit and note that plaintiff was defying the ongoing lawful police orders and subject to arrest.

**56.1 ¶ 69:**

      Pursuant to long-standing practice, a portion of the street closest to the curb of the sidewalk in front of 60 Centre Street was closed to vehicular traffic. This portion of the street, approximately three feet wide, was closed to vehicular traffic by the placement of plastic traffic "cones" (actually, in this case, shaped like barrels). In addition, scooter police who accompanied the protest formed a line outside this line of traffic cones, so that a portion of the street, approximately four to five feet wide running from the curb line, was free of traffic. The street itself is wide enough that vehicular traffic was still able to, and in fact did, move freely and

normally up Centre Street unimpeded by the presence of the line of scooter police who stationed themselves outside the line of traffic cones. As a result of the presence of this double line of traffic cones and police scooters, any pedestrian who may have had to step off the curb of the sidewalk in front of 60 Centre Street to walk around the protestors could have done so safely. The defendants have not demonstrated that any pedestrians were caused to step off the sidewalk by the presence of the protestors, but if any such pedestrians existed, they could have done so safely. (Plaintiff's Video Exhibit H 2:17-2:20).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 69:**

Disputed. Regardless, this is not a material fact. Plaintiff and hundreds of other completely obstructed the sidewalk, pushed against police lines without regard for safety concerns and aggressively confronted various police officers when ordered to disperse until he was arrested.

**56.1 ¶ 70:**

Inspector Edward Winski had previously instructed all officers working under his command, via what he described as a standing order, "not to engage in any conversation" with activists at Occupy Wall Street activities. The refusal of officers to engage in a discussion of the unconstitutionality of their conduct breaking this peaceful assembly was part of a policy of the City of New York promulgated by its policy maker, Inspector Edward Winski (Ex Winski Transcript 79:23 - 80: 1-4).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 70:**

Objection as there is no indication that Inspector Winski had any role in this protest or was even present. Disputed that he constituted a policy maker as plaintiff uses the term here. Regardless this is not a material fact.

**56.1 ¶ 71:**

Eventually Jose Mediavilla was directed towards Lt. Zielinski, as the NYPD officer who seemed to be in charge as he was making announcements. (Exh A Aff Para 14).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 71:**

Disputed.  Plaintiff indicated that he walked towards the Lieutenant because "he seemed to be in charge."

**56.1 ¶ 72:**

Lt. Zielinski was standing in front of a line of officers, facing a group of approximately 15 protestors, one of which was the plaintiff, Mr. Mediavilla.  Most of the protestors were standing still, apparently observing the activity of the police.  About half of them appear to be using a device to film or photograph what is happening.  None are acting in a violent or tumultuous manner. (Defendants video Exhibit C 7:35 - 8:01).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 72:**

Disputed that only fifteen protestors were present, and note that they were in violation of lawful orders to disperse.  Admit that many appeared to film or video, and generally state that the video speaks for itself.

**56.1 ¶ 73:**

One protester is saying to the NYPD, "What you're doing is unlawful.  You are preventing a peaceful assembly.  This is breaking the law."  At the same time, Jose Mediavilla has informed officers that they are violating their oath to uphold the Constitution and violating the First Amendment rights of protesters by breaking this peaceful assembly.  Jose Mediavilla eventually conflates this explanation into one word and begins to repeat it, "treason." (Defendants Exhibit D Morales video 14:33 - 14:39).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 73:**

Admit a protestor makes a statement regarding breaking the law. Admit that plaintiff is repeatedly screaming "treason" at the Lieutenant.

**56.1 ¶ 74:**

Neither the other protesters nor members of the NYPD appear to be disturbed or alarmed by Jose Mediavilla. (Defendants Exhibit D Morales video 14:33 - 14:39).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 74:**

Disputed, and state that the appearance of the officers or other protestors is irrelevant, and note that plaintiff was twice personally directed to get back from Lieutenant Zielinski after he aggressively confronted him, both before plaintiff charged towards Zielinski as he turned away, approaching his hip where he carries his firearm.

**56.1 ¶ 75:**

Lt. Zielinski does not acknowledge Mr. Mediavilla, instead he continues to make various announcements via an amplified bullhorn including, "the sidewalk is closed. You need to move." (Defendants Exhibit D Morales video 14:40 - 14:41).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 75:**

Disputed, as noted in defendants' 56.1 and as is plainly visible on the video, plaintiff was personally ordered back from Lieutenant Zielinski after he confronted him. 56.1 ¶ 70, 73; Decl. Ex. C 08:03-08:05; 08:06-08:10.

**56.1 ¶ 76:**

Lieutenant Zielinski turns and states to Defendant Cokkinos some words to the effect, "they are moving. They are moving." (Defendants video Exhibit C 7:57 - 8:00).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 76:**

Admit.

**56.1 ¶ 77:**

Jose Mediavilla repeats treason several times. (Defendants Exhibit D Morales video 14:41 - 14:42).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 77:**

Admit.

**56.1 ¶ 78:**

In the next three to four seconds, Lt. Zielinski turns to walk away from Mr. Mediavilla, taking approximately three steps away from him. At this point, Lt. Zielinski's back is turned to the plaintiff. The plaintiff takes a single step forward to follow. The plaintiff's hands remain at his sides. He is holding a cardboard sign underneath his right arm, a gas mask in one hand and the U.S. Constitution in his other hand. Lt. Zielinski unexpectedly stops and turns around. (Defendants Exhibit D Morales video 14:42 - 14:46). (Exh A Aff Para 18).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 78:**

Dispute the characterization that plaintiff takes a step, but generally admit that he approached Lieutenant Zielinski as he turned away, and further note that he rapidly approached him from behind, getting close to his right hip, where he holsters his firearm, after shouting in his face, waving something by his head, and getting close enough to warrant two orders to get back.

**56.1 ¶ 79:**

In the next one to two seconds, Mr. Mediavilla, while moving no closer to Lt. Zielinski (in fact, while moving slightly away from him), says the word "treason" twice more. (Defendants Exhibit D Morales video 14:46 - 14:47).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 79:**

Admit that after he startles Lieutenant Zielinski and causes him to turn around he does not get significantly closer, and continues to shout treason.

**56.1 ¶ 80:**

Lt. Zielinski displays no sign of fear. However, Mr. Mediavilla is already being grabbed by other officers to be placed under arrest. In another six seconds, Mr. Mediavilla in on the ground with police all over him. (Defendants Exhibit D Morales 14:47).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 80:**

Dispute. Defendants also object to claims about Lt. Zielinski's mental state as plaintiff has no basis to offer facts about Lt. Zielinski's emotional or mental state. Admit that Mr. Mediavilla was placed, on the ground, placed under arrest and turn to the video evidence for a more accurate characterization of facts.

**56.1 ¶. 81:**

At least six (6) different members of the service are physically active in the detention and arrest of Jose Mediavilla, including Defendant Ciarmirtaro, Albano, Cook and others. Defendant Albano removes the U.S. Constitution from Jose Mediavilla's hand. (Defendants Video Exhibit C 8:29-8:31)

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 81:**

Admit that numerous officers, including Defendant Ciaramitaro assist in placing plaintiff in handcuffs, but deny that they are active in his arrest as it relates to a Fourth Amendment claim as they were not present for the events giving rise to probable cause. Further note that none of the individuals are accused of engaging in any use of excessive force.

**56.1 ¶ 82:**

Defendants Cook, Tcolkowski, Albano, Ciarmitaro, Zielinski are each close enough to the arrest of Jose Mediavilla that they had an opportunity to intervene in this unlawful arrest. (Defendants Video Exhibit C 8:26-9:01).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 82:**

Disputed. Probable cause existed for plaintiff's arrest, making this a moot point. However, even if probable cause was lacking, officers who arrived even seconds later and assisted in placing plaintiff in custody would not be subject to liability, because of the fellow officer rule, and certainly would not have the requisite opportunity to intervene or prevent the purported constitutional violation.

**56.1 ¶ 83:**

Subsequent to the arrest of Jose Mediavilla, other individuals were also arrested including Joshua Wiles, Chris Darden (Defendants Exhibit C 9:02), Marily Collins, Jenny Heinz, Elizabeth Lapenne, Emiloy Maclean, Ann Shirazi, Asya Weisenhaus, Chloe Weisenhaus (Ex 2T) (Plaintiffs Video Exhibit I).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 83:**


**56.1 ¶ 84:**

On Saturday November 5, 2011, the NYPD utilized orange mesh to close the sidewalk in front of the New York State Supreme Courthouse, New York County and continued to close the sidewalk from Worth Street south to One Centre Street, a stretch of sidewalk in downtown Manhattan more than 1/10 of a mile in length. (Plaintiffs Video Exhibit G: 0:00-0: 10, 4:17- 4:45) (Plaintiffs Video Exhibit F: 6:34 - 7:04).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 84:**

Admit that orange mesh was deployed but dispute plaintiff's characterization of the length and location of its deployment. Regardless, this is not a material fact.

**56.1 ¶ 85:**

The City of New York denied that the NYPD shut the sidewalk at all. (Ex O Anger Transcript 205: 10-11).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶.85:**

Admit that Chief Anger's testimony discussed the protestors as shutting down the sidewalk by refusing to leave and choosing to sit down in response to dispersal orders. Further deny that this is a material fact.

**56.1 ¶ 86:**

As the NYPD closed the sidewalk in front of 60 Centre Street, they pushed individuals south and west. One individual can be heard to state, "They are pushing us into the street to get hit by cars." (Defendants Video Exhibit C 10:23-31).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 86:**

The video speaks for itself, and further note that plaintiff had been placed under arrest minutes before that statement to the extent it is accurately reported. Further deny that this is a material fact.

**56.1 ¶ 87:**

At the same time, a chant is undertaken, "Freedom Assembly" (Defendants Video Exhibit C 10:20).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 87:**

The video speaks for itself, and further note that plaintiff had been placed under arrest minutes before that statement to the extent it is accurately reported. Further deny that this is a material fact.

**56.1 ¶ 88:**

Someone is heard to reference the NYPD protest at the Bronx Supreme Courthouse of October 28, 2011 stating, "The police department was allowed to protest at a courthouse last week. You protested last week. We are not allowed to protest at a courthouse." (Defendants Video Exhibit C 10:46-10:53).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 88:**

The video speaks for itself, and further note that plaintiff had been placed under arrest minutes before that statement to the extent it is accurately reported. Further deny that this is a material fact.

**56.1 ¶ 89:**

Eventually, the NYPD had pushed many of the individuals into the street where vehicular traffic became slow, and the protesters were now in harm's way as the roadway became congested and one of the lanes of traffic became filled with individuals who previously had been safely standing and walking in front of 60 Centre Street. (Defendants Video Exhibit D Morales 17:33).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 89:**

Disputed, but admit that protestors were free to cross to Foley Square and continue their protest. Note that plaintiff had been placed under arrest minutes before the video he relies on. Further deny that this is a material fact.

**56.1 ¶ 90:**

On November 5, 2011, there were no warrants for the plaintiff's arrest. (Ex. Q).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 90:**

Disputed. Exhibit Q appears to reference November 12, 2011, not November 5, 2011.

**56.1 ¶ 91:**

Jose Mediavilla was held for approximately twenty-four (24) hours before being released on his own recognizance. (Exh A Aff Para 20).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 91:**

Admit that plaintiff's affidavit describes a 24 hour detention.

**56.1 ¶ 92:**

Jose Mediavilla was conscious of this detention and did not consent to it. (Ext A Aff Para 20).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 92:**

Admit that plaintiff's affidavit describes conscious and nonconsensual detention.

**56.1 ¶ 93:**

This detention was not otherwise authorized. (Ext A Aff Para 20).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 93:**

Disputed and state that this is not a factual issue for a 56.1 statement.

**56.1 ¶ 94:**

Jose Mediavilla returned to court on multiple occasions to fight these charges. (Exh A Aff Para 21).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 94:**

Admit that plaintiff's affidavit and complaints note multiple court appearances that resolved with an ACD.

**56.1 ¶ 95:**

On or around July 24, 2013, the charges against Jose Mediavilla were dismissed and sealed pursuant to New York Criminal Procedure Law 170.55. (Exh A Aff Para 21).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 95:**

Admit that plaintiff's affidavit and complaints note multiple court appearances that resolved with an ACD.

**56.1 ¶ 96-118:**

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 96-118:**

**As plaintiff has withdrawn his claims related to November 12, 2011 these facts are no longer at issue. To the extent any response is required, defendants dispute them.**

**56.1 ¶ 119:**

The City of New York was aware that individuals were going to participate in First Amendment protest activity in the financial center on September 17, 2011. (Ex V Inspector Edward Winski Transcript 52:23-25, 53:1-9).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 119:**

Disputed. Defendants awareness of potential protests is not material.

**56.1 ¶ 120:**

Subsequent to the Republican National Convention in 2004, the City of New York was sued by hundreds of individuals who claimed to be falsely arrested for participating in protest and other expressive speech activity protected by the First Amendment to the United States Constitution. In January 2015, the City of New York paid $18 million dollars to settle these cases. (Ex VV).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 120:**

Admit multiple lawsuits were filed and that many claims were resolved by settlement. Further note that this fact is not material.

**56.1 ¶ 121:**

On August 12, 2011, the NYPD conducted disorder control training on Randall's Island. The focus of the training was on riot control and not policing First Amendment activity. (Ex UU).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 121:**

Object to the use of this news clipping, but further note that the article speaks for itself, and that riot control is appropriate training. Further note this fact is not material.

**56.1 ¶ 122:**

Once Occupy Wall Street began its occupation of Zuccotti Park, the City of New York and the NYPD was on notice that the policing in and around Zuccotti Park would encounter individuals involved in expressive speech activity protected by the First Amendment to the United States Constitution.

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 122:**

Note that this statement has no factual support, and as such it cannot be fairly responded to. This statement raises legal questions inappropriate for a 56.1 statement. Further, it is not material.

**56.1 ¶ 123:**

Due to the occupation of Zuccotti Park, the City of New York should have ensured that the Commanding Officer in charge of supervising the policing of Zuccotti Park was trained in the rights of individuals involved in expressive speech activity protected by the First Amendment to the United States Constitution. Instead, the City of New York allowed Inspector

Edward Winski to supervise all police officers involved in the policing of the individuals involved in expressive speech activity protected by the First Amendment to the United States Constitution  (Ex V Inspector Edward Winski Transcript 168:11-25, 169:1-5).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 123:**

Disputed.  Inspector Winski, had no part in the events of November 5, 2011, or connection to plaintiff's claims.  Additionally, he was not the supervisor of "all police" who were involved in the policing of…expressive speech activity[.]"  This fact is apparently a suggestion of what the NYPD should have done, but it has no factual support, and is disjoined argument only.  Further it is not material.

**56.1 ¶ 124:**

The City of New York had officers who understood the appropriate manner in which policing of individuals involved in expressive speech activity protected by the First Amendment to the United States Constitution should have been conducted.  (Ex U Deputy Inspector Brandon Del Pozo Transcript 86:8-23) (Ex W Deputy Inspector Anthony Raganella Transcript p. 74:18-24, 81:8-16, 88:8-25, 89:1-4).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 124:**

Admit that officers knew how to police First Amendment activities, but object to plaintiff's staffing suggestion arguments couched as facts, and further state that this fact is not material.

**56.1 ¶ 125:**

One of these officers was the commanding officer of the Disorder Control Unit responsible for training of officers.  (Ex W Deputy Inspector Anthony Raganella Transcript 6:2-4).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 125:**

Admit that Anthony Raganella served as commander of the Disorder Control Unit which had some training responsibility.

**56.1 ¶ 126:**

One of these officers was at the onset of Occupy Wall Street, the Commanding Officer of a downtown Manhattan precinct. (Ex U Deputy Inspector Brandon Del Pozo Transcript 9:16-19).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 126:**

Admit that Brandon Del Pozo served as commander of a downtown Manhattan precinct.

**56.1 ¶ 127:**

Former Deputy Inspector (and newly confirmed Police Chief of Burlington, Vermont) Brandon Del Pozo testified about the degree of inconvenience needed to make a lawful arrest relating to disorderly conduct changes when First Amendment rights are involved. "When people are exercising their First Amendment rights, it goes beyond de minimis that you should try to give as much consideration as possible to the protestors. I mean, First Amendment Rights are not de minimis. You owe more considerations to the protesters than merely the de minimis measurement." (Ex Del Pozo Transcript 86: 8-23).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 127:**

Object to the use of irrelevant transcripts and further state that this fact is not material. These transcripts come from depositions unrelated to the events of November 5, 2011, and regardless they do not resolve any legal issues.

**56.1 ¶ 128:**

The City of New York, by its 30(b)(6) witness, the Commanding Officer of the Disorder Control Unit, Deputy Inspector Anthony Raganella, testified about how to handle a protest that takes up an entire sidewalk and explained the need for a substantial disruption, more than mere inconvenience, and then described appropriate factors to consider when making this determination. (Ex W Raganella Transcript p. 74:18-24, 81:8-16, 88:8-25, 89:1-4).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 128:**

Object to the use of irrelevant transcripts and further state that this fact is not material. These transcripts come from depositions unrelated to the events of November 5, 2011, and regardless they do not resolve any legal issues.

**56.1 ¶ 129:**

When asked about how to police a protest that takes up the entire sidewalk, the City of New York, via Deputy Inspector Raganella, explained, "Our first method would probably be asking them— communicating with them to open up the sidewalk and clear it for pedestrians that wanna utilize the sidewalk. This is under the assumption that there's a substantial disruption to people being able to use the sidewalk that aren't involved in the protest." (Ex W Raganella Transcript 74:18-24).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 129:**

Object to the use of irrelevant transcripts and further state that this fact is not material. These transcripts come from depositions unrelated to the events of November 5, 2011, and regardless they do not resolve any legal issues. Further note that plaintiff disregarded minutes of successive warnings to clear the sidewalk.

**56.1 ¶ 130:**

When asked about what factors he would take in consideration under such circumstances, he testified: "I would have to take into consideration the location of where they are, the time of day, how many people there are, the physical environment that we're involved in, maybe even the weather conditions. There's a lot of factors that may go into a decision like that."

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 130:**

Object to the use of irrelevant transcripts and further state that this fact is not material. These transcripts come from depositions unrelated to the events of November 5, 2011, and regardless they do not resolve any legal issues. Further note that safety concerns, as discussed above, are a significant factor.

**56.1 ¶ 131:**

The individual who was put in charge of supervising the policing of Occupy Wall Street and training "hundreds of officers" (Ex V Winski Transcript 168:11-14, 168:15-22) in the appropriate application of laws such as disorderly conduct to individuals engaged in expressive speech activity protected by the First Amendment to the United States Constitution did not understand that a different standard must be used to apply penal statutes such as disorderly conduct to expressive speech activity. (Ex V Winski Transcript 168:1:5).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 131:**

Dispute. Object to the use of irrelevant transcripts and further state that this fact is not material. These transcripts come from depositions unrelated to the events of November 5, 2011, and regardless they do not resolve any legal issues or even present relevant facts. Further note that plaintiff is again selectively quoting transcripts to misrepresent testimony. Further note that Inspector Winski was not 'put in charge' of Occupy Wall Street.

**56.1 ¶ 132:**

Deputy Inspector Edward Winski was asked if he was aware of any interplay between individual's constitutional rights to free speech and free expression and the disorderly conduct charge for obstructing pedestrian traffic, and he responded, "Not specifically, no." (Ex V Winski Transcript 168:15.)

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 132:**

Object to the use of irrelevant transcripts and further state that this fact is not material. These transcripts come from depositions unrelated to the events of November 5, 2011, and regardless they do not resolve any legal issues.

**56.1 ¶ 133:**

The individual who was put in charge of supervising the policing of Occupy Wall Street and training "hundreds of officers" (Ex V Winski Transcript 168:11-14, 168:15-22) in the appropriate application of laws such as disorderly conduct to individuals engaged in expressive speech activity protected by the First Amendment to the United States Constitution did not believe that there was any amount of time that traffic, vehicular or auto, needed to be blocked before he or his subordinates could make an arrest for disorderly conduct. (Ex V Winski Transcript 167:19:23.)

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 133:**

Object to the use of irrelevant transcripts and further state that this fact is not material. These transcripts come from depositions unrelated to the events of November 5, 2011, and regardless they do not resolve any legal issues or even present relevant facts. Further note that Inspector Winski was not 'put in charge' of Occupy Wall Street.

**56.1 ¶ 134:**

The individual who was put in charge of supervising the policing of Occupy Wall Street and training "hundreds of officers" (Ex V Winski Transcript 168:11-14, 168:15-22) in the appropriate application of laws such as disorderly conduct to individuals engaged in expressive speech activity protected by the First Amendment to the United States Constitution did not have the understanding that there was a mens rea requirement in the disorderly conduct statute." (Ex V Winski Transcript 165:14:23, 166:6:17.)

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 134:**

Object to the use of irrelevant transcripts and further state that this fact is not material. These transcripts come from depositions unrelated to the events of November 5, 2011, and regardless they do not resolve any legal issues or even present relevant facts. Further note that plaintiff is again selectively quoting transcripts to misrepresent testimony. Further note that Inspector Winski was not 'put in charge' of Occupy Wall Street.

**56.1 ¶ 135:**

The individual who was put in charge of supervising the policing of Occupy Wall Street and training "hundreds of officers" (Ex V Winski Transcript 168:11-14, 168:15-22) in the appropriate application of laws such as disorderly conduct to individuals engaged in expressive speech activity protected by the First Amendment to the United States Constitution believed the only training necessary was "that they should personally observe the violation." (Ex V Winski 168:5:10).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 135:**

Object to the use of irrelevant transcripts and further state that this fact is not material. These transcripts come from depositions unrelated to the events of November 5, 2011, and regardless they do not resolve any legal issues or even present relevant facts. Further,

plaintiff is again selectively quoting transcripts to misrepresent testimony. Additionally, Inspector Winski was not 'put in charge' of Occupy Wall Street.

**56.1 ¶ 136:**

The individual who was put in charge of supervising the policing of Occupy Wall Street and training "hundreds of officers" (Ex V Winski Transcript 168:11-14, 168:15-22) in the appropriate applications of laws such as disorderly conduct to individuals engaged in expressive speech activity protected by the First Amendment to the United States Constitution regularly failed to read and review Legal Bureau Bulletins. (Ex V Winski Transcript 65: 13-25, 66:1-25, 67:1-10).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 136:**

Object to the use of irrelevant transcripts and further state that this fact is not material. These transcripts come from depositions unrelated to the events of November 5, 2011, and regardless they do not resolve any legal issues or even present relevant facts. Further note that plaintiff is again selectively quoting transcripts to misrepresent testimony. Further note that Inspector Winski was not 'put in charge' of Occupy Wall Street.

**56.1 ¶ 137:**

Unfortunately, this failure of training permeated throughout the policing of Occupy Wall Street at all levels. As an example Chief Steven Anger believed that only mere inconvenience was required to arrest someone for disorderly conduct. He testified, that if someone has to walk around another, then the second person is "obstructing" the sidewalk and "inconveniencing" people sufficiently to justify the charge of disorderly conduct. (Ex O Anger 30(b)(6) Transcript 200:4-6).

## RESPONSE TO 56.1 STATEMENT OF FACT ¶. 137:

Object, and note that plaintiff's presented argument is both an inaccurate statement of the testimony and law. The disorderly conduct statute expressly penalizes obstructing the sidewalk where it causes inconvenience, annoyance or alarm.

## 56.1 ¶ 138:

NYPD Lieutenant Konstantinidis was assigned to supervise police officers at Zuccotti Park at least a couple days every week during the existence of Occupy Wall Street from September 17— November 15, 2011. (Ex X Konstantinidis Transcript 33:4-15).

## RESPONSE TO 56.1 STATEMENT OF FACT ¶. 138:

Object to the use of irrelevant transcripts and further state that this fact is not material. These transcripts come from depositions unrelated to the events of November 5, 2011, and regardless they do not resolve any legal issues or even present relevant facts.

## 56.1 ¶ 139:

NYPD Lieutenant Konstantinidis had no understanding of the First Amendment or that Occupy Wall Street participants were engaged in expressive speech activity protected by the United States Constitution. (Ex X Konstantinidis Transcript 58:8-18).

## RESPONSE TO 56.1 STATEMENT OF FACT ¶. 139:

Object to the use of irrelevant transcripts and further state that this fact is not material. These transcripts come from depositions unrelated to the events of November 5, 2011, and regardless they do not resolve any legal issues or even present relevant facts.

## 56.1 ¶ 140:

Prior to being assigned as a supervising officer at Occupy Wall Street, Lieutenant Konstantinidis received no training in First Amendment activity and the policing of individuals

involved in these activities, except for some training which he probably received at the police academy twenty years earlier that he did not recall. When he was asked about the training he received relating to the First Amendment and testified, "That was probably back in the Academy. I don't remember...." But he did not recall what if any training he received at the academy. (Ex X Konstantinidis Transcript 57:6-9, 59:22-25.)

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 140:**

Object to the use of irrelevant transcripts and further state that this fact is not material. These transcripts come from depositions unrelated to the events of November 5, 2011, and regardless they do not resolve any legal issues or even present relevant facts. Plaintiff has at most shown that training was received and this officer forgot it.

**56.1 ¶ 141:**

NYPD Lieutenant Konstantinidis was asked what the First Amendment means in his police work, and he answered, "I don't know." (Ex X Konstantinidis Transcript 57:10-12)

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 141:**

Object to the use of irrelevant transcripts and further state that this fact is not material. These transcripts come from depositions unrelated to the events of November 5, 2011, and regardless they do not resolve any legal issues or even present relevant facts.

**56.1 ¶ 142:**

As another example, Detective Pastula, an officer who arrested an individual at an Occupy Wall Street demonstration for disorderly conduct, never received any training in the First Amendment rights of people engaging in demonstrations (Ex Z Pastula Transcript 37:10-13) and did not have a proper understanding of the application of disorderly conduct as it applied to individuals involved in First Amendment expressive speech activity. Detective Pastula testified

that a sidewalk is "obstructed" if you cannot "continue walking at pace as if no-one is in front of you." (Ex Z Pastula Tr. 99:15-100:9).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 142:**

Object to the use of irrelevant transcripts and further state that this fact is not material. These transcripts come from depositions unrelated to the events of November 5, 2011, and regardless they do not resolve any legal issues or even present relevant facts. Plaintiff has demonstrated only that asking different people to describe an obstruction gets different answers.

**56.1 ¶ 143:**

The City of New York and the NYPD failed to properly train its officers in how to police First Amendment activity. (Ex Y Perkins Transcript at 11:2-9) (Ex AA Brehm Transcript 80: 17-25, 81: 1-14) (Ex BB Rinelli Transcript 12:12-25, 13: 1-16).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 143:**

Disputed. Object to the use of irrelevant transcripts and further state that this fact is not material. These transcripts come from depositions unrelated to the events of November 5, 2011, and regardless they do not resolve any legal issues or even present relevant facts. Plaintiff has failed to identify any failure in training.

**56.1 ¶ 144:**

NYPD PO Perkins who was involved with policing Occupy Wall Street on at least one occasion was asked in a deposition about whether he had any training or instruction concerning civilian's constitutional rights of freedom of assembly, or rights to freedom of expression and responded the same to both questions, "No." (Ex Y Perkins Transcript at 11:2-9).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 144:**

Disputed. Object to the use of irrelevant transcripts and further state that this fact is not material. These transcripts come from depositions unrelated to the events of November 5,

2011, and regardless they do not resolve any legal issues or even present relevant facts.  Plaintiff has failed to identify any failure in training, and shown at most that officers may not absorb all of the lessons from the academy.

**56.1 ¶ 145:**

As another example, NYPD Police Officer Brehm was involved in policing of Occupy Wall Street at least on one occasion, and did not have an understanding of policing First Amendment Activity. "I don't  know of a specific training of that, but I don't— I can't recall what specific training... I believe there was some training given to us about the First Amendment ... I think at the Police Academy.. Freedom  of speech and freedom  of lawful assembly ... that we were to respect their First Amendment rights ... (but when asked about what the NYPD were to do to respect those rights)  Not to— I'm not really sure.  They would— what they would instruct us." (Ex AA Brehm Transcript 80:17-25, 81:1-14).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 145:**

Disputed.  Object to the use of irrelevant transcripts and further state that this fact is not material.  These transcripts come from depositions unrelated to the events of November 5, 2011, and regardless they do not resolve any legal issues or even present relevant facts.  Plaintiff has failed to identify any failure in training, and shown at most that this officer struggled to describe the First Amendment training he did receive.

**56.1 ¶ 146:**

As another example, NYPD PO Rinelli testified that he learned at the academy about what protesters would look like ("basically a group of people arguing about something or trying to state what they want changed") and when questioned about how the First Amendment relates to policing public protests, he stated "yes ... basically just freedom of speech, you know, say what you want." (Ex BB Rinelli Transcript 12:12-25, 13:1-16).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 146:**

Disputed. Object to the use of irrelevant transcripts and further state that this fact is not material. These transcripts come from depositions unrelated to the events of November 5, 2011, and regardless they do not resolve any legal issues or even present relevant facts. Here plaintiff is apparently just criticizing an officer for recognizing freedom of speech but not giving it an artful description.

**56.1 ¶ 147:**

As a result of the failure of the City of New York to properly supervise and train officers in the policing of individuals involved in First Amendment activity, more than 80 lawsuits, involving hundreds of individual plaintiffs, have been filed in the Southern District of New York arising from expressive speech activity associated with Occupy Wall Street. (Ex WW).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 147:**

Admit that numerous lawsuits have been filed, but note that they represent an incredibly small fraction of arrests from the Occupy Wall Street Movement, indicating that they were proper and justified. Further note that of the lawsuits filed, no case has resulted in a judgment against any officer and a number of cases have been completely dismissed as meritless.

**56.1 ¶ 148:**

The City of New York and the NYPD allow for the blocking of sidewalks when it involves commercial activity such as the Super Bowl Boulevard, the twenty year anniversary of Friends, a bakery shop with a permanent ice cream stand on the sidewalk, Chinatown stalls of fish. (Ex CC. DD (i-v)).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 148:**

Admit that various permitted events and activities that cause lines to form take place in the City of New York. Deny that this is a material fact.

**56.1 ¶ 149:**

On Sunday January 26 to February 2, 2014, the NYPD closed Broadway On from 34th Street to 4ih Street and temporarily renamed it Super Bowl Boulevard. (Ex EE).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 149:**

Admit that a Superbowl promotion took place. Further note that this fact is not material.

**56.1 ¶ 150:**

Hundreds of thousands of people walked around Super Bowl Boulevard during the week January 26 to February 2, 2014. (Ex CC, FF (i-ii)).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 150:**

Admit that a Superbowl promotion took place. Further note that this fact is not material.

**56.1 ¶ 151:**

In addition to the hundreds of thousands of people that walked along Super Bowl Boulevard, media corporations such as Fox and ESPN were broadcasting from Super Bowl Boulevard. (Ex GG).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 151:**

Admit that a Superbowl promotion took place. Further note that this fact is not material.

**56.1 ¶ 152:**

In addition to media corporations such as Fox and ESPN, other large corporations were given public space on Super Bowl Boulevard to display advertising and engage the public with interactive marketing tools. Along Super Bowl Boulevard this included the NFL Rush Zone and Microsoft on 36th to 37th Street, Pepsi/Frito and Papa Johns on 37th to 38th Street, Bridgestone and CNN on 38th to 39th Street, an Autograph and concert stage on 39th to 40th Street, a Toboggan Run on 40th to 41st Street (Ex HH Toboggan Run), NFL Network and MARS Product Display on 41st to 42nd Street, SAP (Software and Solutions Co.) and General Motors on 42nd to 43rd Street and more (including Good Morning America set in the morning on 44th to 45th Street). (Ex GG).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 152:**

Admit that a Superbowl promotion took place. Further note that this fact is not material.

**56.1 ¶ 153:**

The NYPD worked with the Times Square Alliance to ensure the safety of all individuals and corporate participants in the Superbowl Boulevard. (Ex II).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 153:**

Admit that the NYPD values and protects safety.

**56.1 ¶ 154:**

Super Bowl Boulevard impacted the local businesses in a negative manner. (Ex JJ).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 154:**

Admit that a Superbowl promotion took place, deny any clear picture can be drawn about its overall financial impact. Further note that this fact is not material.

**56.1 ¶ 155:**

The NYPD expected between 400,000 and 450,000 people to come to Super Bowl Boulevard. (Ex FF (i-ii)).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 155:**

Admit that a Superbowl promotion took place. Further note that this fact is not material.

**56.1 ¶ 156:**

The City of New York and the NYPD favor commercial use of the stairs, sidewalks and building of the New York State Supreme Courthouse at 60 Centre Street on a regular basis and have sold access to use these areas for commercial purposes for decades. (Exs KK (i-iii), LL, MM, NN).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 156:**

Disputed. This paragraph is argument which is improper for a 56.1 statement. Admit that activities and special events are allowed and sometimes require permits.

**56.1 ¶ 157:**

Since at least 2012, Vanity Fair has sponsored the opening party of the Tribeca Film Festival at the New York State Supreme Courthouse at 60 Centre Street. (Ex KK (i)).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 157:**

Admit that activities and special events are allowed and may require permits. Further note that this fact is not material.

**56.1 ¶ 158:**

As part of this event, this corporate entity is allowed to utilize the stairs and sidewalk in front of the courthouse for advertising and a red carpet. (Ex KK (ii)).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 158:**

Admit that activities and special events are allowed and may require permits. Further note that this fact is not material.

**56.1 ¶ 159:**

As part of this private use of the New York State Supreme Courthouse, Vanity Fair is allowed to paint the logo of the Tribeca Film Festival into the sidewalk in front of the courthouse. (Ex KK (iii)).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 159:**

Admit that activities and special events are allowed and sometimes require permits. Further note that this fact is not material.

**56.1 ¶ 160:**

In 2014, Mayor Bill DeBlasio attended this private event at the courthouse. (Ex LL).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 160:**

Admit that the Mayor can attend private events. Further note that this fact is not material.

**56.1 ¶ 161:**

The stairs of the New York Supreme Court have also been utilized in more episodes of Law & Order than even a fan blog devoted to the show could muster to guess, "I wonder over the years how many times Jack McCoy (Sam Waterston) and his various ADAs have traipsed up and down those stairs, those stairs, not to mention the occasion fictional defense attorney or criminal."

http://allthingslawandorder.blogspot.com/2007/12/law-order-locations-new-york-county.html (Ex MM.)

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 161:**

Admit that special events are allowed and sometimes require permits.  Further note that this fact is not material.

**56.1 ¶ 162:**

The stairs of the New York Supreme Court, as well as the building, have been used for films such as Wall Street, The Bounty Hunter, What Happens in Vegas, It Could Happen to You, Greencard, True Believer, and dozens of other movies.  (Ex NN). http://www.onthesetofnewyork.com/mostpopularsupremecourtbuilding.html

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 162:**

Admit that special events are allowed and sometimes require permits.  Further note that this fact is not material.

**56.1 ¶ 163:**

Every day in New York City, commercial enterprise are given more leeway to block sidewalks than those involved in expressive speech activity, as an example in 2014 on the 20th Anniversary of the television show Friends, an imitation Central Perk Coffee Shop opened in Soho.  (Ex DD 1-ii).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 163:**

Dispute and state that this argument is inappropriate for a 56.1 statement.  Further note that this fact is not material.

**56.1 ¶ 164:**

The 'disney length' lines wrapped around three blocks, including the very narrow sidewalk on the west side of Centre Street between Broome and Kenmare (Ex DD (iv)).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 164:**

Admit that special events are allowed and sometimes require permits. Further note that this fact is not material. Further note that as the Second Circuit has recognized in *inter alia*, Marcavage v. City of New York, 689 F.3d 98 (2d Cir. 2012), different events raise different safety concerns.

**56.1 ¶ 165:**

The NYPD did not shut down this commercial event that blocked pedestrian traffic for more than a week during work hours. (Ex DD (i, ii, iv)).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 165:**

See response to ¶ 164.

**56.1 ¶ 166:**

As another example of the NYPD favoring commercial enterprise over expressive speech activity, is the Ferrara Bakery on Grand Street that has had an ice cream stand out front of its commercial space that sits on half the sidewalk. (Ex DD (iii))[1].

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 166:**

See response to ¶ 163-165.

**56.1 ¶ 167:**

As an another example of the NYPD favoring commercial enterprise over expressive speech activity, the streets of Chinatown, Mott Street and Elizabeth have commercial fish markets that come out onto the sidewalk and also set up buckets and other items on the curbside of the sidewalk leaving almost no room for pedestrians to walk every weekday of the year without interference or arrest by the NYPD. (Ex DD (v)). no room for

---

[1] Counsel does not seek to add Ferrara in this matter in any way nor criticize this bakery, which is a NYC institution, in any fashion.

pedestrians to walk every weekday of the year without interference or arrest by the NYPD. (Ex DD (v)).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 167:**

      See response to ¶ 163-165.

**56.1 ¶ 168:**

      The New York State Supreme Courthouse, New York County at 60 Centre Street is located in a location that is zoned as commercial.  (Ex OO).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 168:**

      Admit that plaintiff's map appears to show it as commercial, and further note that all area courthouses and government buildings at the local, state and federal level, are commercially zoned on that map.

**56.1 ¶ 169:**

      On any given weekday, there are many buildings in and around this area operating as businesses and governmental offices. (Ex QQ).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 169:**

      Admit.

**56.1 ¶ 170:**

      The area around Foley Square and 60 Centre Street has more than three times the distance from building line to building line, heading east to west than the same comparison in and around Seventh Avenue by Madison Square Garden.  (Ex QQ).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 170:**

      Dispute that that fact is shown or accurately depicted in Ex. QQ.  Further note that fact is not material.

**56.1 ¶ 171:**

On a Saturday, this area becomes an empty desolate canyon with virtually no commerce and no residential aspect. (Ex PP).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 171:**

Dispute, and further state that plaintiff's argument presented as a fact lacks support. Further state that this statement is not material.

**56.1 ¶ 172:**

The only pedestrians that would be inconvenienced by being unable to use the east side of Centre Street between Worth and Pearl Street would be pedestrians seeking to access Pearl Street from the North. (Ex QQ). Any pedestrians seeking to proceed further South on the east side of Centre Street could just as easily walk on the west side of Centre Street or continue on Worth and cut through Cardinal Hayes Place to the pedestrian entrance to the Brooklyn Bridge and all points south.

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 172:**

Dispute, and further state that plaintiff's argument presented as a fact lacks support, is contradicted by the video evidence, and speculates on the route and intent of every pedestrian in lower Manhattan. Further state that the potential alternate routes are not material.

**56.1 ¶ 173:**

Any pedestrian that sought to access Pearl Street from the north had multiple options that would allow them to access Pearl Street if for any reason, the east side of Centre Street was blocked. Each of these options would add at most one to two minutes of travel time to their trip. (Ex QQ).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 173:**

Dispute, see ¶ 172.

**56.1 ¶ 174:**

Any pedestrian that was blocked from walking south on Centre Street from Worth Street to Pearl Street (l) can walk on the east side of Centre Street and turn left on Pearl Street (time), the west side of Centre Street and cross Centre Street at Pearl Street and continue on Pearl Street (time), walk south on Lafayette Street and turn left on Duane Street and then cross to Pearl Street (time), walk through Foley Square and turn onto Pearl Street (time) or walk through Foley Square to Duane Street and then cross Centre and navigate to Pearl Street (time) or walk east on Worth Street and turn right at the back entrance to the Daniel Patrick Moynihan Courthouse and walk towards Cardinal Hayes Place at the front entrance of the Federal Courthouse. (Ex QQ).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 174:**

Dispute, see ¶ 172.

**56.1 ¶ 175:**

As of June 18, 2012, over 2,500 participants in Occupy Wall Street activities had been arrested in Manhattan alone. (Ex RR).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 175:**

Admit that the article indicates over 2,500 arrests, and further note that it was written over seven months after the events at issue in this case and is not material.

**56.1 ¶ 176:**

The District Attorney of New York, New York County, kept statistical analysis of the number of arrests, location and charges of those arrested involved in Occupy Wall Street protests. (Ex SS).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 176:**

Dispute and state that this argument is inappropriate for a 56.1 statement. Further note that this fact is not material.

**56.1 ¶ 177:**

As of July 17, 2015, more than 80 lawsuits, involving many hundreds of claimants, have been filed in the Southern District of New York arising out of constitutional violations at Occupy Wall Street activities. (Ex WW).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 177:**

See response to ¶ 147.

**56.1 ¶ 178:**

The NYPD does not believe that there is any reason to review the dispositions of their arrests, even when it involves Constitutionally protected activity. (Ex SS Czark 30(b)(6) witness Transcript 114:16-25, 115:1-3).

**RESPONSE TO 56.1 STATEMENT OF FACT ¶. 178:**

Object to the use of irrelevant transcripts and further state that this fact is not material. These transcripts come from depositions unrelated to the events of

November 5, 2011, and regardless they do not resolve any legal issues or even present relevant facts.

Dated:     New York, New York
           August   28, 2015

                           ZACHARY W. CARTER
                           Corporation Counsel of the
                            City of New York
                           *Attorney for Defendants*
                           100 Church Street, Room 3-168
                           New York, New York 10007
                           (212) 356-2373


                    By:    /s/_____
                           ANDREW J. LUCAS
                           *Assistant Corporation Counsel*


TO:    DAVID A. THOMPSON [DT 3991]
       Stecklow & Thompson
       *Attorneys for Plaintiff*
       217 Centre Street, 6th Floor
       Phone: (212) 566-8000
       Fax:    (212) 202-4952
       dave@sctlaw.nyc